UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
Nurah Abdulhaqq, Maeve Aickin, Nazira Attala,
Emily Carlisle, Sana Cheema,
Suzanne Gardinier, Vega Barrada Gullette,
Riziki Mbugua, Liam Sharif Montague,
Lincoln Richardson, Nora Tucker-Kellogg,

                         Plaintiffs,                          Number:

        -against-

SARAH LAWRENCE COLLEGE,                       COMPLAINT
THE HOUSE COMMITTEE ON
EDUCATION AND THE WORKFORCE,
and TIM WALBERG,

                         Defendants.
-------------------------------------------------------------------

Plaintiffs, by their attorney Jonathan Wallace, for their complaint herein, state as follows.

## INTRODUCTION

1. Advancing a new McCarthyism, defendant House Committee on Education and the Workforce (the "Committee") has assumed the role of jawboning and bullying the nation's universities, seeking the suppression of disfavored speech and the elimination of diversity, using as cover the excuse that it is investigating and deterring antisemitism on campus.[1]

2. In the new McCarthyism, vague and usually false accusations of "antisemitism" have been substituted for the old House Unamerican Activities Committee's ("HUAC") focus on purported "Communism."

3. However, the Committee utilizes a broad, facially unconstitutional definition of antisemitism, which includes almost all criticism of the Israeli nation-state, opposition to the political ideology, Zionism, and, in fact, any expressed support for the Palestinian people.

4. The overbreadth of this definition of antisemitism is established by the fact that Jewish people

---

[1] This is the fourth pending federal action against a university regarding compliance with a letter from the Committee; *Fakhreddine v. U Penn* 2:24-cv-01034 *(*EDPA*)*, *Khalil v. Columbia*, 1:25-cv-02079 (SDNY)*, and Bedi v. Committee* 1:25-cv-03837  (ND Il.). All actions but *Fakhreddine* also name the Committee.

who criticize the Israeli state and Zionism are tarred as antisemites like anyone else.

5.  The Committee's antisemitism "investigation" serves no valid legislative purpose, but is driven by a goal of "exposure for exposure's sake."

6.  The Committee has conducted no neutral, fair or careful investigation, but in its very first contact with universities, indignantly and falsely accuses them of fostering an antisemitic environment, citing as "facts" often wild and baseless assertions, and always hearsay, which the Committee gleans from doxing sites, and from ideological and often malicious individuals and organizations with a declared purpose of suppressing pro-Palestine expression, diversity, and in fact any indication of "wokeness" on campuses.

7.  Sarah Lawrence College (the "College") is a private liberal arts college located in Westchester, New York, which has been one of the Committee targets.

8.  The Committee has sent two letters (the "Letters") to the president and the chairperson of the Board of Trustees of the College, demanding the voluntary production of confidential documents pertaining to students, faculty, and staff of the College, whom the Committee indignantly accuses of antisemitism.

9.  Disclosure of student disciplinary records by the College to the Committee violates students' rights under FERPA.

10. On information and belief, the College has already produced documents responsive to the first Committee Letter, and is responding to the second.

11. In seeking confidential student, faculty, and staff records, the Committee is actively violating its targets' First Amendment rights, and rights of privacy and due process, jawboning and seeking to retaliate against their speech, and to interfere with their freedom of association.

12. The Committee is also violating the Establishment Clause, in that it is privileging the beliefs of a minority of Jewish people who claim that Zionism is fundamental to their religion over all other beliefs.

13.  The Committee, which invokes Title VI as the basis for its antisemitism inquisition, has weaponized federal anti-discrimination law to conduct an egregious campaign of discrimination against Palestinian students, faculty, staff and their supporters.

14.  Sadly, the College, which has expressed pride in its courage during the original McCarthy era, has made itself complicit in the new McCarthyism.

15.  The Committee has to date issued no subpoena or compulsory legal process, and the College's voluntary compliance with the Letters has rendered it an active participant and co-conspirator in the Committee's violation of its targets' First Amendment rights and rights under Title VI.

16.  The College is also breaching its own contracts with its students, faculty and staff, based on specific promises as to free speech, academic freedom, and privacy made in its communications to them, including the Student and Faculty Handbooks, the Freedom of Expression and Mutual Respect promised employees under Policies and Procedures, and also its implied obligation of good faith and fair dealing. The College's Principles for Mutual Respect state, "We foster honest inquiry, free speech and open discourse," and "We embrace our diversity in all its dimensions." Plaintiffs have found this not to be true when it comes to criticism of the state of Israel and advocacy around the Israeli genocide in Palestine. "We endeavor to inflict no harm on one another, in word or deed," state the Principles; yet Plaintiffs have faced retaliatory measures from the College that have caused harm, in response to pro-Palestine protest, and exposed Plaintiffs to possible future harm in their failure to keep this pledge to the whole College community. The Student Handbook states, "At Sarah Lawrence College, freedom of expression is a core value that fosters an environment of open dialogue and intellectual growth." Plaintiffs have found that restrictions and disciplinary actions have resulted when the exercise of this freedom involves criticism of the state of Israel and advocacy around the Israeli genocide in Palestine.

17.

## THE PARTIES

18. Plaintiffs Nurah Abdulhaqq, Maeve Aickin, Nazira Attala, Emily Carlisle, Sana Cheema, Vega Barrada Gullette, Riziki Mbugua, Liam Sharif Montague, Lincoln Richardson, and Nora Tucker-Kellogg are current or recently graduated students at the College.

19. Plaintiff Suzanne Gardinier is a tenured faculty member at the College.

20. Sarah Lawrence College is a private university chartered under the laws of New York State.

## JURISDICTION AND VENUE

21. This Court has federal subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

22. Venue is proper in this district under 28 U.S.C. § 1391 because "a substantial part of the events giving rise to Plaintiffs' claims occurred" within this judicial district.

## THE FACTS

23. The Committee sent the two Letters to the President and Chairperson of the Board of Trustees of the College.

24. The first Letter, dated March 27, 2025, falsely accused (and pre-judged) the College of "encouraging antisemitic conduct," showing "permissiveness toward antisemitism," and allowing "hate towards Jews on this campus."

25. This Letter then asked for four categories of documents, including those pertaining to 1. "disciplinary action taken against students or faculty involved in" certain campus demonstrations, including an encampment; 2. "the agreement reached between SLC and encampment participants which resulted in the encampment disbanding"; 3. "the selection of [Students for Justice in Palestine] for a 'Group Excellence Award'"; 4. "[a] list of all student disciplinary or conduct cases relating to alleged antisemitic incidents," including detailed

information about sanctions, the reviewing body, and the current standing of the student.

26.  The Committee's overbroad, unconstitutional definition of antisemitism is clearly stated in a footnote: "The term antisemitic incidents should be understood to include any incidents involving the targeting of Jews, Judaism, Israel, Israelis, Zionism, and/or Zionists, or incidents otherwise identified as antisemitic."

27.  The Committee's actual purpose of shutting down pro-Palestine expression and expelling actual Palestinian people and their supporters from the American polity is not concealed but is evident in their public communications. To cite just two examples: at the Committee's April 17, 2024 hearing, in which it interrogated Columbia President Minouche Shafik, who is Egyptian, Muslim, and a person of color, Committee member Rick Allen of Georgia asked the witness this highly rhetorical question: "[A]re you familiar with Genesis 12:3?...It was a covenant that God made with Abraham and that covenant was real clear. If you bless Israel, I will bless you. If you curse Israel, I will curse you....Do you want Columbia University to be cursed by [the] God of the Bible?"

28.  Chairman Walberg said publicly at a March 2024 town hall meeting in Dundee, Michigan, in reference to Gaza, "We shouldn't be spending a dime on humanitarian aid. It should be like Nagasaki and Hiroshima. Get it over quick."

29.  The College met with faculty, staff, and students to discuss the Letter.

30.  Affected faculty and students, including the Plaintiffs in this action, asked the College not to comply with the letter, citing academic freedom and the First Amendment.

31.  When reminded about the College's alleged courage defending its community during the McCarthy era, College administrators made vague promises that they would not harm any members of the College community.

32.  Soon after, they stated they had hired "outside legal counsel," "experienced with Congress." They declined to say who it was, and ceased all further communication about responses to the

Letter, refusing to answer any more questions about their compliance with the Committee.

33. On information and belief, the College has produced documents to the Committee pertaining to the Plaintiffs, as College students and faculty involved in pro-Palestine activism, some of whom have been investigated by the College or been the subject of student conduct proceedings.

34. The second Letter, dated June 11, 2025, falsely alleged that pro-Palestine demonstrators "repeatedly fomented and engaged in antisemitic harassment," causing Jewish students to "walk around campus fearing that they will be physically assaulted or otherwise attacked."

35. This letter falsely names plaintiff Suzanne Gardinier as an antisemite.

36. The second Letter also asks for four categories of documents, pertaining to 1. "reports or complaints of antisemitic acts or incidents received by Sarah Lawrence from January 1, 2022, through the date of your response"; 2. "antisemitism; harassment or crimes against Jewish students; violence against Jews, Israelis, or Zionists; or the violent destruction of a Jewish state." This section asks for documents in six subcategories, including those related to Students for Justice in Palestine;  "cancellation of classes by faculty or the modification of course materials in support of the Westlands occupation or encampment"; "Social media posts by Sarah Lawrence faculty on platforms celebrating violence against Jews, Israelis, or Zionists, including posts that applaud the October 7th attack"; and "Coordinated efforts to pressure students not to register for classes taught by Jewish professors."

37. These letters are extraordinary documents in that the Committee does not even make a pretense of having conducted any kind of neutral or careful investigation, but attributes its fact assertions to hearsay uttered by adversaries of pro-Palestine expression, "woke" culture and the university in general on social media and in highly partisan reports.

38. The Committee is unlikely to tolerate any arrangement under which the College produces documents while seeking to protect the identity of students, as is evidenced by the instruction given in the Letters: "When producing documents, do not alter them in any way, including but

not limited to, the application of redactions" and an angry letter the Committee sent Harvard on February 7, 2024, referring to its " inappropriate and inexplicable redactions."

39.  The Committee's intention, which is congruent with that of the presidential administration, is to cleanse the College and the academic world in general both of pro-Palestine expression and criticism of Israel, and also of Palestinian students and their supporters, simultaneously a violation of the First Amendment, the Equal Protection clause, and Title VI.

*The College  Is Not An Antisemitic Environment*

40.  There are many Jewish members of the College community who do not believe it is an antisemitic environment.

41.  Those who claim it is, including the Committee, are using a controversial, overbroad and unconstitutional definition of antisemitism, which conflates anti-Zionism, and in fact any criticism of Israel or support of the Palestinian people, with antisemitism.

42.  The Committee's Letters clearly spell out that this is the definition of antisemitism being used by the Committee, which has also made this clear in other statements, reports and press releases.

43.  Many American Jews, including members of the College community, are horrified by Israeli violence, and regard themselves as anti-Zionist and as supporters of the Palestinian people.

44.  In order to claim to carry out its project, the Committee must inevitably proclaim that half or more of the American Jewish population are themselves antisemites--an absurdity.

45.  This harassment of American Jews who do not fit a preconceived mold is itself a form of antisemitism.

46.  Many of the people accusing the College of antisemitism are not themselves Jewish.

47.  Jewish and non-Jewish faculty, staff and students at the College have noted that what have been alleged to be instances of antisemitism at the College involve antipathy toward or criticism of Israel, not bias against Jewish people.

48.  Most members of the Republican majority on the Committee are not Jewish, including defendant Walberg.

49.  On information and belief, the Committee is using the excuse of purporting to detect antisemitism (even among Jewish people) as an excuse to transform the College and other universities into a right-wing model, without diversity and without pedagogy critical of the United States or Israel or perceived as "leftist" or "woke."

50.  Members of the Committee have, during hearings, in virtually the same breath in which they condemned antisemitism, also attacked DEI and claimed the universities lack conservative voices.


*The First Amendment is Being Violated*

51.  The Plaintiffs have come to expect hatred, threats and punishment for mentioning Gaza or Israel on campus or in their own private social media.

52.  The College is cooperating with the Committee in retaliating against such First Amendment protected expressions.

53.  The Committee and the Trump Administration have worked hard to create a hostile environment, in the nation as at the College, in which anyone expressing criticism of Israel or support of Palestine is execrated as an antisemite and supporter of terrorism.

54.  The College itself has unwisely made statements about Plaintiffs which contributed to "exposure for the sake of exposure."

55.  Plaintiffs have received death and rape threats and hate speech, including to their private email addresses, cell phones and social media, which are generated and validated by the Committee's project.

56.  Their freedom of association has been infringed, because it is no longer safe for them to associate and share ideas and companionship with each other on or off campus or online, without

becoming the targets of hostile attention.

57. The College's Campus Safety department has become involved, harassing and surveilling Plaintiffs and contributing to a sense of unsafety on campus.

58. Plaintiffs believe that the views of people who support Israeli aggression, including the bombing of civilian populations, hospitals and universities, and who defend the genocide being committed in Gaza, are being privileged over all other views on campus.

59. The Committee's mission (as revealed in the very language of the Letters quoted above) is to eliminate all pro-Palestine expression and criticism of Israel from the College.

*The Committee's Project Also Violates Title VI*

60. Viewpoint discrimination infringing the First Amendment may sometimes be closely allied with discrimination which violates Title VI.

61. Where for example members of a protected class are associated with a particular viewpoint of which their university disapproves, they may receive more severe sanctions or retaliation than non-members.

62. Similarly, it may be an act of racism or discrimination automatically to assign certain opinions or viewpoints to members of a protected class.

63. Plaintiffs are on the receiving end of both types of Title VI discrimination.

64. As Palestinian, Arab and Muslim students and their supporters, they are more severely punished than others similarly situated, for equivalent alleged violations of student code.

65. As Palestinian, Arab and Muslim students and supporters, they are also viewed in a biased way as being dangerous, violent and prone to antisemitism and supporters of terrorism.

66. The Committee project is a bigoted one, seeking to eliminate all Palestinian, Arab and Muslim students, and anyone supporting and associating with them, from the College and from the academic world generally.

67.  The College has rendered itself complicit in the Committee's project, by turning over

confidential files, and by giving in to the pressure to harass, surveil, jawbone and sanction

students, staff, and faculty, including Plaintiffs.

68.  The College is privileging another putative protected class, Jews who assert that Zionism is an

aspect of their religion, over everyone else, including Jewish people who oppose the actions of

Israel and the Zionist political philosophy.


*The College is Complicit in the Committee's Project*

69.  The College, like apparently all other universities named or contacted by the Committee, is

intimidated by the Commitee's attention.

70.  As this administration has demonstrated through its actions in recent months, the government

has used similarly false assertions of antisemitism to cancel federal grants and contracts to

universities, revoke their ability to accept international students, and even to threaten to remove

their accreditation.

71.  A false accusation that the College tolerates a hostile antisemitic environment may also result in

fewer students accepting offers to attend, and in donors canceling projects or withholding funds.

72.  Receiving a letter from the Committee is inherently coercive.

73.  The College had other choices: citing academic freedom, freedom of speech and Title VI, or the

College Principles of Mutual Respect to refuse voluntary compliance pending a subpoena, or of

course to sue the Committee itself.

74.  Instead, the College has chosen to comply with the Committee's requests, disclosing

confidential student and faculty files, and possibly staff files as well, harassing, jawboning and

surveilling members of its community, and investigating and sanctioning students for their pro-

Palestine expression and criticism of Israel.

75.  The fact that the College is being bullied, threatened and pressured by the Committee does not

create a defense to Plaintiff's causes of action or let the College off the hook for its violations of

Plaintiffs' rights as members of the College community.

*Plaintiffs Sue the Defendants Jointly and Severally*

76.  Plaintiffs sue both the College and Committee on all causes of action for their conspiracy,

cooperation, and joint action in harming the Plaintiffs.

77.  Plaintiffs assert in the alternative that due to the Committee's coercive action against the

College, backed by the government's threats, the College has renounced its integrity as a separate

non-compliant institution to the point of functioning as a state actor itself.

78.  In other words, there has been a meeting of purposes between the College and the Committee to

engage in conduct to deprive Plaintiffs of constitutional rights.

79.  Each of the College and the Committee has aided and worked in concert with the other to

violate the Plaintiffs' rights; for this reason, the College is named as a co-defendant on the First

Amendment claim.

80.  Plaintiffs assert that the Committee is acting with no valid legislative purpose and therefore

cannot assert the protection of the Speech and Debate clause, and is therefore subject to

jurisdiction and suit in this Court.

81.  In the alternative, if the Committee is entitled to immunity, Plaintiffs assert a cause of action

against the College alone, as set forth in the *AT&T, Mazar* and *RNC* cases.

82.  Also, the Plaintiffs' breach of contract and of privacy laws claims lie against the College

independently of the Committee's presence in or absence from the case.

83.  Considering the voluntary nature of the compliance (the College has not yet been subpoenaed),

Plaintiffs' claims would lie against the College regardless of whether it proposed to disclose their

confidential records to the *New York Post,* Canary Mission or the Anti-Defamation League rather

than the Committee.

84. The Committee is not a necessary party to these claims.

85. The Court may also note that the Committee has a right to intervene in actions it considers to affect it and historically has done so on a number of occasions, including when subpoenas to third parties were being challenged.

86. For the reasons given, Plaintiffs have asserted claims against the Committee and the College jointly, and against each of them severally.

*Plaintiffs Have Been Actually Harmed by Past Disclosures and Reasonably Expect Future Harm from Future Disclosures*

**Nurah Abdulhaqq**

87. Plaintiff Nurah Abdulhaqq is a recent graduate of Sarah Lawrence College who was heavily involved in pro-Palestine organizing on campus. She was one of the lead negotiators for the November 2024 student occupation and encampments, as well as a representative on the Student Senate. As one of the few women on campus to observe wearing the hijab, and the president of the Muslim Students Association, Abdulhaqq is one of the most easily identifiable students involved. Her fears of reprisal are justifiable. In October of 2023, Abdulhaqq was standing in the campus center when a student labeled her a member of "Hamas" for wearing a Jordanian shemagh.

88. Nurah has an avid online presence, as she documented student activity over the past year in relation to pro-Palestine organizing. She has also been published in various venues, and has been photographed at various actions over the past year. Her presence makes her not only an easy target but an identifiable one. Due to her years-long relationships with College staff and administration and continued email correspondence with them, she is concerned about exposure of her private correspondence leading to doxing, harassment, and other forms of harm for those looking to target Brown, Arab and Muslim students.

89.  After observing her friends and peers at similar institutions endure doxing and harassment, Nurah Abdulhaqq reasonably fears irreparable harm if the College were to disclose her private correspondence with College officials.

**Maeve Aickin**

90.  Plaintiff Maeve Aickin is a former organizer with Students for Justice in Palestine (SJP) at Sarah Lawrence College. She acted as a negotiator during the November 2024 encampment on the College's South Lawn and participated in digital correspondence with administrative officials as they pursued the encampment's termination. She has been threatened with violence and called a terrorist for wearing a keffiyeh and attending educational events related to Palestinian history, and she reasonably fears that the disclosure of her private student records will encourage bad-faith actors to escalate their threats to her safety.

91.  After the Congressional Committee on Education and the Workforce demanded that the College disclose FERPA-protected documents that relate to her involvement in the encampment, Maeve made her First Amendment-protected online expression private. She did so because she had witnessed peers in analagous SJP leadership positions across the country face violent harassment at the hands of private actors bolstered by the McCarthyist ideological project that the Committee is undertaking. Maeve is particularly concerned by Immigration and Customs Enforcement (ICE) agent Peter Hatch's court testimony[2] that agents from ICE and the Department of Homeland Security (DHS), with whom the Sarah Lawrence Campus Safety force has trained,[3] utilize the private doxing website known as Canary Mission to identify and target students for deportation.[4] If the College were to release identifying information about Maeve and her peers, many of whom are Jewish themselves, linking them to the peaceful anti-war actions

---

2    AAUP v. Rubio, 1 44 (2025).
3    https://www.instagram.com/p/DGRa7rNOkNR/?hl=en
4

for which Canary Mission calumniates students, it would set a dangerous precedent for the cooperation of higher education institutions with militarized agencies like ICE and DHS. In targeting immigrants for expressing principled political beliefs founded on global citizenship and the desire for universal access to safety and and essential resources, ICE and DHS are operating in diametrical opposition to the values that educational institutions like Sarah Lawrence claim to promote. Furthermore, as she enters the workforce, Maeve reasonably fears that the College's disclosure of her involvement in pro-Palestine organizing would invite private doxing organizations to misconstrue her anti-war beliefs and, in so doing, restrict her employment opportunities while exposing her to harassment, rape threats, and death threats.

92.  Maeve is additionally concerned by the Committee's request to review documents related to "coordinated efforts to pressure students not to register for classes taught by Jewish professors,"[5] as the incident to which the Committee appears to refer was a First Amendment-protected protest of a faculty member's speech. In fall 2024, a group of autonomous students encouraged their peers to peacefully disengage from a professor who had written several blog posts and articles in nationally distributed publications that both denounced students for exercising their free speech rights and celebrated university presidents who called law enforcement officers onto their campuses to violently remove student protestors, most of whom were either Arab, Muslim, or allies to these communities. The autonomous students took further issue with the professor's calls to dismantle Diversity, Equity, and Inclusion (DEI) programs in the interest of disabusing women of the notion that they experience gender-based discrimination. The students reasoned that these opinions were incompatible with Title IX of the Education Amendment of 1972 and Title VI of the Civil Rights Act of 1964. Maeve compiled direct quotations from the professor's published articles in which he celebrated the use of police to arrest student protestors, questioned the existence of gender-based discrimination, and opposed DEI programs, and she disseminated

---

5   Tim Walberg & Burgess Owens, LETTER TO SARAH LAWRENCE COLLEGE FROM THE COMMITTEE ON EDUCATION AND WORKFORCE (2025).

these excerpts among Sarah Lawrence students. What the Committee describes as a campaign to dissuade students from "register[ing] for classes taught by Jewish professors" was more accurately the distribution of one professor's published writing. Due to the Committee's inaccurate representation of these events, Maeve is reasonably concerned that it will use her private records to inaccurately represent her actions. The professor exercised his First Amendment rights by publishing the articles in question, and Maeve exercised her First Amendment rights by distributing quotations from those articles. The First Amendment does not protect hate speech; but since the speech acts that the Committee is investigating were either direct quotations from or paraphrases of this professor's publications, the Committee appears to be scrutinizing the writing of an individual on whose behalf it purports to advocate.

93.  After observing students at peer institutions who have played similar roles within their respective pro-Palestine organizations face doxing, detention, and be threatened with deportation for advocating against what a United Nations Special Committee and Amnesty International describe as a U.S.-funded genocide, Maeve Aickin reasonably fears irreparable harm if Sarah Lawrence discloses her private correspondence with College officials and her private records to the Committee on Education and the Workforce..


**Nazira Atalla**

94.  Plaintiff Nazira Atalla has been involved in pro-Palestine organizing and activism at the College. She was involved in the the occupation and encampment. Nazira was also involved in negotiations with the College administration before, during and after the encampment. As one of the only Palestinian students at Sarah Lawrence College, Nazira has been continually subject to racist rhetoric and actions from College administrators and Campus Security. If the College administration complies with the demands of the Congressional Committee on Education and Workforce, Nazira would be subject to further racist targeting in the form of online harassment

or doxing. Following the Committee's demand for FERPA-protected information, Nazira has been forced to reduce expressions of her political beliefs online and has avoided peaceful actions for fear of being identified and harassed. Additionally, following the Committee's first letter, Nazira was forced to remove three articles describing her advocacy work from the Sarah Lawrence *Phoenix* newspaper website in order to protect her privacy and avoid online harassment.

95. Student activists at higher education institutions have been the targets of online smear campaigns misconstruing their actions and beliefs, resulting in professional and, educational consequences, as well as detainment and deportation. If the College complies with the Committee's demands by disclosing FERPA-protected information, Nazira reasonably fears irreparable harm if Sarah Lawrence discloses her records and private correspondence with College administrators.

**Emily Kate "Kat" Carlisle**

96. Plaintiff EmilyKat Carlisle is a student activist at Sarah Lawrence College and is associated with the College's Students for Justice in Palestine club. They were not officially involved in the occupation of the Westlands building in late 2024, but they were present in the building during the open hours. Though Emily Kat has not been yet been accused of anything or faced disciplinary charges, the demand by the Committee that the College disclose FERPA-protected documents related to EmilyKat's friends and fellow SJP members has made them worry about their own political speech and actions. Emily Kat reasonably fears that the College's Students for Justice in Palestine club will face harassment in person and online if information surrounding the club or its members is released. Additionally, EmilyKat reasonably fears for the quality of their education should their professors be persecuted for protected political speech.

97. Emily Kat is worried for the future of free speech on campus should the College fail to protect

its students and faculty from political persecution. Emily Kat states: "If the College agrees to release students' disciplinary records once, I know that they will do so again. And since I know that my political beliefs do not align with those of the disciplinary committee, I could very well be the next student whose information is made public. I refuse to allow an administration's personal disagreement with my views to stop me from doing and saying what I think is right, but I fear for the consequences of being an activist in this political climate."

**Sana Cheema**

98.  Plaintiff Sana Cheema is involved in pro-Palestine organizing and activism at the College. She was involved in the occupation of Westlands in November 2024, and in negotiations both during the occupation and during the subsequent encampment. She has faced unfair and targeted College disciplinary processes, and knows her personal records will be at risk if the College complies with the demands made by the Congressional Committee on Education and the Workforce. Under disciplinary processes that other students also underwent for pro-Palestine actions, Sana was one of a few singled out as 'leaders' with no solid proof. She was subject to the use of racist rhetoric and messaging used by the administration to turn faculty and staff against the students. At a primarily white institute like the College, targeting Sana puts her in a higher risk position than that of some of her peers. While Campus Safety and the administration have continued to make racist and/or violent comments about students, Sana fears this rhetoric will have larger consequences than the College admits; though she has not been doxed, she fears that if this continues this outcome is not unlikely. If the school decides to cooperate with the Committee it will put her in harm's way, in public and online, and submit her to further risk beyond the bounds of the College.

99.  Students across the country engaging in free speech on behalf of Palestine have faced violent harassment and threats. Some have had their right to education ripped away, and some have even

been detained. If the school cooperates with this request in violation of her rights, Sana fears she may be among those students with a target on their backs, as has been the case with many brown and Muslim students, and that this will affect more than just her own life if she is doxed. She reasonably fears this will jeopardize her academic and professional future as well as her safety and security, and the lives of others at the College that the administration does not seem to be actively protecting.

**Suzanne Gardinier**

100. Plaintiff Suzanne Gardinier, a tenured professor who's taught at Sarah Lawrence for more than thirty years, holds the Anita Stafford Chair in Service Learning. She teaches a combined poetry class at the Bedford Hills Correctional Facility for Women and has served as the director of the Sarah Lawrence study abroad program in Cuba. In 2010 she was Chair of the College's first Diversity Committee. In 2002 she was part of the first delegation of Faculty for Israeli-Palestinian Peace, and in 2003 served on a panel at the annual American Studies Association meeting called "American Jews, Israel, and the Palestinian Question." She's an award-winning American poet who's published twelve books and a co-founder of the campus chapter of Faculty & Staff for Justice in Palestine.

101. Professor Gardinier's nomination of the campus chapter of Students for Justice in Palestine in the spring of 2024[6] was indirectly targeted in the Committee's first letter; the second letter names her directly, targeting the politics of her social media posts. In both cases, the Committee cites the testimony of a colleague in Political Science, Professor Samuel J Abrams, without any apparent vetting or investigation as to his reliability or credibility.

---

6    "I've seen such admirable Palestinian, Jewish, and allied courage in SJP members, doing their daily work against genocide in Gaza while trying to meet their academic responsibilities at the same time. I feel honored & lucky to be able to work with them on our campus, & can think of no other student leadership I've found more worthy of recognition in my thirty years at the College." Suzanne Gardinier, nomination of campus chapter of Students for Justice in Palestine for Student Leadership Award, Sarah Lawrence College, April 2024

102. Professor Abrams began publicly targeting campus Diversity programs in 2018, through an editorial in the *New York Times*[7] attacking a conference organized by the African-American Director of Diversity and Campus Engagement at Sarah Lawrence. Since then he has made use of the publicity channels provided by the Koch-funded Institute for Humane Studies and the American Enterprise Institute to attack college diversity programs ("Sarah Lawrence Continues to Lean Into Toxic DEI"[8]), politically active women ("The Rise of the Single Woke (and Young, Democratic) Female"[9]), and students, staff, and faculty members protesting the Israeli genocide in Palestine. These attacks have included links to activist students' social media accounts, making them vulnerable to doxing. At no point has Professor Abrams attempted to take part in actual political discussion on campus of antisemitism, anti-Zionism, and the Israeli genocide in Palestine. This leaves open the question of whether he is expressing his genuine views or serving as a mouthpiece for his deep-pocketed benefactors.

103. On April 30, 2024, Professor Abrams published an article directly defaming Professor Gardinier as "known antisemite and professor Suzanne Gardinier,"[10] because of her social media posts and her role as a co-founder of the campus chapter of Faculty & Staff for Justice in Palestine. When Professor Gardinier met with the Provost and the Director of Human Resources on May 23, 2024 to discuss how to respond to this defamation, she was told that there was nothing the College was willing to do. On February 24, 2025, Professor Abrams again defamed Professor Gardinier ion his American Enterprise Institute blog, as "well-known anti-Semitic professor Suzanne Gardinier."[11] The College made no response. On the other hand, the College has been quite active in response to the speech and expression of student and staff Palestine

---

7     "Think Professors Are Liberal? Try School Administrators," https://www.nytimes.com/2018/10/16/opinion/liberal-college-administrators.html

8     https://www.realcleareducation.com/2024/07/24/sarah_lawrence_continues_to_lean_into_toxic_dei_1046902.html

9     https://www.aei.org/articles/the-rise-of-the-single-woke-and-young-democratic-female/

10  https://www.aei.org/society-and-culture/some-truths-about-higher-education/

11  https://www.aei.org/social-cultural-and-constitutional-studies/ant-semitic-faculty-activism-in-on-full-display/

activists. In addition to disciplinary procedures against students for protest, the campus chapter of Faculty & Staff for Justice in Palestine received reports that some administrative supervisors had been contacted by the Provost and informed that any staff activity in support of Palestine had to be "balanced" by activity in support of Israel, so the College could be perceived as supportive of "both sides." This has amounted to a chilling of open campus speech by staff about Palestine.

104.    After the student occupation of Westlands in November 2024, following the College's refusal to commit to divestment from Israeli genocide, the Dean of Students gave both faculty and staff, in two separate meetings, detailed presentations, including videos, photographs, and an extended administrative narrative that student demonstrators were frightening, extremist, dangerous, disrespectful of other members of the community, and departing from campus protest traditions instead of continuing them. Students were then subject to disciplinary hearings before panels chosen by the same administrators who made the charges. Because accused students were not permitted accompaniment, whether by a lawyer or by a trusted professor or advisor, Professor Gardinier was unable to provide direct support to the students she works with. There were no extensive campus presentations on the dangers of allowing wealthy foundations and unchecked state power to influence and undermine the integrity and autonomy of campus communities.

105.    In this case, political expressions on social media seem particularly important to protect, as one of the few places that students, staff, and faculty without the financial support and reach of large vested interests or state power can make their views known. In the immediate aftermath of the Westlands occupation and subsequent encampment, one student wrote: "I found myself drawn to how the narrative around the encampment was forming. [The Dean of Students] and [The President's] emails obviously played a major role in forming the mainstream opinion about the encampment, especially for parents and faculty who were not on campus. If you were just reading their emails, you would think the campers were starving the Westlands residents and

punching Campus Security officers. The importance of SJP and FSJP on social media was in being able to form counter-narratives and demonstrate that the encampment was a nexus for community and solidarity, as opposed to violence and hate. Putting out that narrative is incredibly important, but I am worried that given Instagram's limited reach, that narrative did not reach a majority of the SLC community."

106.   Another student wrote:"The way that SJP used social media was also really interesting--contextualizing what they were doing and leaving no room for misinterpretation. They clearly stated their demands and shared ways for people to participate. It reminded me of a quote from Andy Carvin's case study. *Networked and distributed social media platforms potentially expand the range of actors involved in the construction of the news. Yet studies indicate that the ability of media audiences to participate in the processes of news production within professional publications has been severely circumscribed.[12]  Bruno's study of the coverage of three major news outlets of the 2010 Haiti earthquake suggests an opportunistic model at play, rather than a desire to represent a broad spectrum of voices.'*  Using social media empowered SJP to construct their narrative and express their perspective on what they are doing."

107.   Because of the unchecked defamation from Professor Abrams, based solely on Professor Gardinier's political views and expressions; ; and because of the College's refusal to take a stand consistently respecting and protecting pro-Palestine speech and expression; and because of the Committee's evident disrespect for US higher education in general and neglect of its responsibilities if proceeding with an actual campus climate investigation, ; Professor Gardinier reasonably fears irreparable harm if Sarah Lawrence continues to disclose private College information to the Committee.

---

[12]   Lasorsa et al., 2012; Lewis, 2012; Singer et al., 2011

**Vega Barrada Gullette**

108.  Plaintiff Vega Barrada Gullette is involved in pro-Palestine organizing and activism at Sarah Lawrence College. She was involved in the November 2024 occupation and in negotiation sessions during both the occupation and encampment. Vega Gullette has maintained her activist work despite receiving repeated death threats and harassment on social media and in person. She has been doxed to a lesser degree in the past and has repeatedly been called a "terrorist," as have members of her family. She is deeply concerned by the potential for further unchecked violence, including stalking and physical assault, aimed at herself and her peers if the College is to divulge FERPA-protected records, an act which has caused irreparable harm to students before her.

109.  Based on her regular engagement with College administrators, , Vega Gullette feels substantial concern that threats and violence against pro-Palestine student activists would be exacerbated by the College divulging to the Committee information about its biased handling of pro-Palestine campus protest. She has witnessed the College, a predominantly white institution, routinely fall short of its self-proclaimed ethos of "belonging for all" in its prioritizing of those aligned with whiteness, wealth, and political power. Throughout the 2024-2025 school year, she watched College officials fail to provide adequate support for international students seeking assurance regarding illegal detentions and deportations of students linked to Palestine solidarity activism. She also witnessed repeated instances of racism and Islamophobia by College officials towards Arab and Muslim students.

110.  In the spring of 2025 the College provided lackluster responses to rising fears of ICE kidnappings on college campuses, and ignored international students' requests for additional support. Given that the people abducted, deported, and/or incarcerated have been predominantly racialized people whose outspoken solidarity with the Palestinian people has painted them as "national security threats" in the eyes of the government, Gullette understands the potential ramifications of the College's disclosure to be severe. As an Arab and Muslim student, Vega

Gullette met with College administrators and officials as part of a group responding to several critical incidents regarding student reactions to anti-Palestinian racism: a phenomenon understood to target both the ethnic Arab character of the nation and its predominantly Muslim character. In one such meeting, with a high-level College administrator, the Dean of Students, Gullette was present as part of a group of Arab and/or Muslim students expressing concern about the removal of an Arabic word from a "Free Speech Board," due to complaints that the word was "threatening." During the meeting, the high-level College administrator consistently employed the terms "Arab" and "Muslim" interchangeably, demonstrating a concerning negligence given the administrator's position and responsibilities with regard to student well-being. The administrator then instructed the group to engage in a "mental exercise" which involved "imagining the most offensive thing a person could say to [them]." This "exercise" gave credence to anti-Arab and anti-Palestinian racism, as the administrator was equating "the most offensive thing" the students could imagine being called with another student's racist fear of an Arabic word. Considering the ongoing genocide of Palestinians and the consistent calls for "death to Arabs" and "death to Muslims" made by its perpetrators and supporters, Vega Gullette found the attempted exercise inappropriate, insensitive and disturbing. The students in the room had undergone traumatic experiences from racist or Islamophobic harassment, and many of their families, including Vega Gullette's, continue to suffer from the violence through which consent is manufactured through racist and Islamophobic rhetoric like the kind the administrator was trying to elicit.

111.   Vega was targeted and singled out by the College as a 'leader' of pro-Palestine actions without solid proof. Following the occupation of Westlands, it was brought to Gullette and her peers' attention that this same administrator attempted to influence the staff and faculty appointed to serve on the conduct hearing boards for those alleged to have participated in the occupation. She discovered that this College administrator played a slideshow of images from the occupation at

both faculty and meetings, recounting a narrative of threat and violence. Within the hearings—administered over winter break, with extremely short notice—the accused students were forbiddden to be accompanied, whether by a lawyer, a trusted professor, or a don, the faculty-student advisor role which draws students to the College, here deprived of what's claimed to be its primary function: close collaboration and mentorship. In denigrating, targeting, and isolating pro-Palestine students, the College has set a standard regarding activism that is consistent with that of this government. Vega Gullette does not believe the College is prepared for to meet the task of protecting herself and her peers from further external threats, given its record of unwillingness to protect those advocating for Palestinian liberation within the College. She is seriously concerned that, were the College to disclose information to the Committee, she and her peers would be targets of violence from individual political actors, private doxing groups, and the Trump administration, all of which intersect and are waiting for the chance to sabotage the livelihoods of more young activists, in the name of enabling the US-Israeli genocide of Palestinians.

**Riziki Mbugua**

112.   Plaintiff Riziki Mbugua was involved in pro-Palestine organizing and activism at the College until her graduation in May of 2025. Riziki was involved in the November 21st occupation, the subsequent encampment, and several other subsequent pro-Palestinian organizing events. She faced unfair and targeted disciplinary processes by the College. She knows her records will be at risk if the College complies with the demands of the Congressional Committee on Education and the Workforce. Though Riziki has not yet been doxed or harassed online, since the College and private doxing organizations have yet to make her identity public, she fears the College's potential cooperation with the Congressional Committee on Education and the Workforce will put her in harm's way publicly and submit her to further risk beyond her campus experience.

113.  If Riziki were to be doxed as a result of the College's cooperation, it would put not just her but

her entire family at risk of harassment, deportation, and loss of academic and work opportunities.

Students across the country have faced violent harassment and threats. Some have had their right

to education ripped away, and some have even been detained, for nothing more than standing

firmly against apartheid and genocide, as Riziki has, which the documents requested by the

Congressional committee would make clear. Because of this, Riziki reasonably fears that the

demanded release of her private information will jeopardize her academic and professional

future as well as her safety and security and that of her loved ones. Any cooperation of the

College with the demands of the Congressional Committee on Education and the Workforce will

further contribute to the current presidential administration's violation of her rights to privacy

and academic freedom as a student, and would put all participants in higher education at further

risk of the denial of their constitutional rights.


**Liam Sharif Montague**

114.  Plaintiff Liam Sharif Montague has been actively involved in pro-Palestine organizing at  the

College. He acted as a negotiator between student activists and the College administration during

the November 2024 encampment, and participated in digital correspondence with the College's

administrative officials as they pursued the encampment's termination. He has been in regular

communication with administration officials since March of 2024 regarding pro-Palestine

organizing on campus, including e-mail correspondence and in-person meetings. In December of

2024, he was charged by the College with several conduct violations for involvement in peaceful

pro-Palestine protests in the Westlands administration building and the subsequent encampment

on the South Lawn in support of ethical investment and divestment from support of human rights

violations in Palestine. He was found responsible for all but one of the charges and put on

disciplinary probation for one semester.

115.     In the summer of 2024, he submitted a bias incident report under Title VI, alleging that the two Campus Safety officers who followed him to his off-campus residence after the end of the College's spring 2024 session did so as result of his race, religion, and/or affiliation with a campus pro-Palestine organization. In the spring of 2024, he had to pay an online service to scrub his name from Internet records after he was doxed by the *Jewish News Syndicate* and the *New York Post* for involvement in a pro-Palestine protest in New York City.

116.  Ever since the  Committee demanded that the College disclose FERPA-protected documents that relate to his involvement in the encampment, Sharif has reduced his online expression of his political beliefs and avoided peaceful actions in which he might be identified, out of fear of being doxed and violently harassed. As he enters the workforce, he reasonably fears that the College's disclosure of his involvement in pro-Palestine organizing would invite private doxing organizations to misconstrue his beliefs and, in so doing, severely restrict his employment opportunities. He also worries that his mother, an Arab Muslim immigrant from Egypt, could be targeted following any disclosure of his personal information by the College.

117.  After observing students at peer institutions who have played similar roles within their respective pro-Palestine organizations be doxed, detained, and threatened with deportation, Liam Sharif Montague reasonably fears irreparable harm if Sarah Lawrence discloses his private correspondence with College officials and records of disciplinary proceedings following the 2024 encampment.

**Lincoln Richardson**

118.  Plaintiff Lincoln Richardson is actively involved in pro-Palestine organizing at Sarah Lawrence College. He was involved in the occupation of Westlands and organizing the encampment. He has been subjected to targeted disciplinary hearings by the College for political expression, through a process that did not include measures of support, such as chosen faculty

accompaniment, that are customary at comparable institutions. He has faced harassment and baseless accusations of antisemitism from peers on multiple occasions due to canvassing for support on divestment. He has experienced College administrators threatening disciplinary action for no cause. He witnessed two Campus Safety officers discussing at length their desire to physically assault students during the occupation.

119. Should the College release the identities of students involved in pro-Palestine organizing, these kinds of unjust, discriminatory, and threatening instances of bias are likely to increase. Further, they would risk transforming into state repression, as has been the case with the illegal detention of Columbia student Mahmoud Khalil, or worse, foster a climate of impunity for racist violence against Palestinians, such as that against murdered six-year-old Palestinian-American Wadea Al Fayoume, for whom the occupation of Westlands was named.

**Nora Tucker-Kellogg**

120. Nora Tucker-Kellogg is involved in pro-Palestine organizing at the College, including in the November 2024 occupation of Westlands and the subsequent encampment. In January 2024, NoraTucker-Kellogg was charged by the College with student code of conduct violations for peacefully exercising her right to free speech by participating in the occupation and encampment. NoraTucker-Kellogg has not yet been the target of doxing or harassment, but reasonably fears that she might become the target of such behavior, like many of her peers, if the College chooses to disclose her FERPA-protected records to the House Committee on Education and the Workforce. Nora Tucker-Kellogg worries that the disclosure of such information as requested by the Committee could not only endanger herself, but do irreparable damage to her friends and peers.

## COUNT I

**The Committee's demand that the College relinquish to it individual student records violates the First Amendment**

121. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

122. Coercion of a third party can be the means by which the government violates the First Amendment rights of another.  The First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries.

123. The First Amendment guarantees the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.  Indeed, privacy in group association is indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.

124. The government may regulate in the First Amendment area only with narrow specificity, and compelled disclosure regimes are no exception. Thus when it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution.

125. When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough,  because First Amendment freedoms need breathing space to survive.

126. The First Amendment proscribes the Government not only from directly infringing upon those rights but also from infringing upon them indirectly through the use of  techniques like jawboning, a strategy which allows government officials to expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over.

127. As outlined above, by sending the two Letters, the Committee has repeatedly pressured the

College to suppress and punish student, faculty, and staff's protected speech regarding Palestinian human rights that the Committee disfavors.

128.  At the three Committee hearings held before the spring of 2024, the frankly absurd lines of questioning, in combination with the threats made against university presidents and trustees, led to two university presidents' resignations, the firing and/or suspension of numerous faculty members, and the pervasive and severe doxing and harassment of numerous administrators, faculty, staff, and students by members of Congress, their staffs, and third-party individuals and entities. The outcome of these hearings, and of the October 31 Committee Report, makes evident that this Committee's threats, which it and the administration have carried out against other institutions, have real, life-altering consequences for both the College and members of its community, and particularly for these Plaintiffs.

129.  Thus, even just the veiled threats of exposure, jawboning, funding cuts or stoppages, whether or not the Committee intends to or indeed can follow through, so intimidated the College that they apparently feel compelled to comply with whatever the Committee demands in order to assure their own survival as an academic institution.

130.  Following the Committee's public attacks on former Harvard University President Claudine Gay, Dr. Gay, like many other students and faculty members, "faced death threats and was called the N-word during a weeks-long attack on her character designed to end her presidency." [13] Also akin to the experiences of Plaintiffs,  an ABC News article discusses a broad campaign to dox and harass Dr. Gay in order to force either her resignation or her dismissal. [14]

131.  The Letters request what would amount to hundreds of pages of disciplinary records, which infringe upon the Plaintiffs' and all students' privacy of association that is indispensable to their

---

13  Matt Egan, "Harvard's Claudine Gay says she faced death threats and was called the N-word as critics pushed 'tired racial stereotypes'," CNN (Jan. 3, 2024), available at https://www.cnn.com/2024/01/03/business/harvard-claudine-gay-new-york-times-op -ed/index.html.

14  See Kiara Alfonseca, "The forces behind Harvard President Claudine Gay's resignation," ABC News (Jan. 5, 2024), available at https://abcnews.go.com/US/forces-harvard-president-claudine-gays-resignation/story?id=106071191.

freedom of association, without any clarity as to how these records aid any legitimate legislative purpose.

132. The language of the Committee's Letters explicitly demonstrates its viewpoint discrimination toward any speech or expression that opposes Israel's actions against Palestinian people and/or that lift up the human rights of the Palestinian people, and reveals their political intent to target this political speech and association.

133. The Committee is using, and is pushing the College to use, a definition of antisemitism that labels as bigoted and discriminatory the common and typical criticisms people, including Plaintiffs, make about Israel—that it is a racist state, led by war criminals, and/or in some ways similar to Nazi Germany—even as they do not attach such negative labels and consequences when such criticism is leveled against the U.S. or other foreign governments. Plaintiffs challenge that definition facially and as-applied.

134. When viewing the totality of these circumstances, it can  be reasonably understood that the Letters, and the Committee's continued focus on the College, and by proxy the Plaintiffs, are intended to convey a threat of adverse government action.

135. Furthermore, the Committee is not immune from these allegations under the Speech and Debate Clause, as the overly broad Letters, compelling the College to produce hundreds of pages of private student disciplinary records,  including the names and personally identifying information of individual students, including the Plaintiffs, do not substantially relate to any valid legislative purpose, let alone any compelling government interest.

136. The Letters, along with this Committee's other  actions, including but not limited to the Republican Staff Report released on October 31, 2024, and the doxing of students and faculty on social media platforms, demonstrate the Committee's lack of concern with actual incidents of antisemitism and its intent to "expose for the sake of exposure" based solely on the viewpoints held by those individuals.  Moreover, there can be no legitimate legislative purpose when the

Committee is engaging in prohibited conduct, which is to improperly suppress through a third

actor protected speech because of the viewpoints expressed..

137. Because the  Letters are predicated on clear viewpoint discrimination, endeavor to deploy

unlawful jawbone tactics to suppress through a third party protected speech based on that

viewpoint, and can be reasonably seen as a clear intent to chill associational and speech rights,

the Committees' Letters serve no legitimate legislative purpose and violate the First Amendment.

138. The Committee's project also violates the Establishment Clause, in that it singles out not just

for endorsement, but for enforcement, a single faith's claims and assertions about Palestine, and

punishes those of other faiths who disagree or critique these views, or advance those of other

faiths.


## COUNT II

### Discrimination and Retaliation
### under Title VI of the Civil Rights Act of 1964,
### 42 U.S.C. § 2000d

139. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

140. The College receives federal financial assistance.

141. In fear of the Committee due to the Letters,  the College engaged in a purposefully

discriminatory course of conduct that involved repeatedly deviating from its established

mandates regarding expressive activity and student discipline in order to silence the Plaintiffs'

legitimate protest activities and remove them from campus life. This includes subjecting

Plaintiffs to draconian, opaque, and illegitimate disciplinary procedures that caused them to

suffer a range of harms.

142. The College singled out the Plaintiffs and others for this disparate treatment in large part

because of their identity as Palestinians, Arabs, Muslims, and their supporters.

143. The College had actual notice of severe and pervasive discrimination against Palestinian, Arab,

Muslim, and students supporting Palestine on campus, directly from Plaintiffs and others. The College possessed enough knowledge of the harassment that it reasonably should have implemented deterrence measures.

144. The College also created a racially hostile environment on campus, including by characterizing the Plaintiffs and their associates as antisemitic, promoters of terrorism, and disorderly, by restricting their ability to congregate and engage in protected speech, by directing or permitting Campus Safety to target, surveil and harass them in violation of established norms and protocols, by sharing their personal information with the Committee and others, and by failing to protect them from or adequately discipline the perpetrators of doxing and harassment against them.

145. The College also targeted white Plaintiffs and other students, staff and faculty, due to their solidarity with Palestinian students and people, creating the conditions of associational discrimination.

146. The College also has privileged one putatively protected class, Jewish people who assert that Zionism is a cornerstone of their religious beliefs, over all others, including other Jewish people, creating the conditions of reverse discrimination.

147. The College also retaliated against the plaintiffs for opposing its unlawful practices and policies.

148. Additionally, the College engaged in intentional harassment through its knowledge of and deliberate indifference to the harassment, including threats and defamation that the plaintiffs faced from students and faculty who were under the College's substantial control.

149. Moreover, the College created a hostile environment through its failure to take prompt and effective steps to end the harassment, eliminate the hostile environment, prevent its recurrence, and address its effects, thereby severely injuring the Plaintiffs and depriving them of access to their education.

150. By treating Plaintiffs differently and causing them harm because of their race, ethnicity, and

affiliations, as well as by creating a racially hostile environment on the College's campus, and by retaliating against their opposition to this unlawful practice or policy, the College violated Title VI of the Civil Rights Act of 1968.

151. As a direct and proximate result of the College's actions and inactions in violation of Title VI, the Plaintiffs have sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

152. Accordingly, Plaintiffs are entitled to all relief available under Title VI, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief.

## Count III

## New York Human Rights Law, NY Exec. Law § 290 et seq.

153. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

154. By targeting the plaintiffs to suppress their protected speech and creating a hostile environment in which they were assaulted by other students, the College failed to provide an education free of discrimination or harassment based on the plaintiffs' racial identities and national origin.

155. The environment at the College, which has been rendered hostile for the Plaintiffs, is sufficiently severe, pervasive, persistent, and offensive such that it deprives them of equal access to the opportunities and benefits that the College provides to other students.

156. By restricting and denying access to campus facilities for events and protests, by failing to stop student-on-student bullying and assault, by placing plaintiffs on "interim suspension" and subjecting them to other sham disciplinary measures without due process, the College denied plaintiffs the use of its facility by reason of their race and national origin. *See* NY Exec. Law

296(4).

157. The College has retaliated against the Plaintiffs for opposing their unlawfully discriminatory practice. *See* NY Exec. Law 296(7).

158. Plaintiffs' support of the Palestinian people has also subjected them all to anti-Palestinian discrimination by the College, bringing them within the protections of New York Human Rights Law for reverse discrimination.

159. This conduct violates the New York Human Rights Law.

160. As a direct and proximate result of the College's actions and inactions in violation of New York Human Rights Law, Plaintiffs sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, physical harm, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

161. Accordingly, Plaintiffs are entitled to all relief available under New York Human Rights Law, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief.

## COUNT IV

### Breach of Contract--Tedeschi Rights

162. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

163. Under *Tedeschi v. Wagner College,* 49 N.Y.2d 652 (1980), a private university must strictly observe and grant the procedural and substantive rights it promises its students in its manuals and codes.

164. The College similarly has an implied obligation of good faith and fair dealing in its relations with the plaintiffs.

165. The College promises its students due process, equal protection, and academic freedom in its

Student Handbook as well as the confidentiality of all records, including disciplinary files.

166. Similarly, it promises its faculty academic freedom and privacy in its Faculty Handbook, and sets forth for all employees, under Policies and Procedures, its principles protecting Freedom of Expression and Mutual Respect.

167. The College also must not retaliate against members of its community for their First Amendment protected personal opinions stated in academic or nonacademic environments.

168. Instead of protecting the plaintiffs, as their *Tedeschi* Rights mandated, the College enthusiastically and willfully punished them for their criticism of Israel and support for the Palestinian people.

169. The College's violations of plaintiffs' *Tedeschi* Rights include, but are not limited to: refusing to publicly address the harm to student, staff, and faculty academic freedom caused by anti-Palestinian bullying; departing from decades-long campus customs around political protest to form ad hoc, unjust disciplinary procedures against pro-Palestine student protest; and by implicitly using and distorting the stated campus community commitment to "mutual respect" as a way to stifle criticism of the Israeli genocide in Gaza and support for the Palestinian people.

170. The College's violations of the plaintiffs *Tedeschi* Rights have inflicted severe damage on their education and their personal well-being. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiffs sustained damages including, but not limited to: emotional distress, physical harm, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment:

A. Declaring that Defendants' actions, policies, and practices complained of herein violate Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution, the New York Human Rights Law, and their contracts (Tedeschi Rights) with the University;

B. Granting preliminary and permanent injunctive relief enjoining Defendants, their officers, agents, and employees from:

    i.  Disclosing, publishing, distributing, or otherwise making use of confidential or FERPA-protected information referring or relating to Plaintiffs;

    iii. Engaging in any further acts of discrimination, retaliation, or censorship against Plaintiffs for their protected speech and association;

C. Awarding Plaintiffs compensatory damages in an amount to be determined at trial;

E. Awarding Plaintiffs their reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1988;

F. Granting such other and further relief as the Court deems just and proper.

Dated: Amagansett, NY
August 5, 2025

                    /s/ Jonathan Wallace
                    Jonathan Wallace
                    PO #728
                    Amagansett NY 11930
                    917-359-6234
                    jonathan.wallace80@gmail.com
                    Counsel for Plaintiffs