UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAHMOUD KHALIL et al.,<br><br>                    Plaintiffs,<br><br>-against-<br><br>THE TRUSTEES OF COLUMBIA UNIVER-<br>SITY IN THE CITY OF NEW YORK et al.,<br><br>                    Defendants. | 25-cv-2079 (AS)<br><br><u>OPINION AND ORDER</u> |

ARUN SUBRAMANIAN, United States District Judge:

Plaintiffs are current and former students who say the federal government has unlawfully co-erced Columbia University to suppress their protected speech. Specifically, they claim that to force Columbia to stifle political advocacy it disfavors, the government threatened to cancel $400 million of the university's funding. The defendants are (1) the U.S. House of Representatives Committee on Education and Workforce and its chairman (Congressional defendants); (2) five officials of the U.S. Department of Justice, U.S. Department of Education, U.S. Department of Health and Human Services, and General Services Administration (Agency defendants); and (3) Columbia, its Trustees, and Interim President (Columbia).

Plaintiffs' second amended complaint (SAC) asserts five causes of action. Counts I through III allege violations of the First Amendment by the Congressional defendants, Agency defendants, and Columbia, respectively. Dkt. 62, SAC ¶¶ 157–97. Count IV asserts an Administrative Procedure Act claim against the Agency defendants. *Id.* ¶¶ 198–207. And Count V asserts a breach of contract claim against Columbia. *Id.* ¶¶ 208–19. Plaintiffs have also moved for a preliminary injunction. Defendants have moved to dismiss plaintiffs' claims, and they oppose any injunctive relief. For the following reasons, the Congressional defendants' motion to dismiss is GRANTED, the Agency defendants' and Columbia's motions are GRANTED IN PART and DENIED IN PART, and plaintiffs' motion for a preliminary injunction is DENIED without prejudice.

## BACKGROUND

### I.    The February and March 2025 letters

On February 13, 2025, the House Committee on Education and the Workforce sent Columbia a letter explaining that "Columbia's continued failure to address the pervasive antisemitism that persists on campus is untenable, particularly given that the university receives billions in federal funding." Dkt. 101-1 at 1. The Committee directed Columbia to "[p]lease produce," by February 27, 2025, "[a]ll disciplinary records" related to eleven specific events that involved political expressions about Palestine and Israel. *Id.* at 5. That would require Columbia "to turn over entire

private files of hundreds of its students, faculty, and staff," which contain "demographic, academic, and financial information, and at most, personally identifying information, student group affiliations and associations, and related private information that could be and ha[s] been used to harass, make threats against, and dox the individuals whose records are turned over to the Committee." SAC ¶¶ 56, 58. Columbia first produced responsive documents on February 27, 2025 but "welcome[d] further conversations with [Committee] staff to provide updates," Dkt. 82-6 at 1, and later indicated that its investigation was "ongoing," Dkt. 82-7 at 3; *see also* SAC ¶ 185.

The next week, the Agency defendants issued a press release saying they would "conduct a comprehensive review of the more than $5 billion in federal grant commitments to Columbia University to ensure the university is in compliance with federal regulations, including its civil rights responsibilities." SAC ¶ 6 (quoting Dkt. 101-2). Days later, they "canceled or paused" approximately $400 million in federal grants to Columbia, citing "its failure to protect Jewish students from antisemitic harassment." SAC ¶¶ 6, 103.

On March 13, 2025, the Agency defendants sent Columbia a letter outlining "a set of policy changes as a precondition for continued federal funding" and directing compliance within one week. SAC ¶¶ 107–08. Those requirements included, among others, that Columbia "[f]ormalize, adopt, and promulgate a definition of antisemitism," "enforce existing disciplinary policies," and "centralize all disciplinary processes under the Office of the President." Dkt. 101-3 at 1–2. The letter noted that "President Trump's Executive Order 13899 uses the [International Holocaust Remembrance Alliance (IHRA)] definition" of antisemitism. *Id.*

On March 21, 2025, Columbia responded, outlining various policy changes, including that it "substantially revised the University's antidiscrimination and discriminatory harassment policy for students and groups . . . [and] will incorporate the definition of antisemitism recommended by Columbia's Antisemitism Taskforce." Dkt. 101-4 at 2; *see also* SAC ¶¶ 125–34 (explaining those changes). Describing Columbia's letter, the Congressional defendants posted on X later that day: "Columbia FOLDS." SAC ¶ 124.

## II.    Procedural History

On March 13, 2025, plaintiffs filed their original complaint, Dkt. 1, which they amended the following week, Dkt. 13. On March 18, plaintiffs (other than Mahmoud Khalil) filed an unopposed motion to proceed under pseudonyms, which the Court granted. Dkts. 5, 12, 55. The next day, they moved for a temporary restraining order. Dkt. 16. Pending its decision on that motion, the Court enjoined Columbia from providing plaintiffs' records to Congress or any federal agencies or releasing plaintiffs' names or any other identifying information. Dkt. 20. The Court held a hearing on March 25 and, on April 4, denied the motion for a restraining order without prejudice. However, the Court required Columbia to advise plaintiffs and the Court "[a]t least thirty days before furnishing to Congress any student records, or students' identities in records already produced." Dkt. 54 at 2. That order stands.

2

On April 18, plaintiffs filed their second amended complaint,[1] which all defendants move to dismiss. Over two months later, plaintiffs moved for a preliminary injunction.

## LEGAL STANDARDS

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when [a] district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "The task of the district court is to determine whether the pleading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (cleaned up). The Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor," although "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Buday v. New York Yankees P'ship*, 486 F. App'x 894, 895 (2d Cir. 2012) (citations omitted). To assess standing, the Court may also consider evidence outside the pleadings. *See Luckett v. Bure*, 290 F.3d 493, 496–97 (2d Cir. 2002); *Est. of Close v. Cigna Health & Life Ins. Corp.*, 2023 WL 8846562, at *2 (S.D.N.Y. Dec. 21, 2023).

To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing a motion to dismiss, a court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).

"A preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.'" *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 298 (S.D.N.Y. 2021) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "[I]t 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Id.* (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *Id.* (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).[2]

---

[1] The Court deems this amendment to have been made under Federal Rule of Civil Procedure 15(d), which allows the Court to consider "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."

[2] The parties dispute whether the Court can apply the "serious questions" standard to evaluate the preliminary-injunction motion or whether it must apply the more rigorous "likelihood-of-success" standard. Dkt. 101 at 8; 118 at 3–4. The Court need not resolve the issue at this stage because, as discussed further below, and consistent with plaintiffs' invitation, the motion will be denied without prejudice to refiling after discovery has been taken.

**DISCUSSION**

For the following reasons, plaintiffs' First Amendment claims survive, except for the claims against the Congressional defendants. The APA and contract claims are dismissed. Plaintiffs' motion for a preliminary injunction is denied without prejudice.

### I.    Plaintiffs' First Amendment claims against the Congressional defendants are dismissed (Count I)

The Congressional defendants are entitled to immunity under the Constitution's Speech or Debate Clause, so the Court dismisses Count I for lack of jurisdiction under Rule 12(b)(1).

The Speech or Debate Clause mandates that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. That means "Congressmen and their aides are immune from liability for their actions within the legislative sphere, even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312–13 (1973) (internal quotation marks and citations omitted); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975) ("Without exception, our cases have read the Speech or Debate Clause broadly to effectuate its purposes."). Where it applies, the Clause "operates as a jurisdictional bar." *Clyde v. Walker*, 2023 WL 6939987, at *2 (D.C. Cir. Oct. 20, 2023) (citations omitted).

The "power to investigate" is within the legislative sphere because a "'legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" *Eastland*, 421 U.S. at 504 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)); *see also Bragg v. Jordan*, 669 F. Supp. 3d 257, 267 (S.D.N.Y. 2023) ("Congress may conduct inquiries 'into the administration of existing laws, and . . . surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'" (quoting *Trump v. Mazars USA, LLP*, 591 U.S. 848, 861 (2020)). That includes informal letters requesting a response, *see Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 518 (D.D.C. 2021), *aff'd*, 23 F.4th 1028 (D.C. Cir. 2022), as well as formal subpoenas compelling the disclosure of information, *see Eastland*, 421 U.S. at 504.

Such investigations must have a legitimate legislative purpose, but that inquiry is narrow and deferential: The Court asks only whether "the investigation upon which the [Committee] had embarked concerned a subject on which 'legislation could be had.'" *Id.* at 506 (citation omitted). "[T]he legitimate legislative purpose bar is a low one, and the purpose need not be clearly articulated." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*, 575 F. Supp. 3d 53, 64 (D.D.C. 2021).

In this case, the Committee articulated a valid legislative purpose for its February 13 letter: To investigate targeting, harassment, and violence directed at Jewish students at Columbia, which receives federal funding. *See* Dkt. 82-5 (detailing allegations of harassment and intimidation of Jewish students at Columbia); *see also* Dkts. 82-1–4 (same). To address whether Columbia has

been deliberately indifferent to any antisemitic incidents taking place on its campus, the Committee is entitled to review whether and how Columbia has addressed alleged incidents—without its members forgoing their immunity from suit. That satisfies the Court's narrow scope of inquiry. *See Eastland*, 421 U.S. at 506.

Plaintiffs argue that the Committee's actions had no legitimate purpose and were motivated only by the desire to suppress plaintiffs' disfavored views. *See* Dkt. 104 at 12–23. But the Supreme Court has stated "that the action of the legislative body was with a legitimate object, if it is capable of being so construed, and [the Court] ha[s] no right to assume that the contrary was intended." *McGrain v. Daugherty*, 273 U.S. 135, 178 (1927) (citation omitted). Where, as here, a Congressional committee asserts that it is investigating in aid of legislating, "the presumption should be indulged that this was the real object." *Id.*; *see also Eastland*, 421 U.S. at 508 ("Our cases make clear that in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it."); *Bragg v. Jordan*, 669 F. Supp. 3d 257, 269 (S.D.N.Y. 2023) ("The Court is required to presume that a congressional committee's stated legislative object is the real object. . . . [E]ven if [the plaintiffs'] hypotheses about the Committee's *real* motivations were correct, they are irrelevant. It is not a court's function to invalidate a congressional investigation that serves a legislative purpose." (internal quotation marks and citations omitted)).

In plaintiffs' reply brief in support of their motion for a preliminary injunction—*not* their opposition to the Congressional defendants' motion to dismiss—they cite various cases for the proposition that the Speech or Debate Clause doesn't immunize members of Congress who publish and distribute Congressional materials. Dkt. 134 at 23–24. But any such argument is forfeited as to the motion to dismiss and, even if it weren't, plaintiffs' complaint doesn't seek to enjoin the Committee's publication of plaintiffs' records.[3] SAC ¶¶ 157–74, 219.

The Committee's February 13 letter is "capable of being . . . construed" as a request for information in support of its investigation into antisemitism on college campuses and the administration of federal anti-discrimination laws. *McGrain*, 273 U.S. at 178 (citation omitted); *see* Dkt. 82-5. So the Congressional defendants are immune from suit, and Count I is dismissed for lack of subject matter jurisdiction.

## II.    Plaintiffs' First Amendment claims against the Agency defendants and Columbia survive (Counts II and III)

Plaintiffs allege that the Agency defendants, through threats conveyed in the March 13 letter, coerced Columbia to implement policy changes to stifle plaintiffs' disfavored political advocacy, and that Columbia violated plaintiffs' First Amendment rights by complying. Plaintiffs also allege that Columbia violated their First Amendment rights by complying with the Congressional defendants' coercive "request" for their disciplinary records in the February 13 letter.

---

[3] Although the SAC also mentions a "Senate Committee's March 26, 2025" letter, SAC ¶¶ 171, 174, plaintiffs have not included that Senate Committee or its members as parties to this lawsuit. *Id.* ¶¶ 13–30.

Six out of eight plaintiffs have standing to assert their First Amendment claims against Columbia, and two have standing to assert their claims against the Agency defendants. The Tucker Act doesn't bar those claims against the Agency defendants. And each plaintiff with standing has also stated a plausible claim upon which relief could be granted, so Counts II and III survive for those plaintiffs.

### A. Certain plaintiffs have standing to pursue their First Amendment claims

#### 1. Two plaintiffs have plausibly alleged standing to challenge the Agency defendants' and Columbia's actions in connection with the March 13 letter

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* (cleaned up). To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In their First Amendment claims stemming from the March 13 letter, plaintiffs challenge Columbia's revised anti-discrimination policy. Dkt. 103 at 18. The Second Circuit "assess[es] pre-enforcement First Amendment claims . . . under somewhat relaxed standing and ripeness rules." *Cerame v. Slack*, 123 F.4th 72, 81 (2d Cir. 2024) (quoting *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)). Columbia acknowledges that this standard applies "[w]here a plaintiff challenges a policy or procedure in a pre-enforcement posture, as Plaintiffs do here," given that the policy hasn't been enforced against them yet. Dkt. 84 at 18–19.

To establish a cognizable injury in fact, plaintiffs must demonstrate "(1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'arguably proscribed by' the challenged regulation; and (3) that 'there exists a credible threat of prosecution thereunder' that is 'sufficiently imminent.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). Even under this standard, "'[a]llegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *See id.* at 81 n.12 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). "At the pleading stage, as here, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* at 81–82 (quoting *Lujan*, 504 U.S. at 561).

As to their First Amendment challenge to Columbia's revised anti-discrimination policy, plaintiffs have adequately pleaded each of the necessary elements to establish an injury in fact for the purposes of Article III. *First*, plaintiffs' desire to engage in "public debates about Palestine and Israel" involves a course of conduct tied to a First Amendment interest. SAC ¶ 156; *accord id.* ¶¶ 144, 145, 153.

6

*Second*, plaintiffs' contemplated speech is arguably proscribed by Columbia's revised anti-discrimination policy. When plaintiffs filed the second amended complaint on April 18, 2025, Columbia had already stated that it "will incorporate the definition of antisemitism recommended by Columbia's Antisemitism Taskforce" into its policy. Dkt. 101-4 at 2. That definition states, among other things, that "[a]ntisemitism can manifest . . . [as] exclusion or discrimination based on Jewish identity or ancestry or real or perceived ties to Israel; and certain double standards applied to Israel." Task Force on Antisemitism, Report #2: Columbia University Student Experiences of Antisemitism and Recommendations for Promoting Shared Values and Inclusion (Aug. 2024), at 44 (available at https://www.columbia.edu/content/sites/www.columbia.edu.content/files/content/about/Task%20Force%20on%20Antisemitism/Report-2-Task-Force-on-Antisemitism.pdf).

Plaintiffs frame some of their intended speech this way: They intend to say that Israel "is a racist state, led by war criminals, and/or similar to Nazi Germany in some ways" even though "they do not attach such negative labels and consequences [to] the U.S. or other foreign governments." SAC ¶ 179. This is plausibly the kind of "double standard" that might be the subject of discipline, because plaintiffs are holding Israel to a different standard than they would other nations. And because Columbia considers its definition of antisemitism in determining whether to discipline students, SAC ¶¶ 86–90, and doesn't specify which "double standards" are impermissible, the policy arguably proscribes plaintiffs' contemplated speech. *See Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023) ("[I]ntended conduct need only be *arguably* proscribed by the challenged statute, not necessarily *in fact* proscribed." (internal quotation marks omitted)). Accordingly, plaintiffs' interpretation of the policy and its application to them is "reasonable enough" to satisfy this prong. *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022).

In response, Columbia emphasizes its policy's carveout: "Nothing in this Policy may be construed to abridge academic freedom, principles of free speech, or the University's educational mission." Dkt. 118 at 15 (quoting Dkt. 120-2 at 4). But in *Cerame*, the Second Circuit rejected that argument, noting that "the carve-out is not enough, on its own, to render Appellants' fear of a misconduct complaint and its professional repercussions 'imaginary or wholly speculative' for Article III purposes." 123 F.4th at 85; *see also id.* at 83 ("[W]e do not defer to the Appellees' interpretation of the Rule to determine if conduct is arguably proscribed."). To be sure, the policy "requir[es] an analysis of the 'totality of the circumstances'" in assessing "whether a . . . violation has occurred." Dkt. 118 at 15 (quoting Dkt. 120-2 at 6). And "[i]n responding to Reports concerning speech or conduct regarding a country's policies or practices," Columbia "will consider whether such speech or conduct is an exercise of academic freedom and inquiry." *Id.* at 16 (quoting Dkt. 120-2 at 6). That said, "[w]hile it is indeed *possible* that none of the speech specified in the complaint is actually proscribed by [the Policy], [plaintiffs'] contrary conclusion . . . is both 'arguable' and 'reasonable.'" *Cerame*, 123 F.4th at 83 (quoting *Picard*, 42 F.4th at 99).

7

*Third*, the two plaintiffs alleged to be current Columbia students have demonstrated that they face a credible threat of enforcement.[4] SAC ¶¶ 18 (Sam Soe anticipates graduating in 2027),[5] 20 (Kam Koe anticipates graduating in 2028). This standard "sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant [policy] is recent and not moribund." *Vitagliano*, 71 F.4th at 138 (quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016)).[6] Here, Columbia officially incorporated its Taskforce's definition of antisemitism only after plaintiffs filed the second amended complaint, and plaintiffs say it has "recently suspended or expelled" "more than 80 students . . . for participation in pro-Palestine protests" and "subject[ed] plaintiffs to . . . investigations based purely on their anti-Israel speech." Dkt. 142 at 3. At this stage, those allegations are more than enough to show a credible threat of enforcement, even without relying on a presumption that Columbia will enforce the policy.

And far from moribund, the policy has recently become even broader. In their March 13 letter, the Agency defendants mentioned the IHRA definition of antisemitism as one definition Columbia could adopt. In their briefing, the Agency defendants and Columbia emphasized that Columbia wasn't required to adopt the IHRA definition, and that in fact it didn't. Dkts. 84 at 12; 86 at 27; 117 at 4; 118 at 13–14. But in the middle of briefing these motions, Columbia did in fact adopt the IHRA definition, right around the time that it reached a settlement with the government resolving the university's funding issues. Dkt. 123-1. The Court will address the implications of all of this at summary judgment, but the record at this stage certainly is enough for pleading purposes.

Having shown a cognizable injury-in-fact through a threat of specific future harm, those two plaintiffs must also plausibly allege causation and redressability. Causation is satisfied because they plausibly allege that the Agency defendants coerced Columbia to adopt a definition of antisemitism through which it would punish and suppress plaintiffs' political speech. *See infra* § II.C.2; SAC ¶¶ 176, 179. And an injunction preventing Columbia from considering (at least portions of) the Taskforce or IHRA antisemitism definitions (and accompanying examples) in determining whether to discipline plaintiffs for their contemplated speech would redress that injury. That's because plaintiffs allege that their contemplated speech couldn't—without those portions of the definitions that they challenge—fall under the policy. SAC ¶ 163. Plus, if it's true that the

---

[4] Even if plaintiffs who are no longer Columbia students initially had standing to challenge Columbia's changes to its policy, their challenges are now moot because plaintiffs have not alleged that Columbia enforces its policy against alumni. To be sure, plaintiffs allege that "Columbia has persisted in disciplining 'active alumni,'" but they say so in the context of Columbia's disciplinary records disclosure, SAC ¶ 11, and don't allege that Columbia has or will discipline any alumni under the revised policy.

[5] In July, Soe submitted a declaration that they were "issued a two-year suspension" due to their "refusal to unmask" at a "a teach-in at Butler Library" in May, and that they are currently subject to a Columbia investigation relating to that same event. Dkt. 134-1. At summary judgment, the parties may address whether and how that (and any other facts) affect Soe's standing.

[6] Although *Vitagliano* refers to "the government" enforcing the law, plaintiffs' theory is that the government compelled Columbia to adopt and enforce the policy, so Columbia assumes the role of the government and is evaluated in the same manner. *See infra* § II.C.1 (discussing state action).

Agency defendants required Columbia to punish speech it wouldn't otherwise punish, then enjoining the Agency defendants from threatening to withhold funds on that basis (*i.e.*, precluding the means of coercion) would be one way to redress the injury. *See* Dkt. 102 at 16 (collecting cases). Again, at this early stage, those allegations are plausible.

In their reply brief, the Agency defendants say that *American Association of University Professors v. United States Department of Justice*, 2025 WL 1684817 (S.D.N.Y. June 16, 2025), appeal filed at 25-1529 (2d Cir.), "is apposite on the standing issue here." Dkt. 117 at 6. That case involved a preliminary-injunction motion related to the March 13 letter filed by two Columbia faculty labor unions. The court denied relief after holding that the unions and their members lacked standing under the heightened burden applicable to that kind of motion. But on a motion to dismiss, the only question is whether plaintiffs have met their burden to *plead* Article III standing. In addition, *AAUP* involved different kinds of plaintiffs: labor unions made up of professors, not students facing school discipline. In that context, the court concluded that the plaintiffs had shown nothing more than a "subjective feeling of chill." 2025 WL 1684817, at *13.[7] Here, Soe and Koe have plausibly alleged a concrete and imminent risk of discipline if they engage in the same kind of speech that they engaged in long before Columbia received the March 13 letter.

These plaintiffs have standing to pursue their claims as to the anti-discrimination policy. However, the complaint also raises two other issues with the March 13 letter, focusing on Columbia's subsequent "face mask ban" and changes to its Middle East, South Asian, and African Studies (MESAAS) department. But plaintiffs have since acknowledged that "students engaging in demonstrations are not, in fact, subject to a blanket mask ban during otherwise rule-compliant demonstrations," Dkt. 134 at 29. And plaintiffs haven't plausibly alleged that any current student has been (or will be) unable to take any class in the MESAAS department. So their challenges to these other actions by Columbia fail.

### 2. *Four plaintiffs have plausibly alleged standing to challenge Columbia's actions in connection with the February 13 letter*

Plaintiffs allege that Columbia has violated and will violate their First Amendment rights by complying with the Congressional defendants' coercive "request" for their disciplinary records. Four plaintiffs have standing to assert that challenge as to records not already disclosed. Those plaintiffs are Ned Noe, Sally Roe, Jane Joe, and Mahmoud Khalil.

As to records already disclosed to the Congressional defendants, any harm wouldn't be redressable because those defendants are immune. *See supra* § I. So if any plaintiffs have standing to challenge the disclosure of their disciplinary records, that standing must come from the threat of future injury. To show injury-in-fact for a future injury, plaintiffs must plausibly allege "that

---

[7] Notably, other courts addressing claims like those asserted in *AAUP* have found standing based on a theory that the plaintiffs' First Amendment rights were impaired by a specific threat of future harm. *See, e.g.*, *President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 112–13 (D. Mass. 2025); *Am. Ass'n of Univ. Professors v. Trump*, 2025 WL 3187762, at *16–18 (N.D. Cal. Nov. 14, 2025).

the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

The plaintiffs listed above say they "have directly been subject to Columbia University disciplinary processes based on allegations of direct and/or indirect involvement in at least one of the eleven events outlined in the Committee's February 13 letter, and therefore expect that their records . . . will be disclosed to Government Defendants." SAC ¶ 152. The "will be disclosed" language is key: Drawing a reasonable inference in those plaintiffs' favor, at least some of their records relating to those incidents have not yet been disclosed but will be. Plaintiffs also point out that Columbia, in its February 27, 2025 letter to the Committee, says it is producing the "existing . . . case files for each of the eleven events" and "welcome[s] further conversations with your staff to provide updates." Dkt. 82-6 at 1; *see also id.* at 3 (noting that "certain case files may include information related to other incidents"). And plaintiffs highlight that, on March 7, 2025, Columbia followed up with another letter to the Committee that described various disciplinary cases as "ongoing" and "reserve[d] the right to . . . update this information." Dkt. 82-7 at 3; *see* Dkt. 103 at 17. What's more, that letter explains that Columbia "is today producing certain documents that were provided to the Committee in the February 27 production with certain redactions removed." Dkt. 82-7 at 1. Reasonable inferences from those statements further support plaintiffs' allegations.

As to harm, those plaintiffs argue that Columbia's disclosure of their private information to the Committee is a cognizable injury in fact. "In *TransUnion* itself, the Supreme Court specifically recognized that 'disclosure of private information' was an intangible harm 'traditionally recognized as providing a basis for lawsuits in American courts.'" *Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276, 286 (2d Cir. 2023) (quoting *TransUnion*, 594 U.S. at 425); *see also Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 573 (S.D.N.Y. 2024) ("[A] plaintiff whose private information has been disclosed to third parties has standing to sue regardless of whether the third parties used that information to cause additional harm.").

Columbia argues that showing injury-in fact isn't so simple. *First*, it says that plaintiffs don't explain how disclosing their disciplinary records "to Congress in response to a congressional investigation" would be a cognizable injury in fact under *TransUnion* "given the rule at common law that such disclosures are absolutely privileged." Dkt. 118 at 8. But plaintiffs also say that the Congressional defendants will then publish that information. SAC ¶ 94; *cf. Newman v. Legal Servs. Corp.*, 628 F. Supp. 535, 542 (D.D.C. 1986) ("The law is well established in this circuit that testimony and statements are absolutely privileged when presented to legislative proceedings at the express request of those conducting such hearings," but "[p]ublication to individuals not associated with the legislature and republication by the legislator are not covered by this privilege." (internal quotations omitted)). It's true that, "[r]ather than guesswork, the plaintiffs must show that the third-party [i.e., Congressional defendants]. . . 'will likely react in predictable ways' to the defendants' conduct." *See Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). But plaintiffs have plausibly alleged that the Committee would publicly disclose information in student disciplinary records, given that it allegedly did exactly that in 2024.

SAC ¶ 94 ("When the University previously complied with the Committee's requests, student records were leaked to the press, 79 students' identities were not properly safeguarded in the Committee's October 31, 2024, Report, and members of Congress or their staffers posted students' private information on social media sites and identified students and faculty on the public record during congressional hearings in December 5, 2023, April 17, 2024, and May 3, 2024—all of which led to widespread economic and reputational harm, as well as increased incidents of doxing and harassment.").

*Second*, Columbia claims there will be no disclosure of *private* information because it de-identifies all student information before disclosing it. And Columbia points out that plaintiffs concede that it previously complied with its legal obligations under the Family Educational Rights and Privacy Act (FERPA) before disclosing student records. But drawing reasonable inferences in plaintiffs' favor, they've plausibly alleged that their anonymity will not be protected. SAC ¶¶ 56, 58. Just because Columbia has anonymized records in the past doesn't mean it necessarily will in the future, especially if plaintiffs are proven correct that the Committee is coercing Columbia to "name names" to suppress plaintiffs' pro-Palestine speech. And even if the records were "de-identified" like before, plaintiffs plausibly allege that they aren't anonymized in the relevant sense, because it is feasible to uncover their identities given the unredacted contextual information. SAC ¶¶ 53, 54, 172; Dkt. 52 at 71:18–72:2 ("[E]ven if certain personally identifying information is removed, by placing [plaintiffs] in certain times and places, by physically describing them, even by the color of their keffiyeh, some of these students are so identifiable by these third-party people who are harassing them and reporting them to ICE to Rubio, to all kinds of people, they are so identifiable that even when you take all of those FERPA-protected pieces of information out, somebody is going to recognize them.").

*Third*, Columbia argues that plaintiffs "fail[] to draw any connection between disclosure of the de-identified records to the Committee and any threat of punishment under the definition of antisemitism or otherwise." But plaintiffs say they have not engaged in political speech because they fear Columbia will disclose their disciplinary records from those eleven events to the Committee, which will put them at risk in the ways detailed above.

*Finally*, Columbia says there's no certainly impending or substantial risk of harm. But plaintiffs have plausibly alleged a substantial risk of further disclosures, given Columbia's February 27 and March 7, 2025 letters discussed above. Dkts. 82-6, 82-7. And to the extent Columbia suggests any challenge regarding the February 13 letter is moot because it doesn't currently plan to develop or hand over any more records (and hasn't since the second amended complaint was filed), *see* Dkt. 52 at 34:17–20, Columbia hasn't met its burden to show that its practice of disclosing students' disciplinary records to the Committee cannot "reasonably be expected to recur." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)). And notably, while there may have been no further records produced to the government over the last year, that state of affairs has been in the shadow of this litigation, where the Congressional defendants have been parties, and Columbia

has been subject to an order to notify plaintiffs and the Court before any further productions are made.

Drawing all reasonable inferences in plaintiffs' favor, four plaintiffs have plausibly alleged that Columbia will—in the absence of a lawsuit—disclose their private information to the Congressional defendants, and that an injunction barring Columbia from doing so would redress any harm stemming from such a disclosure.

There's one other issue. The Congressional defendants argue that they are necessary parties to Count III (arising from the Committee's February 13 letter) but cannot be joined (once they are out of the case), so that claim against Columbia should be dismissed. Dkt. 81 at 16–22; *see* Fed. R. Civ. P. 19. But even assuming that the Congressional defendants are necessary parties, the Rule 19 factors don't favor dismissal here.

Under Rule 19(b), "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." "Rule 19(b) specifies four factors: (1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the court dismissed the suit." *CP Solutions PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 159 (2d Cir. 2009). It's true that an injunction barring Columbia from producing more disciplinary records to the Committee in response to the February 13 letter could prejudice the immune Congressional defendants, who want access to "*[a]ll* disciplinary records" to support their investigation. Dkt. 101-1 at 5 (emphasis added). But any prejudice would be alleviated by the fact that an injunction would apply to the records of *four plaintiffs only*. (Plaintiffs haven't added class allegations to their complaint, even after the Court raised the issue.) And without that injunction, none of those plaintiffs would have an adequate remedy to challenge the disclosure of their records. So under the Rule 19(b) factors, Count III may proceed.

This analysis aligns with the logic of *United States v. AT&T*, 567 F.2d 121 (D.C. Cir. 1977), which says "the [Speech or Debate] Clause does not and was not intended to immunize congressional investigatory actions from judicial review. . . . [And it] does not bar the challenge so long as members of the [Committee] are not, themselves, made defendants in a suit." *Id.* at 129; *see also Eastland*, 421 U.S. at 514 (1975) (Marshall, J., concurring) ("[T]he protection of the Speech or Debate Clause is personal. It extends to Members and their counsel acting in a legislative capacity; it does not preclude judicial review of their decisions in an appropriate case."). In other words, the Congressional defendants are immune from suit, but these plaintiffs may still seek to prevent Columbia from handing over their records.

Finally, plaintiffs "demand damages . . . as to documents referencing them already produced to the [Congressional defendants]." SAC ¶ 219. But in their briefing, plaintiffs don't contest that they've failed to assert a cause of action for damages against the Congressional defendants or Columbia as to this claim, so any such claim for damages is dismissed.

**B. The Tucker Act doesn't bar plaintiffs' First Amendment claims against the Agency defendants**

The Agency defendants say there's another jurisdictional issue: that the Tucker Act bars plaintiffs from bringing First Amendment claims against them in this Court because the Court of Federal Claims has exclusive jurisdiction.[8] That argument fails.

"Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source of the rights upon which the plaintiff bases [his] claims, and . . . the type of relief sought." *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999)).

The Agency defendants reason that plaintiffs' First Amendment claims "stem from the Government's contractual relationship with Columbia, rather than an 'independent, non-contractual source,'" and that "in the absence of the Government's grants and contracts with Columbia, 'it is likely that no cause of action would exist at all.'" Dkt. 117 at 8 (quoting *Up State*, 198 F.3d at 376–77 (2d Cir. 1999)). True enough, threatening to withhold or cancel funds is the alleged *method* of coercion here, but it isn't the *basis* of plaintiffs' claims. The basis is an "independent, non-contractual source"—the First Amendment. *Up State*, 198 F.3d at 376.

Moreover, plaintiffs aren't seeking to preserve funding to Columbia no matter what. They're just seeking to prevent the Agency defendants from leveraging their funding to suppress plaintiffs' speech. SAC ¶ 219 (seeking to enjoin the Agency defendants "from withholding federal funding in order to coerce Columbia into chilling the constitutionally protected academic freedom, speech and association of its students based on viewpoint"); *see also* Dkt. 102 at 26–28. And the most this Court would order to address that harm would be to prohibit the Agency defendants from doing just that, not to require the Agency defendants to pay money to Columbia. For this reason, the "type of relief sought" doesn't support Tucker Act jurisdiction either. *See Nat'l Inst. of Health v. Am. Public Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (challenge to agency guidance that resulted in grant termination properly heard in district court, even if grant termination itself is not, because "[e]ven if the guidance and grant terminations are linked, vacating the guidance does not necessarily void decisions made under it").

Finally, jurisdiction is proper because "[p]laintiffs could not themselves bring claims in the Court of Federal Claims, as they are not signatories to the underlying contracts." *New Jersey v. United States Dep't of Transportation*, 2026 WL 323341, at *4 (S.D.N.Y. Feb. 6, 2026). "As the D.C. Circuit held, 'the Court of Federal Claims can have exclusive jurisdiction *only* with respect to matters that Congress has proclaimed are within its jurisdictional compass. . . . There cannot be

---

[8] The Agency defendants also make this argument as to the APA claim, but that is irrelevant because the Court dismisses that claim as moot. *See infra* § III.

exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act.'" *Id.* (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176–77 (D.C. Cir. 2006)).

### C. The plaintiffs with standing have stated First Amendment claims

As discussed above, two plaintiffs have standing to challenge the Agency defendants' and Columbia's actions in connection with the March 13 letter, and four plaintiffs have standing to challenge Columbia's actions in connection with the February 13 letter. For the reasons below, those plaintiffs have stated valid claims for injunctive relief. (Plaintiffs have voluntarily dismissed their claims against the Agency defendants in their individual capacities, Dkt. 98, and "do not now seek damages of any kind," Dkt. 102 at 26.)

#### 1. State action

Because the Free Speech Clause "prohibits only *governmental* abridgment of speech," plaintiffs must plausibly allege that Columbia qualifies as a "state actor" to assert First Amendment claims against it. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808–09 (2019) (emphasis in original). "[A] private entity can qualify as a state actor in a few limited circumstances— including, for example, . . . when the government compels the private entity to take a particular action [(the 'compulsion test')]" or "when the government acts jointly with the private entity [(the 'close nexus test')]." *Halleck*, 587 U.S. at 809. The close nexus test is satisfied "when the state provides significant encouragement" to the private party to act or when the private party is a "willful participant in joint activity with the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (internal quotations omitted). Under both tests, "[t]he fundamental question . . . is whether the private entity's challenged actions are 'fairly attributable' to the state." *Id.* (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

Plaintiffs say that the Congressional defendants and Agency defendants have coerced or significantly encouraged Columbia at the same time and for the same purpose: to suppress plaintiffs' political speech. They read the letters in concert as ratcheting up the pressure on Columbia to discipline students for expressing disfavored views.

The Court first examines the February 13 letter to determine whether plaintiffs have plausibly alleged that it coerces or significantly encourages Columbia to suppress plaintiffs' political speech. That letter begins by referring to Columbia's "public and private promises to . . . Members of Congress" to "combat the rampant antisemitism on Columbia's campus" but laments Columbia's "fail[ure] to uphold its commitments, both because the disciplinary process has failed and because the campus administration has refused to enforce its pre-existing rules." Dkt. 101-1 at 1. It then explains how "Columbia's continued failure to address the pervasive antisemitism that persists on campus is untenable, particularly given that the university receives billions in federal funding." *Id.* The letter goes on to outline "numerous antisemitic incidents" on campus during Fall 2024 and continuing into 2025, which happened "[d]espite [Columbia's] promises and commitments to end or curb antisemitism on campus." Dkt. 101-1 at 3. Finally, the letter directs Columbia to "[p]lease

produce," in less than two weeks, "[a]ll disciplinary records" related to those eleven "incidents" on campus. *Id.* at 5.

Plaintiffs say the letter is a veiled threat. They claim that the Committee's stated desire for Columbia to "curb antisemitism" is pretext for a demand that Columbia suppress disfavored "views expressed by Plaintiffs and other pro-Palestine students," Dkt. 104 at 16–17, or else risk losing "billions in federal funding," Dkt. 101-1 at 1. That means Columbia is either compelled to suppress plaintiffs' protected speech or—if Columbia shares the Committee's underlying intention—has gladly enlisted to suppress that speech. Either way, according to plaintiffs, the letter demands "hundreds of individual and associational records as a means to identify and target Plaintiffs and other pro-Palestine student activists." Dkt. 104 at 18. As discussed above, Columbia has already provided many of those records and it is plausible that they will provide more when requested to do so.

Even so, Columbia says that "courts in this Circuit have consistently recognized that a private party's 'mere furnishing of information to government officials is insufficient' to establish state action." Dkt. 84 at 9 (quoting *Guan N. v. NYC Dep't of Educ.*, 2013 WL 3819609, at *4 n.8 (S.D.N.Y. July 23, 2013)). It also makes two related arguments: 1) that private entities like Columbia don't become state actors just because they cooperate with congressional investigations, especially given their duty to do so, Dkt. 84 at 9, and 2) even if the action items in the February 13 letter were compulsory, complying still wouldn't constitute state action because "mere compliance" with a subpoena doesn't transform a private actor into a state actor. *Id.* at 10.

Those arguments miss the mark. Plaintiffs allege more than the "mere furnishing of information to government officials," "mere compliance" with a subpoena, or "mere cooperation" with an "arms-length" government investigation. Dkt. 84 at 10. They allege not only that Columbia will comply with the Committee's demand, but that it is being significantly encouraged or coerced into punishing them for protected speech. In other words, coercion to violate a third party's constitutional rights doesn't equal "mere compliance"; it's state action. For instance, in *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), the Second Circuit affirmed the district court's finding of state action because the government "intervened in [the private party's] decisionmaking" and "steered [the private party] toward [the government's] preferred . . . policy and then supervised its application." *Id.* at 148. The court determined that "[s]uch 'overt' and 'significant encouragement' supports the conclusion that [the private party's] conduct is properly attributed to the State." *Id.* As discussed above, that's the same type of conduct that plaintiffs have plausibly alleged here.[9]

---

[9] *Stein* involved the dismissal of a criminal indictment, and the state-action question was relevant to whether the government could be held responsible for the actions of a private party in denying the defendants their right to counsel. Here, of course, both the private party (Columbia) and the government are parties, but that doesn't change the analysis. State action is state action no matter if both the private party and government are parties, or if only the government is a party.

To be sure, the facts that turn up in discovery may not bear out these allegations, and this case at summary judgment may resemble *Gilman v. March & McLennan Co., Inc.*, 826 F.3d 69 (2d Cir. 2016), where the Second Circuit, at the summary-judgment stage, rejected the plaintiff's state-action argument, as well as any categorical rule that "acts that are taken by a private company in response to government action, and that have as one goal obtaining better treatment from the government, amount to state action." *Id.* at 77.

Columbia also points to *Fakhreddine v. University of Pennsylvania*, 2025 WL 345089 (E.D. Pa. Jan. 30, 2025), in which the court concluded that the plaintiffs failed to plausibly allege that the university was a state actor in connection with the Committee's records request. *Id.* at *5–6. But the court in *Fakhreddine* reached that conclusion after determining that the plaintiffs *conceded* that Penn wasn't coerced into providing the plaintiffs' records. To hammer home that point, the court quoted and italicized parts of the operative complaint, which alleged that Penn was "*[a]sked* by the House Committee for information," that "Penn is *voluntarily* complying," and that "the Information Letter is not a subpoena and has *no legal compulsory* effect." *Id.* at *5.[10] Here, plaintiffs allege that the federal government defendants are "compel[ling] Columbia to do what [they] cannot do directly: violate students' First Amendment Rights," SAC ¶ 45, and that by "disclosing information about them to the Committee[] and otherwise capitulating to the illegal demands of the federal government, Columbia is intentionally exposing Plaintiffs to [harm] . . . for their First Amendment-protected criticism of Israel and their pro-Palestinian expression," SAC ¶ 215.

Columbia disputes those allegations, but what matters at the motion-to-dismiss stage is whether plaintiffs are entitled to relief if the Court accepts their plausible allegations as true. *See Austin*, 826 F.3d at 625. In light of the letter's reference to "private promises to . . . members of Congress," Columbia's "billions in federal funding," and underlying events that could—when the evidence comes out—cohere with plaintiffs' view, the complaint plausibly alleges that the further disclosure of plaintiffs' disciplinary records stemming from those events is "fairly attributable" to the government under both the "close nexus" and "compulsion" theories of state action. Under either test, the Court must engage in a "necessarily fact-bound inquiry," and here, plaintiffs haven't even gotten discovery yet. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)).

Next, the Court turns to the March 13 letter. The Agency defendants sent that letter to Columbia less than a week after they "canceled or paused" approximately $400 million in federal grants to Columbia, citing "its failure to protect Jewish students from antisemitic harassment." SAC ¶¶

---

[10] On appeal, the Third Circuit held there was no standing for the federal claim, no jurisdiction over the remaining state claims, and it affirmed the dismissal of the case without prejudice on that basis without reaching the state-action question. *Fakhreddine v. Univ. of Pennsylvania*, 2026 WL 74593, at *5 (3d Cir. Jan. 9, 2026).

6, 103. The letter outlines "immediate next steps that [the Agency defendants] regard as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." Dkt. 101-3 at 1. One of those conditions, discussed above, is that Columbia "formalize, adopt, and promulgate a definition of antisemitism."[11] Plaintiffs read the letter as coercion, plain and simple: Either you change your policies to punish what we deem "antisemitic" (including protected speech), or we won't unfreeze hundreds of millions of dollars in funding, and we may terminate much more.

In its March 21 letter, Columbia responded that it "substantially revised the University's anti-discrimination and discriminatory harassment policy for students and groups . . . [and] will incorporate the definition of antisemitism recommended by Columbia's Antisemitism Taskforce." Dkt. 101-4 at 2. Plaintiffs say this is Columbia capitulating to the Agency defendants' demand, which supports their "compulsion" theory of state action. Dkt. 103 at 8. They also highlight Columbia's concession that the March 13 letter "crystalized efforts that were already underway" and impacted the policy changes in its March 21 letter. *Id.* (quoting Dkt. 84 at 13); *accord* Dkt. 52 at 65:5, 66:10–12. That admission, they say, is more than enough to keep their state action allegations alive (at least on a "close nexus" theory). Dkt. 103 at 8.

In response, Columbia highlights differences between the March 13 letter and the policy changes announced on March 21. For instance, Columbia explains that while the "March 13 Letter sought to have Columbia adopt the IHRA definition of antisemitism, the University instead adopted a definition of antisemitism developed by its own internal University Task Force," so "it would be more accurate to describe" Columbia's policy changes as coming from within rather than imposed from without. Dkt. 84 at 12 (internal citation omitted). And it says that if its policy changes primarily came from within, then some influence from the March 13 letter alone doesn't transform its actions into state action. Dkt. 84 at 13. Columbia also points to various cases recognizing that a private actor does not become a state actor just by acting in response to government oversight, or by complying with state or federal law. Dkt. 84 at 11.

Whether "it would be more accurate to describe" Columbia's policy changes one way or the other is a question of fact that the Court cannot resolve at this stage. But the Court notes that some of the available facts—e.g., Columbia recently adopting the IHRA definition in close proximity to its settlement agreement with the Agency defendants—appear to support plaintiffs' theory. Dkt. 134 at 7–9; Dkt. 142 at 5 (calling the settlement the "only discernable explanation" for that adoption). And again, as to the cases that say responding to government oversight at arm's length or complying with the law isn't enough, plaintiffs have alleged more: that this wasn't (and isn't) arms-length; that this isn't mere "regulation"; and that the letter's real purpose isn't its stated purpose.

---

[11] As Columbia correctly notes, the Court must examine whether "the government compels the private entity to take a *particular* action." Dkt. 84 at 8 (quoting *Halleck*, 587 U.S. at 809 (emphasis added)). So the Court examines the Agency defendants' "antisemitism definition" precondition because it is one that Columbia fulfilled and which two plaintiffs have standing to challenge.

Finally, Columbia argues that it should not be deemed liable if it truly lacked any free choice. For this argument, Columbia relies on Ninth Circuit authority explaining that "only the state actor, and not the private party, should be held liable for the constitutional violation that resulted from the state compulsion." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838 (9th Cir. 1999); *see also Children's Health Defense v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024) (noting "reason to doubt that a purely private actor . . . which was the *victim* of the alleged coercion, would be the appropriate defendant, rather than the government officials responsible for the coercion," but declining to resolve the question).

To begin with, *Sutton* itself acknowledged that it was parting ways with other circuits, including the Fourth, Fifth, Seventh, and Eleventh; and while nodding to suggestive lines in other cases, its primary support was a single law review article. 192 F.3d at 837–38 (quoting Barbara Rook Snyder, Private Motivation, State Action, and the Allocation of Responsibility for Fourteenth Amendment Violations, 75 Cornell L. Rev. 1053, 1067, 1069 (1990)). But more to the point, *Sutton* involved holding a private party liable for compliance with a generally applicable legal requirement, and not the kind of targeted conduct at issue in this case. Indeed, *Sutton* itself recognized this distinction, differentiating the former kind of case from one in which "the government directed a specific entity to take a specific (allegedly unconstitutional) action against a specific person," where the Ninth Circuit had previously held that the coerced entity could be held liable. *Id*. at 843 (distinguishing *Carlin Comm's, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987)). And finally, even *Sutton* recognized that to the extent the evidence shows that the private party intended to deprive the plaintiff of their constitutional rights or acted jointly with the government in doing so, there would be liability. *Id*. at 841. That wasn't alleged in *Sutton*, but it is alleged in this case. SAC ¶¶ 183–96.

### 2. Vullo *analysis*

"To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 191 (2024).

For the reasons discussed above, both the February 13 and March 13 letters "could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech," so plaintiffs have stated their *Vullo* claims against the Agency defendants and Columbia. Indeed, other courts have upheld similar *Vullo* claims. *See President & Fellows of Harvard Coll.*, 798 F. Supp. 3d at 125 (granting summary judgment to plaintiffs on *Vullo* claim after concluding that the federal government "[d]efendants unconstitutionally sought to force Harvard to better manifest the government's favored worldview"); *Am. Ass'n of Univ. Professors*, 2025 WL 3187762, at *12 (granting preliminary injunction to plaintiffs on *Vullo* claim because "the unrebutted record . . . shows that [the d]efendants have used the threat of investigations and economic sanctions to impermissibly coerce the UC to stamp out faculty, staff, and student 'woke,' 'left,' 'anti-American,' 'anti-Western,' and 'Marxist'" speech"). And while Columbia has moved

to dismiss plaintiffs' *Vullo* claims based on a lack of standing and state action, it makes no independent argument on the merits. Dkt. 84 at 7–23.

As for the Agency defendants, they largely rehash Columbia's arguments on state action, and those arguments fail for the same reasons. Indeed, most "fall[] flat for the simple reason that [they] require[] the Court to accept [the Agency defendants'] limited reading of the complaint." *Vullo*, 602 U.S. at 197. But, in any event, the Court addresses each in turn.

*First*, the Agency defendants claim there's no coercion because "the demands in the March 13 Letter do not align with the actions taken by Columbia," including that "Columbia did not adopt the IHRA definition." Dkt. 117 at 16–19; *see* Dkt. 86 at 24 (arguing that "Columbia did *not* follow all the [Agency] Defendants' demands" and that any changes came from within). But Columbia has adopted the IHRA definition, and even if it hadn't, plaintiffs have still plausibly pleaded coercion for the reasons discussed above. *See supra* § II.A.1. Relatedly, the Agency defendants argue that the March 13 letter "does not restrict protected speech or expression on the basis of viewpoint" because it "does not demand the adoption of any specific definition of antisemitism." Dkt. 86 at 27. But plaintiffs have alleged that the letter, taken in context, requires a definition that would enable Columbia to punish plaintiffs' protected speech.

*Second*, the Agency defendants assert that "this case, unlike *Vullo*, does not involve the Government threatening coercive action against one party (the insurance company) to get at the protected speech of a third party (the gun groups)." Dkt. 86 at 25. Instead, they say, "the Government is using its enforcement authority to act directly upon a regulated entity that receives federal funding (Columbia) because of *that entity's* own conduct." *Id.* But, as discussed, plaintiffs have plausibly alleged that the Agency defendants have threatened coercive action against one party (Columbia) to squelch the protected speech of a third party (plaintiffs).

*Third*, the Agency defendants correctly note that "governmental entities may act properly in furtherance of legitimate state interests, even though such state action incidentally chills First Amendment rights." Dkt. 86 at 25 (quoting *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996)). But plaintiffs have plausibly alleged that the Agency defendants are improperly motivated by a desire to suppress plaintiffs' political speech.

*Finally*, the Agency defendants argue that "[a]ntisemitic harassment is not shielded by the First Amendment." Dkt. 86 at 26. They are correct that "[t]rue threats of [antisemitic] violence are outside the bounds of First Amendment protection." *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). But plaintiffs allege that their contemplated speech doesn't involve harassment, threats, or violence, but rather "protected . . . speech regarding Palestinian human rights that the [Agency defendants] disfavor." SAC ¶ 176. For example, the double standards that plaintiffs allegedly apply to Israel—i.e., critiques they level at the Israeli government but not any other governments—aren't inherently antisemitic threats. SAC ¶ 179. In any event, even if the government can enforce the law and police the use of public funds, they may not do so "in order to punish or suppress [plain-

19

tiffs'] protected expression." *Vullo*, 602 U.S. at 196 ("[T]he contention that the NRA and the insurers violated New York law does not excuse Vullo from allegedly employing coercive threats to stifle gun-promotion advocacy."). Because "the complaint plausibly alleges coercive threats aimed at punishing or suppressing disfavored speech, the plaintiff[s]" with standing have "state[d] [their] First Amendment claim[s]." *Id.* at 197.

To be clear, nothing in this discussion should be read to suggest that plaintiffs will succeed in making out their claims at summary judgment or trial. Many of the arguments raised by the defendants may have force down the road, when the cards are all on the table. Just to give an example, it may turn out Columbia acted on its own volition to address the important goal of stopping anti-semitic harassment on campus, and that it isn't being pressured—and has no intent—to suppress any student's protected political speech. At this stage, the only question the Court is authorized to address is whether the complaint, when its factual allegations are accepted as true and viewed in the light most favorable to plaintiffs, alleges a viable claim for relief warranting discovery. It does.

### III.    Plaintiffs' APA claim is dismissed as moot (Count IV)

In Count IV, which is titled "The Government Defendants' Withholding of Funds Violates the APA and Title VI (Against Agency Defendants)," plaintiffs allege that "[t]he Agency Defendants' suspension and termination of $400 million of funds to Columbia is final agency action in excess of Title VI's authority," and that plaintiffs are "directly affected by Columbia losing its federal funding" because they "benefit from the federal funds Defendants have suspended and terminated." SAC ¶¶ 206–07.

But plaintiffs have since acknowledged the "Agency defendants' recent restoration of grant funding to Columbia Defendants" in withdrawing their motion for a preliminary injunction on that issue, Dkt. 134 at 29, so their APA claims are dismissed as moot. And while the parties' briefing alleges other potential bases for plaintiffs' APA challenges, no other claim is alleged in the second amended complaint.

### IV.    Plaintiffs' contract claims against Columbia are dismissed with prejudice (Count V)

In the complaint, plaintiffs have identified an enforceable promise but have failed to state when and how Columbia breached it, so Count V is dismissed.

"Under New York law, a student and the college or university in which the student enrolls enter into an implied contract, the essence of which is that the 'academic institution must act in good faith in its dealings with [the] student[].'" *Goldberg v. Pace Univ.*, 88 F.4th 204, 210 (2d Cir. 2023) (quoting *Matter of Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 414 (1980)) (alterations in original). !'The precise terms of the implied contract are established by 'the university's bulletins, circulars and regulations made available to the student.'" *Id.* (quoting *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011)). "To state a valid claim for breach of contract . . . , the student must first identify an express promise" and then "'must state when and how the defendant breached [that] specific contractual promise.'" *Id.* (quoting *In re*

*Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 421 (S.D.N.Y. 2021)). They must also plausibly allege "damages suffered as a result of the breach." *Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, 736 F. App'x 274, 276 (2d Cir. 2018).

Plaintiffs say that Columbia has broken specific, enforceable promises that it made to them. They highlight Section 440 of Columbia's Rules of University Conduct, which states in relevant part: "[T]he University cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue." SAC ¶ 210 (quoting Columbia Univ., *Rules of University Conduct* § 440). They also point to a University Provost's statement that "freedom of expression is a core University value and it is our collective responsibility to uphold the principles of civic debate and discourse," SAC ¶ 211, and to Columbia's March 21 letter, which says that "[f]reedom of expression is what enables the rigorous debate and free inquiry on which our academic mission depends." Dkt. 101-4 at 1. Plaintiffs claim generally that Columbia breached its contract through its response to the February and March letters. SAC ¶ 215.

Columbia makes three arguments in response. The first two fail, but the last one succeeds. First, Columbia says there's no enforceable contract so there can't be any viable claim. In particular, Columbia claims that the language in Section 440, the Provost's email, and the March 21 letter "reflect[] first principles and value statements articulating the University's broad and general commitment to freedom of expression," and that those sorts of value statements are "general policy statements" that are "too general to form a contract under New York law." Dkt. 118 at 31–32. To be sure, "courts have rejected claims based on . . . general promises — for example, i) to provide a great learning environment for adult students; ii) to respect adult students and treat them with respect; iii) to not discriminate against adult students; iv) to provide supervision and teaching by honest and unbiased instructors; and v) to provide and to follow guidelines for student treatment." *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d at 422 (cleaned up), *aff'd sub nom. Tapinekis v. Pace Univ.*, 2024 WL 2764146 (2d Cir. May 30, 2024). The statements in the Provost's email and March 21 letter, about "freedom of expression" as a "core value," fall into that category.

But the language in Section 440 is specific enough to allow courts to determine whether it was breached in a particular case. *Cf. Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015) ("On a motion to dismiss a breach of contract claim, we should resolve any contractual ambiguities in favor of the plaintiff." (internal quotation marks and citation omitted)). That is, if students can prove that Columbia "rule[d]" their political speech "out of order" (e.g., by disciplining them for that speech) "on the ground that [their political expression] is objectionable, offensive, immoral, or untrue," then a court would be able to assess whether Columbia broke its promise that it "will not" do so.

Next, Columbia notes that Section 440 "explicitly recognizes limits" on freedom of expression. Dkt. 118 at 31–32. The thrust of that argument, it seems, is that the reach of any cognizable promise in Section 440 "is not unlimited." *Id.* at 31. True enough. But Section 440 "recognizes only two kinds of limitations on the right of freedom of expression, and both are to be narrowly construed." *Rules of University Conduct* § 440. The first covers reasonable time, place, and manner restrictions on certain forms of public expression. The second covers genuine threats of harassment. *Id.* That

means that to make out a claim, a student must allege, and later prove, that their political expression ruled "out of order" was outside of those two categories. It doesn't mean that there is no enforceable promise in the first place.

But despite plausibly alleging an enforceable promise between Columbia and students, plaintiffs have dropped the ball on their contract claim in all other respects. Columbia observes that plaintiffs have failed to "state when and how the defendant breached the specific contractual promise." Dkt. 118 at 32 (quoting *Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005)). Indeed, although plaintiffs generally mention Columbia "disclosing information about them to the Committee," "capitulating to the illegal demands of the federal government," and "fail[ing] to maintain its own doxing and privacy policies," they fail to identify (1) any specific instance of an alleged breach of the promise (2) against a particular plaintiff in this case that (3) caused that plaintiff to incur damages. SAC ¶¶ 215, 217.

These are fatal defects, and they require dismissal of Count V. The only remaining question is whether that dismissal should be with prejudice. Plaintiffs have had two chances to amend their complaint, they've been on notice of the arguments raised by Columbia for several months, and they haven't suggested that they could address these pleading deficiencies in a proposed amended complaint. For these reasons, dismissal with prejudice is appropriate here. *See Green Star Energy Sols., LLC v. Edison Props., LLC*, 2022 WL 16540835, at *17 (S.D.N.Y. Oct. 28, 2022).

## V.    Plaintiffs' motion for a preliminary injunction is denied without prejudice

"The evidentiary burden for establishing Article III standing for the purposes of a motion for a preliminary injunction is at least as onerous as the burden for establishing standing to secure a summary judgment." *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 113–14 (2d Cir. 2025). That means plaintiffs "must set forth by affidavit or other evidence specific facts" demonstrating injury in fact, causation, and redressability. *Lujan*, 504 U.S. at 561 (internal quotations omitted). Standing "cannot be inferred, but must affirmatively appear in the record." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 43 (2d Cir. 2015) (internal quotations omitted). And to warrant the "extraordinary and drastic remedy" of a preliminary injunction, plaintiffs must carry their burden on the other requirements detailed in the legal standards section above. *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).

Suffice it to say that the materials put forward by plaintiffs on their preliminary-injunction motion don't meet the standard, which plaintiffs all but concede by noting that a "hearing or decision on Plaintiffs' motion for preliminary injunction could be deferred until Plaintiffs have the opportunity to conduct limited discovery of Agency and Columbia Defendants." Dkt. 142 at 6 n.4. Plaintiffs' claims turn on the nature of defendants' internal communications, which aren't in the record. If, after an appropriate period for discovery, plaintiffs believe they have sufficient evidence on standing, state action, and the merits, they may renew their motion, and defendants will have an opportunity to oppose it. That said, plaintiffs may decide that it makes better sense—given the

22

fact-intensive nature of their claims—to focus on quickly completing discovery, overcoming defendants' inevitable summary-judgment motions, and proceeding to trial. In any event, plaintiffs will have only one opportunity to renew their motion for a preliminary injunction, so they should be thoughtful about when they choose to do it.

## CONCLUSION

For the reasons discussed above, the Congressional defendants' motion to dismiss is GRANTED, the Agency defendants' and Columbia's motions to dismiss are GRANTED IN PART and DENIED IN PART, and plaintiffs' motion for a preliminary injunction is DENIED without prejudice. Discovery will proceed on the surviving claims, and the parties should submit a revised case management plan by March 31, 2026. Given the nature of plaintiffs' claims, and the ongoing harm they allege, the Court will entertain an expedited schedule for discovery and summary-judgment motions.

The Clerk of Court is directed to terminate Dkts. 80, 83, 85, 101, 165, and 167.

SO ORDERED.

Dated: March 19, 2026
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge