UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------
Suzanne Gardinier, Maeve Aickin, Nazira Atalla,
Emily Carlisle, Sana Cheema,
Vega Barrada Gullette,
Riziki Mbugua, Liam Sharif Montague,
Lincoln Richardson, Nora Tucker-Kellogg,
and  Nurah Abdulhaqq,

|  |  |
|---|---|
| Plaintiffs, | Number: 7:25-cv-06442 |
| -against- |  |
|  | FIRST AMENDED COMPLAINT |
| SARAH LAWRENCE COLLEGE, THE HOUSE COMMITTEE ON EDUCATION AND THE WORKFORCE, and TIM WALBERG, |  |
| Defendants. |  |

---------------------------------------------------------------------

Plaintiffs, by their attorney Jonathan Wallace, for their complaint herein, state as follows.

## INTRODUCTION

1. Advancing a new McCarthyism, defendant House Committee on Education and the Workforce (the "Committee") has assumed the role of jawboning and bullying the nation's universities, seeking the suppression of disfavored speech and the elimination of diversity, using as cover the excuse that it is investigating and deterring antisemitism on campus.[1]

2. The Committee is carrying out this project with unusually open expressions of bigotry, spite, and the Christian fundamentalism of certain members.

3. In the new McCarthyism, vague and usually false accusations of "antisemitism" have been substituted for the old House Unamerican Activities Committee's ("HUAC") focus on purported "Communism."

4. However, the Committee utilizes a broad, facially unconstitutional definition of antisemitism,

---

[1] This is the fourth pending federal action against a university regarding compliance with a letter from the Committee; *Fakhreddine v. U Penn* 2:24-cv-01034 *(EDPA), Khalil v. Columbia,* 1:25-cv-02079 (SDNY)*, and Bedi v. Committee* 1:25-cv-03837  (ND Il.).

which includes almost all criticism of the Israeli nation-state, opposition to the political ideology, Zionism, and, in fact, any expressed support for the Palestinian people.

5.  The overbreadth of this definition of antisemitism is established by the fact that Jewish people who criticize the Israeli state and Zionism are tarred as antisemites like anyone else.

6.  The Committee's antisemitism project serves no valid legislative purpose, but is driven by a goal of "exposure for exposure's sake."

7.  The Committee has conducted no neutral, fair or careful investigation, but in its very first contact with universities, indignantly and falsely accuses them of fostering an antisemitic environment, citing as "facts" often wild and baseless assertions, and always hearsay, which the Committee gleans from doxing sites, and from ideological and often malicious individuals and organizations with a declared purpose of suppressing pro-Palestine expression, diversity, and in fact any indication of "wokeness" on campuses.

8.  Sarah Lawrence College  (the "College") is a private liberal arts college located in Westchester, New York, which has been one of the Committee targets.

9.  The Committee has sent two letters (the "Letters")  to the president and the chairperson of the Board of Trustees of the College, demanding the voluntary production of confidential documents pertaining to students, faculty, and staff of the College, whom the Committee indignantly accuses of antisemitism.

10. Disclosure of student disciplinary records by the College to the Committee violates students' rights under FERPA.[2]

11.  On information and belief, the College has already produced documents responsive to  the two Letters.

12.  In seeking confidential student, faculty, and staff records, the Committee is actively violating its targets' First Amendment rights, and rights of privacy and due process, is "jawboning" and

---

2   Though there is no private right of action, ""FERPA creates an interest that may be vindicated in a section 1983 action", *Fay v S. Colonie Cent. Sch. Dist*., 802 F2d 21, 33 (2d Cir 1986).

seeking to retaliate against their speech, and to interfere with their freedom of association.

13. The Committee is also violating the Establishment Clause, in that it is privileging the beliefs of a minority of Jewish people who claim that Zionism is fundamental to their religion over all other conflicting beliefs,  including those of other Jewish people, *Commack Self-Service Kosher Meats, Inc. v Weiss,* 294 F3d 415, 429 (2d Cir 2002) (New York law required meat labeled "kosher" to be butchered according to Orthodox, not Conservative, Jewish rules).

14. The Committee, which invokes Title VI as the basis for its antisemitism inquisition, has weaponized federal anti-discrimination law to conduct an egregious campaign of discrimination against Palestinian students, faculty, staff and their supporters.

15. Sadly, the College, which has expressed pride in its courage during the original McCarthy era, has made itself complicit in the new McCarthyism.

16. The Committee has to date issued no subpoena or compulsory legal process, and the College's voluntary compliance with the Letters has rendered it an active participant and co-conspirator in the Committee's violation of its targets' First Amendment rights and rights under Title VI.

17. The College is also breaching its own contracts with its students, faculty and staff, based on specific promises as to free speech, academic freedom, and privacy made in its communications to them, including the Student and Faculty Handbooks, the Freedom of Expression and Mutual Respect promised employees under Policies and Procedures, and also its implied obligation of good faith and fair dealing. The College's Principles for Mutual Respect state, "We foster honest inquiry, free speech and open discourse," and "We embrace our diversity in all its dimensions." Plaintiffs have found this not to be true when it comes to criticism of the state of Israel and advocacy around the Israeli genocide in Palestine. "We endeavor to inflict no harm on one another, in word or deed," state the Principles; yet Plaintiffs have faced retaliatory measures from the College that have caused harm, in response to pro-Palestine protest, and exposed Plaintiffs to possible future harm in their failure to keep this pledge to the whole College

3

community. The Student Handbook states, "At Sarah Lawrence College, freedom of expression is a core value that fosters an environment of open dialogue and intellectual growth." Plaintiffs have found that restrictions and disciplinary actions have resulted when the exercise of this freedom involves criticism of the state of Israel and advocacy around the Israeli genocide in Palestine.

## THE PARTIES

18. Plaintiffs Nurah Abdulhaqq, Maeve Aickin, Nazira Atalla, Emily Carlisle, Sana Cheema, Vega Barrada Gullette, Riziki Mbugua, Liam Sharif Montague, Lincoln Richardson, and Nora Tucker-Kellogg are current or recently graduated students at the College.

19. Plaintiff Suzanne Gardinier is a tenured faculty member at the College.

20. Sarah Lawrence College is a private university chartered under the laws of New York State.

## JURISDICTION AND VENUE

21. This Court has federal subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

22. Venue is proper in this district under 28 U.S.C. § 1391 because "a substantial part of the events giving rise to Plaintiffs' claims occurred" within this judicial district.

## THE FACTS

23. The Committee sent the two Letters to the President and Chairperson of the Board of Trustees of the College.

24. The first Letter, dated March 27, 2025, falsely accused (and pre-judged) the College of "encouraging antisemitic conduct," showing "permissiveness toward antisemitism," and allowing "hate towards Jews on this campus."

4

25. This Letter then asked for four categories of documents, including those pertaining to 1. "disciplinary action taken against students or faculty involved in" certain campus demonstrations, including an encampment; 2. "the agreement reached between SLC and encampment participants which resulted in the encampment disbanding"; 3. "the selection of [Students for Justice in Palestine] for a 'Group Excellence Award'"; 4. "[a] list of all student disciplinary or conduct cases relating to alleged antisemitic incidents," including detailed information about sanctions, the reviewing body, and the current standing of the student.

26. The Committee's overbroad, unconstitutional definition of antisemitism is clearly stated in a footnote: "The term antisemitic incidents should be understood to include any incidents involving the targeting of Jews, Judaism, Israel, Israelis, Zionism, and/or Zionists, or incidents otherwise identified as antisemitic."

27. The College met with faculty, staff, and students to discuss the Letter.

28. Affected faculty and students, including the Plaintiffs in this action, asked the College not to comply with the letter, citing academic freedom and the First Amendment.

29. When reminded about the College's alleged courage defending its community during the McCarthy era, College administrators made vague promises that they would not harm any members of the College community.

30. Soon after, they stated they had hired "outside legal counsel," "experienced with Congress." They declined to say who it was, and ceased all further communication about responses to the Letter, refusing to answer any more questions about their compliance with the Committee.

31. On information and belief, the College has produced documents to the Committee pertaining to the Plaintiffs, as College students and faculty involved in pro-Palestine activism, some of whom have been investigated by the College or been the subject of student conduct proceedings.

32. The second Letter, dated June 11, 2025, falsely alleged that pro-Palestine demonstrators "repeatedly fomented and engaged in antisemitic harassment," causing Jewish students to "walk

around campus fearing that they will be physically assaulted or otherwise attacked."

33.  This letter falsely names plaintiff Suzanne Gardinier as an antisemite.

34.  The second Letter also asks for four categories of documents, pertaining to 1. "reports or complaints of antisemitic acts or incidents received by Sarah Lawrence from January 1, 2022, through the date of your response"; 2. "antisemitism; harassment or crimes against Jewish students; violence against Jews, Israelis, or Zionists; or the violent destruction of a Jewish state." This section asks for documents in six subcategories, including those related to Students for Justice in Palestine;  "cancellation of classes by faculty or the modification of course materials in support of the Westlands occupation or encampment"; "Social media posts by Sarah Lawrence faculty on platforms celebrating violence against Jews, Israelis, or Zionists, including posts that applaud the October 7th attack"; and "Coordinated efforts to pressure students not to register for classes taught by Jewish professors."

35. Both Letters were the subject of press releases issued by the Committee on its web site, and both Letters accusing Plaintiffs of being antisemites prior to any investigation, were made public in full.

36.  These Letters are extraordinary documents in that the Committee does not even make a pretense of having conducted any kind of neutral or careful investigation, but attributes its fact assertions to hearsay uttered by adversaries of pro-Palestine expression, "woke" culture and the university in general on social media and in highly partisan reports.

37.  The Committee's intention, which is congruent with that of the presidential administration, is to cleanse the College and the academic world in general both of pro-Palestine expression and criticism of Israel, and also of Palestinian students and their supporters, simultaneously a violation of the First Amendment, Title VI and the New York State Human Rights Law.

**38.**

*The Committee is a Perfect Storm of Islamophobia[3], Christian Fundamentalism, Personal Vindictiveness, and Malicious Disregard of Civil Liberties and of the First Amendment*

39. The Committee  is, by its majority members' own statements and actions, publicly acts on, endorses and enables Islamophobia, Christian fundamentalist goals for government action,  and brutal disregard for the civil rights and liberties of the Palestinian and Muslim students whom it claims to be investigating.

40. The Committee has twenty Republican members, constituting the Committee's decision-making majority. The following paragraphs set forth statements by all of them.

41. Plaintiffs assert that this evidence would be admissible at trial under Fed. R. Ev. 406, which states: "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness", *cf. Vil. of Arlington Hgts. v Metro. Hous. Dev. Corp.,* 429 US 252, 267 (1977) "[H]istorical background... is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes"); *Carroll v Trump,* 124 F.4th 140, 168 (2d Cir 2024) (admitting the "Access Hollywood" tape under Rule 406).

42.  The Committee's Chairman, Tim Walberg, said at a March 2024 town hall meeting in Dundee, Michigan, in reference to Gaza, "We shouldn't be spending a dime on humanitarian aid. It should be like Nagasaki and Hiroshima. Get it over quick."

https://www.nytimes.com/2024/03/31/us/politics/tim-walberg-gaza-nagasaki-hiroshima.html

43.  Its former chair and current member, Representative Virginia Foxx, rather carelessly confessed in an X post  on September 12, 2025, to having secretly attempted to obtain the expulsion of a Columbia student:  "Khymani James...was not expelled. Nothing was done. @Columbia you

---

3    The New York Times, in a March 19 editorial, said:"The attacks against Islam and Muslims from Mr. Trump and other Republicans are shameful. They are filled with lies. They deserve denunciation from all Americans, regardless of politics or religion." The article includes examples of blatantly bigoted statements by other legislators not serving on the Committee.

have failed again, again, and again." https://x.com/virginiafoxx/status/1966508008818786572

44. Foxx told the *New York Times*: "The people here believe that the Jews are God's chosen people, and I grew up in the Baptist Church believing that....There are verses in the Bible that ministers will quote, that if you bless the Jewish people you will be blessed. If you curse the Jewish people you will be cursed." https://www.nytimes.com/2024/04/16/us/virginia-foxx-harvard-antisemitism.html

45. Member Rick Allen of Georgia quoted the same verse of the Bible of which Ms. Foxx was apparently thinking, to then-Columbia President Minouche Shafik, who is Egyptian, Muslim, and a person of color, at the Committee's April 17, 2024 hearing: "[A]re you familiar with Genesis 12:3?... It was a covenant that God made with Abraham and that covenant was real clear. If you bless Israel, I will bless you. If you curse Israel, I will curse you... Do you want Columbia University to be cursed by [the] God of the Bible?" https://www.rev.com/transcripts/university-antisemitism-hearing

46. Committee member Joe Wilson said: "'These stones and trees will say oh, Muslim, there is a Jew behind me, come and kill him.' That's their ideology. Free Palestine from the river to the sea is a code for death to Israel, death to America. We know that anti-Zionism is antisemitism." https://congress.gov/119/chrg/CHRG-119hhrg61619/CHRG-119hhrg61619.pdf

47. As for Committee member Glenn Grothman: "Amid the ongoing war between Hamas and Israel, Wisconsin congressman Glenn Grothman wants to prohibit Palestinians from entering the U.S.'I think there are plenty of places in that part of the world that could take them before the U.S.' said Grothman. 'Egypt, Syria, Lebanon, none of which want them, by the way, and we have to wonder why none of them want them. Or perhaps they can just go rebuild Gaza after Israel goes through the next couple of weeks, and clears out the more radical Hamas types.' In an interview posted Monday to the social media platform X (formerly known as Twitter), Grothman said Palestinians have been raised to not like Jewish people. The 6th District Republican said he

may introduce a bill or amendment to prohibit all Palestinians from entering the U.S., not just members of Hamas." https://whbl.com/2023/10/24/congressman-glenn-grothman-doesnt-want-palestinians-in-u-s/

48. Prominent Committee member Elise Stefanik has been particularly outspoken in accusing all segments of pro-Palestinian activism in this nation's universities of being terrorist supporters, calling Mohamed Abdou, then at Columbia, an "extreme pro-terror professor ",

https://x.com/RepStefanik/status/1781321607643869682 , asking the FBI to investigate a Columbia student group, CUAD, https://files.constantcontact.com/81b76c35801/cf6425c5-1967-410a-a0f7-a5d1f686501b.pdf?rdr=true, and also requesting the Treasury Department to investigate America's preeminent Muslim civil liberties organization,  the Council on American-Islamic Relations (CAIR), " to determine if the organization is being funded or directed by Hamas or any other foreign terrorist group" https://stefanik.house.gov/2025/10/stefanik-and-cotton-send-letter-to-treasury-secretary-bessent-requesting-investigation-into-the-council-on-american-islamic-relations

49. Member James Comer "is continuing to investigate organizations reported to be funding and organizing illegal actions, including at institutions of higher education, by individuals spreading pro-Hamas propaganda and engaging in antisemitic harassment and civil rights violations against Jewish students. In a letter to National Students for Justice in Palestine (National SJP)... Chairman Comer is now requesting documents and information to better understand how pro-Hamas propaganda and illegal encampments are being funded and supported across the United States." https://oversight.house.gov/release/comer-continues-to-investigate-groups-funding-and-organizing-illegal-encampments-and-pro-hamas-activities-in-the-united-states%EF%BF%BC/

50. Committee member Burgess Owens, before being elected to Congress, promoted a baseless conspiracy theory in 2016, alleging that "Khizr Khan, a Gold Star father whose son Army Capt.

9

Humayun Khan was killed in Iraq in 2004" and who "spoke about his son at the 2016 Democratic National Convention....co-founded an academic periodical that seeks to defend the arcane Sharia law to a legal system based on Western jurisprudence" and that "Khan's legal work may have helped the 9/11 hijackers enter the United States". Owens also claimed that, by "making it easy for Saudis, Emiratis, and others to game the U.S. immigration system, Khizr Khan shares in some of the responsibility for his son's death".

https://www.mediamatters.org/alex-jones/house-candidate-burgess-owens-frequently-promoted-content-alex-jones-including-anti

51. Member Mary Miller, mistaking for Muslim a Sikh chaplain invited to say a prayer to open a House session "published – then deleted – a post on X saying that Giani Singh... should not have delivered the House's morning prayer...and that it was 'deeply troubling' someone of that faith had been allowed to lead prayer in the House and it 'should never have been allowed...America was founded as a Christian nation, and I believe our government should reflect that truth, not drift further from it...May God have mercy."

https://www.theguardian.com/us-news/2025/jun/06/us-house-prayer-republican-mary-miller

52. Committee member Kevin Kiley described "an expansive network of outside groups partners with school districts to promote the use of instructional material that traffics in antisemitic tropes. Such groups often advance foreign interests and an anti-Israel agenda."

https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412733

53. Committee member Michael Rulli said that "Israel gave the Palestinian people the opportunity to turn Gaza into a bastion of freedom and economic prosperity. They chose to elect Hamas. The consequences of those decisions are not America's problem."

https://x.com/michaelrulli/status/1818017729435296065

54. Member Bob Onder, truly on the extreme fringe of all this hate speech, claimed that the Biden administration had allocated "'$50 million for condoms in Gaza, which were being used to float

IEDs into Israeli territory....You can't make this stuff up'....When pressed... to provide evidence for this claim, Onder admitted he hadn't personally verified the information but said it came from 'sources that I trust, both congressional sources and administration sources.'"

https://www.ksdk.com/article/news/politics/national-politics/gop-congressman-stumbles-on-gaza-aid-claims-in-heated-exchange-over-trumps-funding-freeze/63-13d3a0f3-5b3e-44cf-86b4-a23c449d4ef1

55. Committee member Michael Baumgartner said as a state legislator: "I want to prohibit (BDS) at the state legislator level and say it is illegal and that way I can just shut down these conversations and everybody can focus on teaching class and educating rather than being a politically-correct weapon."

56. https://mynorthwest.com/local/senator-baumgartner-bds-bill/500618

57. Member Mark Harris, "formerly the senior pastor of Charlotte's First Baptist Church, claimed Islam was 'dangerous' and the work of Satan. He also said peace between Israel and the Palestinians could not be achieved until Muslims and Jews accepted Jesus Christ as their savior. 'There is a satanic trinity of the dragon, the beast, and the false prophet. Satan is always a counterfeit' Harris said. "Listen to me, that is why the religion of Islam is so dangerous. It is the great counterfeit of our generation.'".

https://www.cnn.com/2018/11/02/politics/kfile-mark-harris-story

58. Committee member Randy Fine, described by CNN as "a Jewish first-term congressman who was known in the Florida Legislature as 'The Hebrew Hammer' and often makes Islamophobic remarks on social media", recently became notorious for posting that "the choice between dogs and Muslims is not a difficult one." https://www.nytimes.com/2026/02/17/us/politics/randy-fine-muslim-islamophobic-democrats.html Fine also wrote: "We need more Islamophobia, not less. Fear of Islam is rational." https://x.com/RepFine/status/2032230398009200896?s=20

11

59. Lisa McClain is one of the rare Committee members not on record with an equivalent utterance, but voted (along with all the other Committee members then serving in Congress) for House Resolution 883 in 2024 which held that "the slogan 'from the river to the sea, Palestine will be free' is an antisemitic call to arms with the goal of the eradication of the State of Israel". https://www.congress.gov/bill/118th-congress/house-resolution/883

60. Committee member Julia Letlow voted for House Resolution 894 of 2023, which approves the vague and overbroad  IHRA standards for antisemitism and state that "the slogan 'From the River to the Sea'... is a rallying cry for the eradication of the State of Israel and the Jewish people". https://www.congress.gov/bill/118th-congress/house-resolution/894/text

61. Member Ryan Mackenzie agreed with other Committee members, at a meeting at which the President of Haverford was questioned, that funding should be withheld from universities declining to reveal information on student conduct proceedings.[4] "Other Republicans endorsed the idea of funding cuts for schools that refuse to disclose punishments, saying Congress should explore the issue. Rep. Ryan Mackenzie of Pennsylvania said it should be a baseline for receiving funding." https://whyy.org/articles/haverford-college-antisemitism-congressional-hearing/

62. Member Glenn Thompson participated in grilling then- U. Penn president Liz Magill at the December 5, 2023 hearing which would lead to her forced resignation: "Nowhere in the United States have these hateful and divisive ideas been more prevalent or have found a safer home than on college campuses. ...[I]t is impossible for a faculty member to support BDS and treat Israeli academics fairly. Can you tell this Committee unequivocally that no such discrimination has taken place?". Mr. Thompson advocated for "not giving such [BDS supporters]  administrative powers" within the university. https://www.congress.gov/118/chrg/CHRG-

---

4    Haverford won dismissal of an antisemitism lawsuit, on the grounds that anti-Zonism is not antisemitism,  *Landau v. Corp. of Haverford Coll.,* No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at *4-5 (E.D. Pa. Jan. 6, 2025).

118hhrg56239/CHRG-118hhrg56239.pdf At another hearing, questioning the President of Georgetown, Mr. Thompson said, in classic HUAC fashion: "In a social media post, the Associate Director of the Bridge Initiative of Georgetown, Mobashra Tazamal, reposted a statement that said Israel has been recreating Auschwitz in Gaza for two years. Do you believe it's appropriate for a Georgetown-affiliated scholar to publicly endorse a statement comparing Israel actions in Gaza to the evil of Auschwitz?" https://www.rev.com/transcripts/university-antisemitism-hearing

63. Member James Moylan, speaking on the House floor, endorsed violence against Muslim people by uncritically repeating and endorsing an Islamophobic narrative on the House floor: "2 weeks ago, coordinated mobs roamed the streets of Amsterdam, attacking Israelis in town for a soccer match, in a chilling, premeditated assault. Dozens of people were injured, and scores were running and hiding in fear". https://www.congress.gov/118/crec/2024/11/20/170/172/CREC-2024-11-20-pt1-PgH6133.pdf Mr. Moylan omitted the fact that the supporters of Maccabi, the Israeli team, had committed the first violent acts of the day. NBC reported: "At 1 p.m. local, a large number of Maccabi supporters gathered in the city's central Dam Square...Video shared on social media and geolocated by NBC News showed Maccabi fans chanting anti-Arab slogans in front of the square's National Monument. Later Maccabi fans could be seen singing 'Death to the Arabs' and 'Let the IDF win. We will f--- the Arabs,' as well as tearing down a... Palestinian flag". The Maccabi fans attacked and vandalized taxis (whose drivers apparently were, or were thought to be, Arab). https://www.nbcnews.com/news/world/violence-surrounding-soccer-match-israeli-dutch-teams-unfolded-rcna179572 "Footage has also emerged of Maccabi supporters close to Amsterdam central railway station setting off fireworks, chanting anti-Palestine slogans and taking iron scaffolding tubes and wooden planks from a building site to use as weapons. Other footage shows Maccabi fans running through the streets swinging belts".

13

https://www.theguardian.com/world/2024/nov/11/what-happened-amsterdam-israeli-football-fans "[A] report released by the mayor's office earlier this week, compiled with significant input from police investigators, indicates it was Israeli fans who initiated the first attacks, which then spiralled", https://www.cbc.ca/news/world/amsterdam-israeli-soccer-fans-violence-1.7383558

64. The Committee itself has similarly endorsed violence against Arab and Muslim students at Columbia. In January 2024, two Columbia students who were ex-members of the Israeli military disguised themselves, entered a pro-Palestinian student demonstration, and sprayed protesters with a "foul smelling" substance which victims believed to be a military crowd control chemical known as "skunk spray", and which resulted in multiple emergency room and hospital visits. Columbia initially suspended the two perpetrators,  but under pressure from various outside actors including the Committee, ending up reversing the sanctions, and (astonishingly) paying the perpetrators several hundred thousand dollars in settlement. https://www.theguardian.com/us-news/2024/nov/01/columbia-student-protest-lawsuit

65.  In  an October 31, 2024 Committee report, "ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED", https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf, the Committee devotes pages 48-57 to a section  excusing, justifying and minimizing the attack, titled:  "THE COLUMBIA ADMINISTRATION FAILED TO CORRECT FALSE NARRATIVES OF A 'CHEMICAL ATTACK' THAT WERE USED TO VILIFY JEWISH STUDENTS, BUT IMPOSED DISPROPORTIONATE DISCIPLINE ON THE JEWISH STUDENTS INVOLVED". This initiative by the Committee beggars the imagination, shouting Islamophobia, viewpoint discrimination and disparate treatment  to anyone who will listen.

66. Given that the Committee demands maximum punishment for anyone who merely utters the

14

words "From the river to the sea, Palestine shall be free", the Committee's indulgence is quite shocking as to students who assaulted their classmates by spraying them with an unknown substance the Committee describes as "novelty 'fart spray'" (p. 48). Rather than regarding the incident as an instance of violent Islamophobia, the Committee flips the script, accusing Columbia of antisemitism: "The false narrative that Israeli students perpetrated a 'chemical attack' with 'skunk spray' is more than an example of disparate disciplinary treatment: Columbia's failure to correct the record allowed this false narrative to be used by antisemitic students and faculty to vilify Israeli students and call for their exclusion in hateful chants, fliers, and media appearances." p. 50  "The Columbia administration.. imposed disproportionate discipline on the Jewish students involved." p. 2 The message could not be clearer, that violence against people just like Plaintiffs is acceptable.

67. Both with regard to the Maccabi riot in Amsterdam and the chemical spray attack at Columbia, Committee members-- and the Committee itself, speaking officially-- recharacterize perpetrators as victims.

68. While this First Amended Complaint was still being drafted, on March 17, 2026, the Committee issued a report dated "How Campuses Became Hotbeds: The Rise of Radical Antisemitism on College Campuses", https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=413173 , in which pages 7-9 and 24-25 discuss the College: "[I]n the summer of 2024 SLC embraced {a faculty] request to remove the IHRA definition of antisemitism from the school's orientation materials. The IHRA definition is the leading internationally accepted definition of antisemitism; it captures manifestations of antisemitism that are the most common on college campuses today, such as claiming Israel is a 'racist endeavor' or comparing Israelis to Nazis."

69. The International Holocaust Remembrance Alliance (IHRA) standards, endorsed and used by

the Trump administration, Congress and the Committee, are facially violative of the First Amendment,[5] literally stating that calling an Israeli a racist or an Israeli government official a Nazi is an act of antisemitism.

70. The March 17 Report criticizes Sarah Lawrence for adopting "The Jerusalem Declaration on Antisemitism (JDA)—which was created in response to the IHRA definition", because it (Constitutionally correctly) "describes boycott, divestment, and sanctions (BDS) efforts against Israel as 'not, in and of themselves, antisemitic'".

71. The Report indignantly describes the grant of a "student leadership award" to a College student activist group which includes the student Plaintiffs, for having "engaged in empathetic and powerful activism" and as being committed to "direct action and refusal to stand idly by in the face of injustice[.]"  It offers as an example of antisemitic speech which the University is obligated to suppress, the First Amendment-protected statement: "Peace is a white man's word. Liberation is our word."

72. The Report also attacks College faculty falsely as antisemitic, quoting (without naming) Plaintiff Gardinier's First Amendment-protected expression as examples.

73. This Report also clearly signals that the Committee's official and impermissible goal is to punish First Amendment-protected pro-Palestinian expression at the College.

74.  These then are the people to whose tender mercies the College has confided FERPA-protected confidential student information.

75. None of the goals expressly stated by the majority members of the Committee, including its chairman, state a legitimate legislative purpose: they stand for promotion of

---

5  There are a number of pending lawsuits which will result in rulings on the unconstitutionality of IHRA. A District Court in Texas, in granting a preliminary injunction to Students for Justice in Palestine, held that Texas' adoption of the IHRA standards "arguably proscribed" Plaintiffs' First Amendment-protected criticism of Israel, *Students for Just. in Palestine v Abbott,* 756 F Supp 3d 410, 421 (WD Tex 2024) .

Islamophobia,violence against Muslims,  ending Muslim prayer in the House and in fact excluding Islam from America, chilling and silencing campus student organizations and national civil liberties organizations via  FBI and Treasury investigations, obtaining expulsion of named individual students,  ensuring that Genesis is literally enforced on campus,  and pressuring Muslim students to accept Christ.

76. That anti-Zionism is a form of antisemitism is the official policy of the Committee, of the House and of the Trump administration. Committee members, such as  Joe Wilson, quoted above, have said as much. The sense of the House was expressed by HR 894 of 2023, which stated: "Resolved, That the House of Representatives—(4) clearly and firmly states that anti-Zionism is antisemitism", https://www.congress.gov/bill/118th-congress/house-resolution/894/text Every member of the Committee then serving voted "Yea".

77. The  Letters clearly are based on this understanding; for example, the Committee's March 27, 2025 letter, https://edworkforce.house.gov/uploadedfiles/ltr_sarah_lawrence_coll_3.27.2025.pdf, states at footnote 13: "The term antisemitic incidents should be understood to include any incidents involving the targeting of Jews, Judaism, Israel, Israelis, Zionism, and/or Zionists, or incidents otherwise identified as antisemitic."

78.   Federal courts around the nation have, however, uniformly rejected the assertion that anti-Zionism is antisemitism, *StandWithUs Ctr. for Legal Just. v Massachusetts Inst. of Tech.,* 2025 U.S. App. LEXIS 27390, at *18 (1st Cir Oct. 21, 2025, No. 24-1800); *Am. Assn. of Univ. Professors v Rubio*, 802 F Supp 3d 120, n 17 (D Mass 2025); *Landau v. Corp. of Haverford Coll.,* No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at *4-5 (E.D. Pa. Jan. 6, 2025)  *Canel v Art Inst. of Chicago,* 2025 US Dist LEXIS 30309, at *24-25 (ND Ill Feb. 20, 2025, No. 23 CV 17064);  *Gerwaski v Nevada ex rel. Bd. of Regents of the NV Sys. of Higher Educ.,* 2025 US Dist LEXIS 84645, at *21-22 (D Nev May 5, 2025, No. 2:24-cv-00985-APG-MDC); *Newman v.*

*Point Park Univ.,* No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722, at *78-79 (W.D. Pa. Mar. 31, 2022).

79. By attempting to investigate, sanction, chill, punish and end all anti-Zionist expression, the Committee is by its own confession engaged in a project which lacks a valid legislative purpose.

80. This case cannot be decided at any phase, and certainly not on a motion to dismiss, without looking at the totality of bigotry and malice that is the Committee.

81. The Committee has left the "presumption of regularity" so far behind it is no longer even visible in the rear view mirror: "The presumption of regularity that has been previously extended to [the federal government] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds. When [the government], in this case, conveys assurances that any private and sensitive data will remain private and used only for a declared and limited purpose, it must be thoroughly scrutinized and squared with its open and public statements to the contrary", *United States v Oregon,* 2026 US Dist LEXIS 25259, at *34 (D Or Feb. 5, 2026, No. 6:25-cv-01666-MTK).

\

*Iqbal and Twombly Should Not Be Misinterpreted to Disadvantage Constitutional Claims*

82. Defendants will ask this Court to apply a very demanding standard of *proof* to the Complaint, using as justification the "plausibility" language o*f Iqbal* and *Twombly.*

83. This Court should not accept the invitation, *Hemme v Airbus,* 2010 US Dist LEXIS 31920, at *14 (ND Ill Apr. 1, 2010, No. 09 C 7239) ("Motorola misinterprets the plausibility standard of *Twombly* and *Iqbal* as an opportunity to make premature merits-based arguments regarding Plaintiffs' claims at the pleading stage. The Supreme Court has not imposed a probability requirement on plaintiffs[;] Plaintiffs have satisfied their burden of pleading by presenting sufficient facts to foster an expectation that discovery will uncover evidence supporting their

allegations"); *KSW Mech. Servs. v Mech. Contrs. Assn. of NY,* 2012 US Dist LEXIS 63507, at *3-4 (SDNY May 4, 2012) ("[T]he Association both misinterprets *Twombly* and *Iqbal* and misreads the Complaint...*Twombly* and *Iqbal* did not disturb the well-settled rule that courts must accept as true the reasonable inferences that [can] be drawn from [a plaintiff's] allegations"); *Mathews v Verizon Communs. Inc.,* 2020 US Dist LEXIS 158270, at *22-23 (DNJ Sep. 1, 2020, Civil Action No. 19-21442) ("[T]he Court agreed with the plaintiff that '[d]efendants have misinterpreted what is required at the pleading stage under Twombly,' and that '[w]hile [d]efendants are correct that [p]laintiff'slaintiff's claims must be plausible on their face, there is no requirement that [p]laintiff must also plead a plausible motive for [d]efendants' actions... [P]llaintiff is only required to provide enough factual matter (taken as true) to suggest the required element[s] of the claims asserted"); *Griffin-El v Beard,* 2009 US Dist LEXIS 92975, at *6-7 (ED Pa Oct. 5, 2009, No. 06-2719) ("In this case, plaintiff, unlike the case in *Iqbal,* has plead sufficient factual allegations for the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged, and has therefore met the pleading requirement of Federal Rule of Civil Procedure 8(a)"); *H2O Plus, LLC v Arch Personal Care Prods., L.P.,* 2011 US Dist LEXIS 54767, at *12-13 (DNJ May 17, 2011, No. 10-3089 (WJM-MF)) ("The Court agrees with Plaintiff that Defendants have misinterpreted what is required at the pleading stage under *Twombly.* While Defendants are correct that Plaintiff's claims must be plausible on their face, there is no requirement that Plaintiff must also plead a plausible motive for Defendants actions").

*This Court Must Therefore Not Resolve a Disputed Fact Issue as to Redaction*

84. Both Defendants have asserted that all documents pertaining to Plaintiff students were redacted in compliance with FERPA before being disclosed by the College to the Committee.

19

85. Plaintiffs assert plausibly that they cannot rely on this claim of redaction, especially because their request to inspect the documents pertaining to them which were turned over to the Committee.

86. Plaintiffs have a right to view these documents insofar as they constitute each Plaintiff's individual confidential files under FERPA ( 34 CFR § 99.30).

87.  FERPA required the College to obtain consent from the student (if major) or parent (of a minor) before disclosing anything to the House ( 34 CFR § 99.30), as there was no applicable exception (the disclosure was voluntary, not subject to a "judicial order or lawfully issued subpoena"), 99.31). This was never done.

88. Even if the College redacted files, Plaintiffs believe FERPA was still violated, to the extent that, even without names, the files contain "personally identifiable information"[6]. For example, a student conduct record that "[Name withheld] is a junior living off campus with a double major in  architecture and anthropology, and a member of the debating club" might contain enough information for public identification of the student.

89. Each of the  Letters contains a statement directing the recipient not to redact anything, and the Committee has previously savagely criticized MIT and Harvard for supplying redacted files (see above).

90. Mere statements in letters and pleadings, or even under oath in an affidavit, that files were redacted is hearsay and would not be probative of anything even if this were an evidentiary hearing, which it is not.

91. This Court would misapprehend *Twombly* and *Iqbal* if it made a finding that Plaintiffs' Complaint was not "plausible" or that Plaintiffs lacked standing due to defendant's claims about

---

6 Personally identifiable information (PII) includes information that can be used to distinguish or trace an individual's identity either directly or indirectly through linkages with other information." U.S. Department of Education, "Protecting Student Privacy", https://studentprivacy.ed.gov/content/personally-identifiable-information-pii

redaction and FERPA compliance, *Segedie v Hain Celestial Group, Inc.*, 2015 US Dist LEXIS 60739, at \*27 (SDNY May 7, 2015, No. 14-cv-5029 (NSR)) ("To accept Defendant's argument, the Court would need to take Defendant's word over allegations in the Complaint, which the Court must accept as true on a motion to dismiss"); *Patel v NY Life Ins. Co.,* 2012 US Dist LEXIS 72717, at \*16 (SDNY May 21, 2012) ("While the Court may take judicial notice of this Georgia statute, the Court cannot, on a motion to dismiss, simply take Defendant's word that it complied with the statute").

92. In fact, a request to dismiss the Complaint because of the alleged redactions is a disguised mootness argument. To grant a motion to dismiss on a mootness defense, the defendant must satisfy the Court that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation", a threshold which the Defendants cannot imaginably pass here, *Martinez v Pure Green NYC Wholesale Corp*., 2025 US Dist LEXIS 59432, at \*15 (EDNY Mar. 30, 2025, No. 23-cv-4247 (NRM) (MMH)); *United States v Concentrated Phosphate Export Ass'n,* 393 US 199, 203 (1968)(*"*Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant . . . free to return to his old ways").

*The College  Is Not An Antisemitic Environment*

93. There are many Jewish members of the College community who do not believe it is an antisemitic environment.

94. Those who claim it is, including the Committee, are using a controversial, overbroad and unconstitutional definition of antisemitism, which conflates anti-Zionism, and in fact any criticism of Israel or support of the Palestinian people, with antisemitism.

95. Many American Jews, including members of the College community, are horrified by Israeli

21

violence, and regard themselves as anti-Zionist and as supporters of the Palestinian people.

96. In order to claim to carry out its project, the Committee must inevitably proclaim that half or more of the American Jewish population are themselves antisemites--an absurdity.

97. This harassment of American Jews who do not fit a preconceived mold is itself a form of antisemitism.

98. Many of the people accusing the College of antisemitism are not themselves Jewish.

99. Jewish and non-Jewish faculty, staff and students at the College have noted that what have been alleged to be instances of antisemitism at the College involve antipathy toward or criticism of Israel, not bias against Jewish people.

100. Most members of the Republican majority on the Committee are not Jewish, including defendant Walberg.

101. On information and belief, the Committee is using the excuse of purporting to detect antisemitism (even among Jewish people) as an excuse to transform the College and other universities into a right-wing model, without diversity and without pedagogy critical of the United States or Israel or perceived as "leftist" or "woke."

102. Members of the Committee have, during hearings, in virtually the same breath in which they condemned antisemitism, also attacked DEI and claimed the universities lack conservative voices.

*The Committee Lacks a Valid Legislative Purpose*

103. It is impossible to comprehend what legislation could result from Mr. Fine's call for more Islamophobia, Mr. Walberg's suggestion that we destroy Gaza like Hiroshima,  Mr. Onder's urgent demand that we not send bomb-compatible condoms to Gaza, Ms. Miller's judgment that Muslims not be permitted to offer opening prayer in the House, or Mr. Allen 's call for the

universities strictly to obey what he thinks are the strictures of *Genesis*[7].

104. All that is required for this Complaint to survive a motion to dismiss is that Plaintiffs have plausibly pled that the Speech and Debate clause does not shield the Committee because it is pursuing an illegitimate, illegal, nonlegislative purpose.

105. Plaintiffs believe this to be true, and have plausibly so pled.

106. Plaintiffs intend, after filing this First Amended Complaint, also to file a letter motion requesting this Court to stay consideration of motions to dismiss until limited discovery is conducted of the College alone, giving Plaintiffs a chance to examine their own files protected by FERPA, as well as communications from and to the Committee pertaining to the  Letters.

107. This approach would strike a balance between Congress' asserted immunity and Plaintiffs' FERPA rights and rights of discovery, and would also aid this Court in deciding the motions to dismiss justly and economically.

108. The Committee certainly cannot assert immunity as to communications between it and the College, when sought from the latter.

109. "[W]e  cannot accept the proposition that in order to perform its legislative function Congress not only must at times consider and use actionable material but also must be free to disseminate it to the public at large, no matter how injurious to private reputation that material might be. We cannot believe that the purpose of the Clause -- to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary, will suffer in the slightest if it is held that those who, at the direction of Congress or otherwise, distribute actionable material to the public at large have no automatic immunity under the Speech or Debate Clause but must respond to private suits to the extent that others must respond in light of the Constitution  and applicable laws.  To hold otherwise  would be to invite gratuitous injury to citizens for little if any public purpose", *Doe v McMillan,* 412 US 306, 316-317 (1973). "[B]road as is [Congress']

---

7   Which violates the Establishment clause "[b]y creating a regime in which there is a combined exercise of civic and religious authority", *Commack Self-Service Kosher Meats, Inc. v Weiss,* 294 F3d 415, 429 (2d Cir 2002).

power of inquiry, it is not unlimited. There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress....Nor is the Congress a law enforcement or trial agency....No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible...We have no doubt that there is no congressional power to expose for the sake of exposure", *WATKINS v UNITED STATES*, 354 US 178, 187, 200 (1957); *see also  Gravel v United States,* 408 US 606, 618-619 (1972) ("The Speech or Debate Clause could not be construed  to immunize an illegal arrest even though directed by an immune legislative act"); *McCreary County v ACLU,* 545 US 844, 859 (2005) ("[L]ooking to whether government action has 'a secular legislative purpose' has been a common, albeit seldom dispositive, element of our cases");  *Trump v Mazars USA, LLP,* 591 US 848, 863 (2020)  ("Congress may not issue a subpoena for the purpose of law enforcement...Congress may not use subpoenas to "try" someone before [a] committee for any crime or wrongdoing....Congress has no general power to inquire into private affairs and compel disclosures...and there is no congressional power to expose for the sake of exposure"); *United States v Rumely,* 345 US 41, 46 (1953) ("Surely it cannot be denied that giving the scope to the resolution for which the Government contends, that is, deriving from it the power to inquire into all efforts of private individuals to influence public opinion through books and periodicals, however remote the radiations of influence which they may exert upon the ultimate legislative process, raises doubts of constitutionality in view of the prohibition of the First Amendment"); *Kilbourn v Thompson,* 103 US 168, 190, 195 (1880)  ("[N]either of these bodies possesses the general power of making inquiry into the private affairs  of the citizen.....A fruitless inquiry House of Representatives had no power or authority in the matter more than any other equal number of gentlemen interested for the government of their country.... [A] fruitless investigation into the personal affairs of individuals....could result in no valid legislation on the subject to

which the inquiry referred").

110. *Watkins* also raises the question of whether the Committee has Congressional authority to investigate pro-Palestinian expression under the guise it is antisemitism. In its Letters, the Committee states that its jurisdiction is derived from "House Rule X", which it claims gives it "broad" "legislative and oversight jurisdiction, extending to 'education . . . generally' and 'laws, programs, and Government activities relating to domestic educational programs and institutions and programs of student assistance within the jurisdiction of other committees'. This includes enforcement of Title VI and other antidiscrimination laws by the Department of Education". By its own admission, to the extent it is (as the long line of federal cases cited above establishes) investigating pure First Amendment-protected speech, which may not be construed as a Title VI violation, it would lack authority to do so.

111. *Watkins* analyzed a specific grant of authority to investigate "unAmerican activities": "It would be difficult to imagine a less explicit authorizing resolution. Who can define the meaning of 'un-American'?" *Watkins, supra at* 202.

112. Here, it is an easy prediction that Committee members would be hard put to say what they mean by "antisemitism".

113. Plaintiffs in the instant case seek only to enjoin the distribution of FERPA-protected information about them by the Committee to third parties such as the *New York Post, the Free Beacon, Canary Mission,* and the public at large, for sake of exposure or intimidation. The Speech and Debate clause does not protect such publication of information, *Gravel v United States,* 408 US 606, 625 (1972) ("[P]rivate publication by Senator Gravel through the cooperation of Beacon Press was in no way essential to the deliberations of the Senate"); *Hentoff v. Ichord,* 318 F. Supp. 1175, 1182 (1970) ("If a report has no relationship to any existing or future proper legislative purpose and is issued solely for sake of exposure or intimidation, then it exceeds the legislative function of Congress; and where publication will inhibit free speech and assembly,

publication  and distribution in official form at government expense may be enjoined").

*The First Amendment is Being Violated*

114.  The Plaintiffs have come to expect hatred, threats and punishment for mentioning Gaza or Israel on campus or in their own private social media.

115.  The College is cooperating with the Committee in retaliating against such First Amendment protected expressions, through the use of disproportionate student conduct sanctions singling out pro-Palestinian expression (viewpoint discrimination).

116.  The Committee and the Trump Administration have worked hard to create a hostile environment, in the nation as at the College, in which anyone expressing criticism of Israel or support of Palestine is execrated as an antisemite and supporter of terrorism.

117.  The College itself has unwisely made statements about Plaintiffs which contributed to "exposure for the sake of exposure."

118.  Plaintiffs have received death and rape threats and hate speech, including to their private email addresses, cell phones and social media, which are generated and validated by the Committee's project.

119.  Their freedom of association has been infringed, because it is no longer safe for them to associate and share ideas and companionship with each other on or off campus or online, without becoming the targets of hostile attention.

120.  The College's Campus Security department has become involved, harassing and surveilling Plaintiffs and contributing to a sense of unsafety on campus.

121.  Plaintiffs believe that the views of people who support Israeli aggression, including the bombing of civilian populations, hospitals and universities, and who defend the genocide being committed in Gaza, are being privileged over all other views on campus.

122.  The Committee's mission (as revealed in the very language of the Letters quoted above)  is to

eliminate all pro-Palestine expression and criticism of Israel from the College.

123. "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors", *NRA of Am. v Vullo,* 602 US 175, 187, 191 (2024).

124. For purposes either of a standing analysis or injunctive relief, "[L]oss of First Amendment freedoms, even for minimal periods of time, constitute irreparable injury," *Elrod v. Burns,* 427 U.S. 347 (1976); *Students for Just. in Palestine v. Abbott,* No. 1:24-CV-523-RP, 2024 U.S. Dist. LEXIS 196180, at *29 (W.D. Tex. Oct. 28, 2024).

*The Committee Is Attempting to Coerce the College into Discriminating Against Plaintiffs*

125. Viewpoint discrimination infringing the First Amendment may sometimes be closely allied with protected-class discrimination which violates Title VI.

126. Where for example members of a protected class are associated with a particular viewpoint of which their university disapproves, they may receive more severe sanctions or retaliation than non-members.

127. Similarly, it may be an act of racism or discrimination automatically to assign certain opinions or viewpoints to members of a protected class.

128. Plaintiffs are on the receiving end of both types of discrimination.

129. As Palestinian, Arab and Muslim students and their supporters, they are more severely punished than others similarly situated, for equivalent alleged violations of student code.[8]

130. As Palestinian, Arab and Muslim students and supporters, they are also viewed in a biased way as being dangerous, violent and prone to antisemitism and supporters of terrorism,

---

8  Disparate use of student codes and Title VI processes to privilege one set of complainants over another itself contributes to a hostile environment, *Doe v Univ. of Maine Sys.,* 2020 US Dist LEXIS 31993, at *22 (D Me Feb. 20, 2020, No. 1:19-cv-00415-NT) ("[A]ny failure by UMS to investigate those allegations, while actively investigating the complaints against Doe, could potentially be a new act of selective enforcement or could have contributed to a hostile environment for Doe"). See also AAUP Report at https://www.aaup.org/reports-publications/aaup-policies-reports/topical-reports/title-vi-discrimination-and-academic

*Counterman v Colorado*, 600 US 66, 88-89 (2023) ("[U]nfortunately yet predictably, racial and cultural stereotypes can also influence whether speech is perceived as dangerous").

131. The Committee project is a bigoted one, seeking to eliminate all Palestinian, Arab and Muslim students, and anyone supporting and associating with them, from the College and from the academic world generally.

132. The College has rendered itself complicit in the Committee's project, by turning over confidential files, and by giving in to the pressure to harass, surveil, jawbone and sanction students, staff, and faculty, including Plaintiffs.

133. The College is privileging another putative protected class, Jews who assert that Zionism is an aspect of their religion, over everyone else, including Jewish people who oppose the actions of Israel and the Zionist political philosophy.

*The College is Complicit in the Committee's Project*

134. The College, like apparently all other universities named or contacted by the Committee, is intimidated by the Commitee's attention.

135. As this administration has demonstrated through its actions in recent months, the government has used similarly false assertions of antisemitism to cancel federal grants and contracts to universities, revoke their ability to accept international students, and even to threaten to remove their accreditation.

136. A false accusation that the College tolerates a hostile antisemitic environment may also result in fewer students accepting offers to attend, and in donors canceling projects or withholding funds.

137. Receiving a letter from the Committee is inherently coercive.[9]

138. The College had other choices: citing academic freedom, freedom of speech and Title VI, or the

---

9   *Doe v Univ. of the Sciences,* 961 F3d 203, 214 (3d Cir 2020) (university "allegedly intimidated by the 2011 Dear Colleague Letter [from Department of Education] and associated threats of litigation or...scrutiny"); *Menaker v Hofstra Univ.,* 935 F3d 20, 34 (2d Cir 2019);  *Doe v. Columbia University,* 831 F.3d 46 (2d Cir. 2016).

College Principles of Mutual Respect to refuse voluntary compliance pending a subpoena, or of course to sue the Committee itself.

139. Instead, the College has chosen to comply with the Committee's requests, disclosing confidential student and faculty files, and possibly staff files as well, harassing, jawboning and surveilling members of its community, and investigating and sanctioning students for their pro-Palestine expression and criticism of Israel.

140. The fact that the College is being bullied, threatened and pressured by the Committee does not create a defense to Plaintiff's causes of action or let the College off the hook for its violations of Plaintiffs' rights as members of the College community.

*Plaintiffs Sue the Defendants Jointly and Severally*

141. Plaintiffs sue both the College and Committee on all causes of action for their conspiracy, cooperation, and joint action in harming the Plaintiffs.

142. Plaintiffs assert in the alternative that due to the Committee's coercive action against the College, backed by the government's threats, the College has renounced its integrity as a separate non-compliant institution to the point of functioning as a state actor itself.

143. In other words, there has been a meeting of purposes between the College and the Committee to engage in conduct to deprive Plaintiffs of constitutional rights.

144. Each of the College and the Committee has aided and worked in concert with the other to violate the Plaintiffs' rights; for this reason, the College is named as a co-defendant on the First Amendment claim.

145. Plaintiffs assert that the Committee is acting with no valid legislative purpose and therefore cannot assert the protection of the Speech and Debate clause, and is therefore subject to jurisdiction and suit in this Court.

146. In the alternative, if the Committee is entitled to immunity, Plaintiffs assert a cause of action

against the College alone, as set forth in the *AT&T, Mazar* and *RNC* cases.

147. In *Republican Natl. Comm. v Pelosi,* 602 F Supp 3d 1, 22-23 (DDC 2022), *vacated on other grounds* 2022 U.S. App. LEXIS 26068 (DC Cir Sep. 16, 2022, No. 22-5123), the District Court held that, even after dismissal of a Congressional defendant on Speech and Debate clause grounds, "the RNC has standing to assert its claims against Salesforce", the recipient of a subpoena for the RNC's records. "[T] he RNC has established as to each of its claims that it will imminently suffer an injury-in-fact stemming from Salesforce's compliance with the subpoena....fairly traceable to Salesforce's imminent disclosure of the materials at issue to the Select Committee....just as causation is satisfied, so is redressability." Though the Court found this to be a matter of first impression, it noted that "[i]n a few cases in which the issue might have come up, the court had no need to address it because the congressional defendants had intervened—that is, they were not 'made defendants' involuntarily—rendering the Clause inapplicable" (citing to *Am. Tel. & Tel. Co.*, 567 F.2d at 128-30 and *Mazars USA,* 140 S. Ct. at 2028). The District Court, in reaching a decision on the merits, "assume[d] without deciding that House Defendants are not indispensable under Rule 19 and that Salesforce may be treated as a 'state actor' in this context".

148. This Court should consider, as the *RNC* appears to have done, the cause of action against the College pertaining to the Letters as a legal workaround or fiction to assure justice, much like *Monell.* In other words, Plaintiffs should be able to assert any claims against the College exactly as it would have asserted them against the absent House Committee, and the College could assert whatever defenses the Committee might have, except for Speech and Debate. This is not inconsistent with *RNC,* if Sarah Lawrence could be deemed a state actor for purposes of the case, merely by virtue of having complied with the Letters. If, in order to survive a motion to dismiss, Plaintiffs were required to "plausibly" plead some other, unknown set of prediscovery facts to prove entanglement under the *Lugar* standard as set forth in *Dahlberg v Becker,* 748 F2d 85, 92

(2d Cir 1984), *cert. den.* 470 US 1084 (1985) [10] would eliminate any practical utility of the *RNC* holding to almost all litigants.

149. However, whether or not Plaintiffs can pursue their First Amendment claim against the University without naming the Committee, their breach of contract and discrimination claims are independent, and may be validly asserted without naming the Committee.

150. Plaintiffs' claims would lie against the College regardless of whether it proposed to disclose their confidential records to the *New York Post,* Canary Mission or the Anti-Defamation League rather than the Committee.

151. Sarah Lawrence's actions contravene Title VI and the New York State Human Rights Law,  in that the punishment of First Amendment-protected pro-Palestinian speech creates a hostile environment for the Palestinian and Muslim students who utter it, and their supporters (associational discrimination) and privileges Zionist Jewish students over them (reverse discrimination).

152. Also, Sarah Lawrence's actions breach its contract with Plaintiffs, based on applicable student and faculty codes, which commit Sarah Lawrence not to treat them in a discriminatory fashion, to respect their academic freedom, and not to curtail procedural student conduct rights under external pressure. Sarah Lawrence is also, in its treatment of Plaintiffs, violating the implied obligation of good faith and fair dealing.

153. The Committee is not a necessary party to these claims.

154. For the reasons given, Plaintiffs have asserted claims against the Committee and the College jointly, and against each of them severally.

---

10 "[T]he complained of conduct results from a state agent's encouragement or command, the state and private actor jointly participate in depriving plaintiff of his rights, the granting of benefits to a private actor by the state inseparably links them together, or the private actor undertakes to perform activities ordinarily exclusively engaged in by government."

*Sarah Lawrence Breached Its Contract with Plaintiffs*

155. The same facts underlying the hostile environment claim are relied on herein to support a breach of contract claim.

156. Sarah Lawrence did not have the legal right under Title VI or the New York State Human Rights Law to make its campus an intolerable place-- a hostile environment-- for Plaintiffs, yet it did so in giving in to pressure of the bigoted and hostile House Committee members to disclose their confidential information and to sanction them under student conduct codes.

157. At the same time, taking action, making its campus an intolerable environment for the Plaintiffs, breached its contracts with each Plaintiff.

158. Under New York law, the relationship between the student and the university is contractual; the student pays tuition in exchange for an education, *Tedeschi v Wagner Coll.,* 49 N.Y.2d 652, 660 (1980).  This contract is embodied in the Student Code[11]. The Faculty Manual[12] also sets forth enforceable rights under *Tedeschi, Dalmolen v Elmira Coll.,* 279 AD2d 929, 932 (3d Dept 2001*)* As a general rule, judicial review of the disciplinary decisions of private colleges or universities with regard to tenured faculty members is limited to determining whether the institution failed to comply with its own hearing and internal review procedures and whether the decision was made arbitrarily, capriciously or in bad faith", citing *Tedeschi*).

159. Intentionally creating a hostile environment for a student breaches the university's contractual promise to provide an education.

160. A close analogy under New York law is the doctrine of "constructive discharge", which is applicable both to discrimination claims, *Kaptan v Danchig,* 19 AD3d 456, 457 (2d Dept 2005) ("The defendant's alleged repeated comments about the plaintiff's religion were more than insulting and insensitive,  especially during Ramadan" and constituted "constructive discharge"),

---

11 https://www.sarahlawrence.edu/student-life/student-handbook/2025-2026/graduate/community-standards/conduct-code.html
12 https://my.slc.edu/ICS/Faculty/Resources_for_Faculty/?pvt_b1bc39d3-d9b1-4e3b-a2e1-7d022ae442aa=List

and to breach of contract claims, *Morris v Schroder Capital Mgt. Intl.*, 7 NY3d 616, 622 (2006) (issue of whether employee was constructively discharged or voluntarily resigned, for purposes of enforcement of noncompete clause).

161. Under a breach of contract analysis, the creation of an intolerable environment by Sarah Lawrence can also be construed as a violation of its implied obligation of good faith and fair dealing, *Mor v Imbesi Law P.C.,* 2022 NY Slip Op 30799[U], *17 (Sup Ct, NY County 2022) (assertion that "defendant turn[ed] off the power to [plaintiff's][ office space when he met with clients... plead a cause of action for breach of the implied covenant of good faith and fair dealing").

*Plaintiffs Have Been Actually Harmed by Past Disclosures and Reasonably Expect Future Harm from Future Disclosures*

**Nurah Abdulhaqq**

162. Plaintiff Nurah Abdulhaqq is a recent graduate of Sarah Lawrence College who was heavily involved in pro-Palestine organizing on campus. As a Muslim, she is a member of a protected class discriminated against by Defendants. She was one of the lead negotiators for the November 2024 student occupation and encampments, as well as a representative on the Student Senate. As one of the few women on campus to observe wearing the hijab, and the president of the Muslim Students Association, Abdulhaqq is one of the most easily identifiable students involved. Her fears of reprisal are justifiable. In October of 2023, Abdulhaqq was standing in the campus center when a student labeled her a member of "Hamas" for wearing a Jordanian shemagh.

163.    Nurah has an avid online presence, as she documented student activity over the past year in relation to pro-Palestine organizing. She has also been published in various venues, and has been photographed at various actions over the past year. Her presence makes her not only an easy target but an identifiable one. Due to her years-long relationships with College staff and

administration and continued email correspondence with them, she is concerned about exposure of her private correspondence leading to doxing, harassment, and other forms of harm for those looking to target Brown, Arab and Muslim students.

164. After observing her friends and peers at similar institutions endure doxing and harassment, Nurah Abdulhaqq reasonably fears irreparable harm if the College were to disclose her private correspondence with College officials to the Committee, or if the Committee were to publish her information to doxing sites or the public.

**Maeve Aickin**

165. Plaintiff Maeve Aickin is a former organizer with Students for Justice in Palestine (SJP) at Sarah Lawrence College. As a supporter of Palestinian and Muslim students at the College, she is a victim of associational discrimination by Defendants. She acted as a negotiator during the November 2024 encampment on the College's South Lawn and participated in digital correspondence with administrative officials as they pursued the encampment's termination. She has been threatened with violence and called a terrorist for wearing a keffiyeh and attending educational events related to Palestinian history, and she reasonably fears that the disclosure of her private student records will encourage bad-faith actors to escalate their threats to her safety.

166. After the Congressional Committee on Education and the Workforce demanded that the College disclose FERPA-protected documents that relate to her involvement in the encampment, Maeve made her First Amendment-protected online expression private. She did so because she had witnessed peers in analagous SJP leadership positions across the country face violent harassment at the hands of private actors bolstered by the McCarthyist ideological project that the Committee is undertaking. Maeve is particularly concerned by Immigration and Customs Enforcement (ICE) agent Peter Hatch's court testimony[13] that agents from ICE and the

___

13  "AD Hatch was told by DHS leadership... to review the names of student protestors on the Canary Mission website",

Department of Homeland Security (DHS), with whom the Sarah Lawrence Campus Security force has trained,[14] utilize the private doxing website known as Canary Mission to identify and target students for deportation. If the College were to release identifying information about Maeve and her peers, many of whom are Jewish themselves, linking them to the peaceful anti-war actions for which Canary Mission calumniates students, it would set a dangerous precedent for the cooperation of higher education institutions with militarized agencies like ICE and DHS. In targeting immigrants for expressing principled political beliefs founded on global citizenship and the desire for universal access to safety and and essential resources, ICE and DHS are operating in diametrical opposition to the values that educational institutions like Sarah Lawrence claim to promote. Furthermore, as she enters the workforce, Maeve reasonably fears that the College's disclosure of her involvement in pro-Palestine organizing would invite private doxing organizations to misconstrue her anti-war beliefs and, in so doing, restrict her employment opportunities while exposing her to harassment, rape threats, and death threats.

167. Maeve is additionally concerned by the Committee's request to review documents related to "coordinated efforts to pressure students not to register for classes taught by Jewish professors,"[15] as the incident to which the Committee appears to refer was a First Amendment-protected protest of a faculty member's speech. In fall 2024, a group of autonomous students encouraged their peers to peacefully disengage from a professor who had written several blog posts and articles in nationally distributed publications that both denounced students for exercising their free speech rights and celebrated university presidents who called law enforcement officers onto their campuses to violently remove student protestors, most of whom were either Arab, Muslim, or allies to these communities. The autonomous students took further issue with the professor's calls to dismantle Diversity, Equity, and Inclusion (DEI) programs in the interest of disabusing

*Am. Assn. of Univ. Professors v Rubio,* 802 F Supp 3d 120 (D Mass 2025).
14 https://www.instagram.com/p/DGRa7rNOkNR/?hl=en
15 Tim Walberg & Burgess Owens, LETTER TO SARAH LAWRENCE COLLEGE FROM THE COMMITTEE ON EDUCATION AND WORKFORCE (2025).

women of the notion that they experience gender-based discrimination. The students reasoned that these opinions were incompatible with Title IX of the Education Amendment of 1972 and Title VI of the Civil Rights Act of 1964. Maeve compiled direct quotations from the professor's published articles in which he celebrated the use of police to arrest student protestors, questioned the existence of gender-based discrimination, and opposed DEI programs, and she disseminated these excerpts among Sarah Lawrence students. What the Committee describes as a campaign to dissuade students from "register[ing] for classes taught by Jewish professors" was more accurately the distribution of one professor's published writing. Due to the Committee's inaccurate representation of these events, Maeve is reasonably concerned that it will use her private records to inaccurately represent her actions. The professor exercised his First Amendment rights by publishing the articles in question, and Maeve exercised her First Amendment rights by distributing quotations from those articles. The First Amendment does not protect hate speech; but since the speech acts that the Committee is investigating were either direct quotations from or paraphrases of this professor's publications, the Committee appears to be scrutinizing the writing of an individual on whose behalf it purports to advocate.

168. After observing students at peer institutions who have played similar roles within their respective pro-Palestine organizations face doxing, detention, and be threatened with deportation for advocating against what a United Nations Special Committee and Amnesty International describe as a U.S.-funded genocide, Maeve Aickin reasonably fears irreparable harm if Sarah Lawrence discloses her private correspondence with College officials and her private records to the Committee on Education and the Workforce..

**Nazira Atalla**

169. Plaintiff Nazira Atalla has been involved in pro-Palestine organizing and activism at the College. As a Palestinian, she is a member of a protected class discriminated against by

Defendants. She was involved in the the occupation and encampment. Nazira was also involved in negotiations with the College administration before, during and after the encampment. As one of the only Palestinian students at Sarah Lawrence College, Nazira has been continually subject to racist rhetoric and actions from College administrators and Campus Security. If the College administration complies with the demands of the Congressional Committee on Education and Workforce, Nazira would be subject to further racist targeting in the form of online harassment or doxing. Following the Committee's demand for FERPA-protected information, Nazira has been forced to reduce expressions of her political beliefs online and has avoided peaceful actions for fear of being identified and harassed. Additionally, following the Committee's first letter, Nazira was forced to remove three articles describing her advocacy work from the Sarah Lawrence *Phoenix* newspaper website in order to protect her privacy and avoid online harassment.

170. Student activists at higher education institutions have been the targets of online smear campaigns misconstruing their actions and beliefs, resulting in professional and, educational consequences, as well as detainment and deportation. If the College complies with the Committee's demands by disclosing FERPA-protected information, Nazira reasonably fears irreparable harm if Sarah Lawrence discloses her records and private correspondence with College administrators.

**Emily  Kate "Kat" Carlisle**

171. Plaintiff Emily Kat Carlisle is a student activist at Sarah Lawrence College and is associated with the College's Students for Justice in Palestine club. As a supporter of Palestinian and Muslim students at the College, they are a victim of associational and reverse discrimination by Defendants. They were not officially involved in the occupation of the Westlands building in late 2024, but they were present in the building during the open hours. Though Emily Kat has not

been yet been accused of anything or faced disciplinary charges, the demand by the Committee that the College disclose FERPA-protected documents related to Emily Kat's friends and fellow SJP members has made them worry about their own political speech and actions. Emily Kat reasonably fears that the College's Students for Justice in Palestine club will face harassment in person and online if information surrounding the club or its members is released. Additionally, Emily Kat reasonably fears for the quality of their education should their professors be persecuted for protected political speech.

172. Emily Kat is worried for the future of free speech on campus should the College fail to protect its students and faculty from political persecution. Emily Kat states: "If the College agrees to release students' disciplinary records once, I know that they will do so again. And since I know that my political beliefs do not align with those of the disciplinary committee, I could very well be the next student whose information is made public. I refuse to allow an administration's personal disagreement with my views to stop me from doing and saying what I think is right, but I fear for the consequences of being an activist in this political climate."

**Sana Cheema**

173. Plaintiff Sana Cheema is involved in pro-Palestine organizing and activism at the College. As a Muslim, she is a member of a protected class discriminated against by Defendants. She was involved in the occupation of Westlands in November 2024, and in negotiations both during the occupation and during the subsequent encampment. She has faced unfair and targeted College disciplinary processes, and knows her personal records will be at risk if the College complies with the demands made by the Congressional Committee on Education and the Workforce. Under disciplinary processes that other students also underwent for pro-Palestine actions, Sana was one of a few singled out as 'leaders' with no solid proof. She was subject to the use of racist rhetoric and messaging used by the administration to turn faculty and staff against the students.

At a primarily white institute like the College, targeting Sana puts her in a higher risk position than that of some of her peers. While Campus Security and the administration have continued to make racist and/or violent comments about students, Sana fears this rhetoric will have larger consequences than the College admits; though she has not been doxed, she fears that if this continues this outcome is not unlikely. If the school decides to cooperate with the Committee it will put her in harm's way, in public and online, and submit her to further risk beyond the bounds of the College.

174. Students across the country engaging in free speech on behalf of Palestine have faced violent harassment and threats. Some have had their right to education ripped away, and some have even been detained. If the school cooperates with this request in violation of her rights, Sana fears she may be among those students with a target on their backs, as has been the case with many brown and Muslim students, and that this will affect more than just her own life if she is doxed. She reasonably fears this will jeopardize her academic and professional future as well as her safety and security, and the lives of others at the College that the administration does not seem to be actively protecting.

**Suzanne Gardinier**

175. Plaintiff Suzanne Gardinier, a tenured professor who's taught at Sarah Lawrence for more than thirty years, holds the Anita Stafford Chair in Service Learning. As a supporter of Palestinian and Muslim students at the College, she is a victim of associational and reverse discrimination by the Defendants. She teaches a combined poetry class at the Bedford Hills Correctional Facility for Women and has served as the director of the Sarah Lawrence study abroad program in Cuba. In 2010 she was Chair of the College's first Diversity Committee. In 2002 she was part of the first delegation of Faculty for Israeli-Palestinian Peace, and in 2003 served on a panel at the annual American Studies Association meeting called "American Jews, Israel, and the Palestinian

39

Question." She's an award-winning American poet who's published twelve books and a co-founder of the campus chapter of Faculty & Staff for Justice in Palestine.

176. Professor Gardinier's nomination of the campus chapter of Students for Justice in Palestine in the spring of 2024[16] was indirectly targeted in the Committee's first letter; the second letter names her directly, targeting the politics of her social media posts. In both cases, the Committee cites the testimony of a colleague in Political Science, Professor Samuel J Abrams, without any apparent vetting or investigation as to his reliability or credibility.

177. Professor Abrams began publicly targeting campus Diversity programs in 2018, through an editorial in the *New York Times*[17] attacking a conference organized by the African-American Director of Diversity and Campus Engagement at Sarah Lawrence. Since then he has made use of the publicity channels provided by the Koch-funded Institute for Humane Studies and the American Enterprise Institute to attack college diversity programs ("Sarah Lawrence Continues to Lean Into Toxic DEI"[18]), politically active women ("The Rise of the Single Woke (and Young, Democratic) Female"[19]), and students, staff, and faculty members protesting the Israeli genocide in Palestine. These attacks have included links to activist students' social media accounts, making them vulnerable to doxing. At no point has Professor Abrams attempted to take part in actual political discussion on campus of antisemitism, anti-Zionism, and the Israeli genocide in Palestine. This leaves open the question of whether he is expressing his genuine views or serving as a mouthpiece for his deep-pocketed benefactors.

178. On April 30, 2024, Professor Abrams published an article directly defaming Professor

---

16      "I've seen such admirable Palestinian, Jewish, and allied courage in SJP members, doing their daily work against genocide in Gaza while trying to meet their academic responsibilities at the same time. I feel honored & lucky to be able to work with them on our campus, & can think of no other student leadership I've found more worthy of recognition in my thirty years at the College." Suzanne Gardinier, nomination of campus chapter of Students for Justice in Palestine for Student Leadership Award, Sarah Lawrence College, April 2024

17 "Think Professors Are Liberal? Try School Administrators," https://www.nytimes.com/2018/10/16/opinion/liberal-college-administrators.html

18 https://www.realcleareducation.com/2024/07/24/sarah_lawrence_continues_to_lean_into_toxic_dei_1046902.html

19      https://www.aei.org/articles/the-rise-of-the-single-woke-and-young-democratic-female/

Gardinier as "known antisemite and professor Suzanne Gardinier,"[20] because of her social media posts and her role as a co-founder of the campus chapter of Faculty & Staff for Justice in Palestine. When Professor Gardinier met with the Provost and the Director of Human Resources on May 23, 2024 to discuss how to respond to this defamation, she was told that there was nothing the College was willing to do. On February 24, 2025, Professor Abrams again defamed Professor Gardinier in his American Enterprise Institute blog, as "well-known anti-Semitic professor Suzanne Gardinier."[21] The College made no response. On the other hand, the College has been quite active in response to the speech and expression of student and staff Palestine activists. In addition to disciplinary procedures against students for protest, the campus chapter of Faculty & Staff for Justice in Palestine received reports that some administrative supervisors had been contacted by the Provost and informed that any staff activity in support of Palestine had to be "balanced" by activity in support of Israel, so the College could be perceived as supportive of "both sides." This has amounted to a chilling of open campus speech by staff about Palestine.

179.   After the student occupation of Westlands in November 2024, following the College's refusal to commit to divestment from Israeli genocide, the Dean of Students gave both faculty and staff, in two separate meetings, detailed presentations, including videos, photographs, and an extended administrative narrative that student demonstrators were frightening, extremist, dangerous, disrespectful of other members of the community, and departing from campus protest traditions instead of continuing them. Students were then subject to disciplinary hearings before panels chosen by the same administrators who made the charges. Because accused students were not permitted accompaniment, whether by a lawyer or by a trusted professor or advisor, Professor Gardinier was unable to provide direct support to the students she works with. There were no

---

20  https://www.aei.org/society-and-culture/some-truths-about-higher-education/

21  https://www.aei.org/social-cultural-and-constitutional-studies/ant-semitic-faculty-activism-in-on-full-display/

extensive campus presentations on the dangers of allowing wealthy foundations and unchecked state power to influence and undermine the integrity and autonomy of campus communities.

180. In this case, political expressions on social media seem particularly important to protect, as one of the few places that students, staff, and faculty without the financial support and reach of large vested interests or state power can make their views known. In the immediate aftermath of the Westlands occupation and subsequent encampment, one student wrote: "I found myself drawn to how the narrative around the encampment was forming. [The Dean of Students] and [The President's] emails obviously played a major role in forming the mainstream opinion about the encampment, especially for parents and faculty who were not on campus. If you were just reading their emails, you would think the campers were starving the Westlands residents and punching Campus Security officers. The importance of SJP and FSJP on social media was in being able to form counter-narratives and demonstrate that the encampment was a nexus for community and solidarity, as opposed to violence and hate. Putting out that narrative is incredibly important, but I am worried that given Instagram's limited reach, that narrative did not reach a majority of the SLC community."

181. Another student wrote:"The way that SJP used social media was also really interesting-- contextualizing what they were doing and leaving no room for misinterpretation. They clearly stated their demands and shared ways for people to participate. It reminded me of a quote from Andy Carvin's case study. *'Networked and distributed social media platforms potentially expand the range of actors involved in the construction of the news. Yet studies indicate that the ability of media audiences to participate in the processes of news production within professional publications has been severely circumscribed.*[22] *Bruno's study of the coverage of three major news outlets of the 2010 Haiti earthquake suggests an opportunistic model at play, rather than a desire to represent a broad spectrum of voices.'* Using social media empowered SJP to construct

---

22 Lasorsa et al., 2012; Lewis, 2012; Singer et al., 2011

their narrative and express their perspective on what they are doing."

182.  Because of the unchecked defamation from Professor Abrams, based solely on Professor Gardinier's political views and expressions;  and because of the College's refusal to take a stand consistently respecting and protecting pro-Palestine speech and expression; and because of the Committee's evident disrespect for US higher education in general and neglect of its responsibilities if proceeding with an actual campus climate investigation,  Professor Gardinier reasonably fears irreparable harm if Sarah Lawrence continues to disclose private College information to the Committee.

**Vega Barrada Gullette**

183.  Plaintiff Vega Barrada Gullette is involved in pro-Palestine organizing and activism at Sarah Lawrence College. As a Muslim, she is a member of a protected class discriminated against by Defendants.  She was involved in the November 2024 occupation and in negotiation sessions during both the occupation and encampment. Vega Gullette has maintained her activist work despite receiving repeated death threats and harassment on social media and in person. She has been doxed to a lesser degree in the past and has repeatedly been called a "terrorist," as have members of her family. She is deeply concerned by the potential for further unchecked violence, including stalking and physical assault, aimed at herself and her peers if the College is to divulge FERPA-protected records, an act which has caused irreparable harm to students before her.

184.  Based on her regular engagement with College administrators, Vega Gullette feels substantial concern that threats and violence against pro-Palestine student activists would be exacerbated by the College divulging to the Committee information about its biased handling of pro-Palestine campus protest. She has witnessed the College, a predominantly white institution, routinely fall short of its self-proclaimed ethos of "belonging for all" in its prioritizing of those aligned with

43

whiteness, wealth, and political power. Throughout the 2024-2025 school year, she watched College officials fail to provide adequate support for international students seeking assurance regarding illegal detentions and deportations of students linked to Palestine solidarity activism. She also witnessed repeated instances of racism and Islamophobia by College officials towards Arab and Muslim students.

185. In the spring of 2025 the College provided lackluster responses to rising fears of ICE kidnappings on college campuses, and ignored international students' requests for additional support. Given that the people abducted, deported, and/or incarcerated have been predominantly racialized people whose outspoken solidarity with the Palestinian people has painted them as "national security threats" in the eyes of the government, Gullette understands the potential ramifications of the College's disclosure to be severe. As an Arab and Muslim student, Vega Gullette met with College administrators and officials as part of a group responding to several critical incidents regarding student reactions to anti-Palestinian racism: a phenomenon understood to target both the ethnic Arab character of the nation and its predominantly Muslim character. In one such meeting, with a high-level College administrator, the Dean of Students, Gullette was present as part of a group of Arab and/or Muslim students expressing concern about the removal of an Arabic word from a "Free Speech Board," due to complaints that the word was "threatening." During the meeting, the high-level College administrator consistently employed the terms "Arab" and "Muslim" interchangeably, demonstrating a concerning negligence given the administrator's position and responsibilities with regard to student well-being. The administrator then instructed the group to engage in a "mental exercise" which involved "imagining the most offensive thing a person could say to [them]." This "exercise" gave credence to anti-Arab and anti-Palestinian racism, as the administrator was equating "the most offensive thing" the students could imagine being called with another student's racist fear of an Arabic word. Considering the ongoing genocide of Palestinians and the consistent calls for

"death to Arabs" and "death to Muslims" made by its perpetrators and supporters, Vega Gullette found the attempted exercise inappropriate, insensitive and disturbing. The students in the room had undergone traumatic experiences from racist or Islamophobic harassment, and many of their families, including Vega Gullette's, continue to suffer from the violence through which consent is manufactured through racist and Islamophobic rhetoric like the kind the administrator was trying to elicit.

186. Vega was targeted and singled out by the College as a 'leader' of pro-Palestine actions without solid proof. Following the occupation of Westlands, it was brought to Gullette and her peers' attention that this same administrator attempted to influence the staff and faculty appointed to serve on the conduct hearing boards for those alleged to have participated in the occupation. She discovered that this College administrator played a slideshow of images from the occupation at faculty meetings, recounting a narrative of threat and violence. Within the hearings— administered over winter break, with extremely short notice—the accused students were forbidden to be accompanied, whether by a lawyer, a trusted professor, or a don, the faculty-student advisor role which draws students to the College, here deprived of what's claimed to be its primary function: close collaboration and mentorship. In denigrating, targeting, and isolating pro-Palestine students, the College has set a standard regarding activism that is consistent with that of this government. Vega Gullette does not believe the College is prepared for to meet the task of protecting herself and her peers from further external threats, given its record of unwillingness to protect those advocating for Palestinian liberation within the College. She is seriously concerned that, were the College to disclose information to the Committee, she and her peers would be targets of violence from individual political actors, private doxing groups, and the Trump administration, all of which intersect and are waiting for the chance to sabotage the livelihoods of more young activists, in the name of enabling the US-Israeli genocide of Palestinians.

45

**Riziki Mbugua**

187.  Plaintiff Riziki Mbugua was involved in pro-Palestine organizing and activism at the College until her graduation in May of 2025. As a supporter of Palestinian and Muslim students at the College, she is a victim of associational and reverse discrimination by the Defendants. Riziki was involved in the November 21st occupation, the subsequent encampment, and several other subsequent pro-Palestinian organizing events. She faced unfair and targeted disciplinary processes by the College. She knows her records will be at risk if the College complies with the demands of the Congressional Committee on Education and the Workforce. Though Riziki has not yet been doxed or harassed online, since the College and private doxing organizations have yet to make her identity public, she fears the College's potential cooperation with the Congressional Committee on Education and the Workforce will put her in harm's way publicly and submit her to further risk beyond her campus experience.

188.  If Riziki were to be doxed as a result of the College's cooperation, it would put not just her but her entire family at risk of harassment, deportation, and loss of academic and work opportunities. Students across the country have faced violent harassment and threats. Some have had their right to education ripped away, and some have even been detained, for nothing more than standing firmly against apartheid and genocide, as Riziki has, which the documents requested by the Congressional committee would make clear. Because of this, Riziki reasonably fears that the demanded release of her private information will jeopardize her academic and professional future as well as her safety and security and that of her loved ones. Any cooperation of the College with the demands of the Congressional Committee on Education and the Workforce will further contribute to the current presidential administration's violation of her rights to privacy and academic freedom as a student, and would put all participants in higher education at further risk of the denial of their constitutional rights.

**Liam Sharif Montague**

189. Plaintiff Liam Sharif Montague has been actively involved in pro-Palestine organizing at the College. As a Muslim, he is a member of a protected class discriminated against by Defendants. He acted as a negotiator between student activists and the College administration during the November 2024 encampment, and participated in digital correspondence with the College's administrative officials as they pursued the encampment's termination. He has been in regular communication with administration officials since March of 2024 regarding pro-Palestine organizing on campus, including e-mail correspondence and in-person meetings. In December of 2024, he was charged by the College with several conduct violations for involvement in peaceful pro-Palestine protests in the Westlands administration building and the subsequent encampment on the South Lawn in support of ethical investment and divestment from support of human rights violations in Palestine. He was found responsible for all but one of the charges and put on disciplinary probation for one semester.

190. In the summer of 2024, he submitted a bias incident report under Title VI, alleging that the two Campus Security officers who followed him to his off-campus residence after the end of the College's spring 2024 session did so as result of his race, religion, and/or affiliation with a campus pro-Palestine organization. In the spring of 2024, he had to pay an online service to scrub his name from Internet records after he was doxed by the *Jewish News Syndicate* and the *New York Post* for involvement in a pro-Palestine protest in New York City.

191. Ever since the Committee demanded that the College disclose FERPA-protected documents that relate to his involvement in the encampment, Sharif has reduced his online expression of his political beliefs and avoided peaceful actions in which he might be identified, out of fear of being doxed and violently harassed. As he enters the workforce, he reasonably fears that the College's disclosure of his involvement in pro-Palestine organizing would invite private doxing

organizations to misconstrue his beliefs and, in so doing, severely restrict his employment opportunities. He also worries that his mother, an Arab Muslim immigrant from Egypt, could be targeted following any disclosure of his personal information by the College.

192. After observing students at peer institutions who have played similar roles within their respective pro-Palestine organizations be doxed, detained, and threatened with deportation, Liam Sharif Montague reasonably fears irreparable harm if Sarah Lawrence discloses his private correspondence with College officials and records of disciplinary proceedings following the 2024 encampment.

**Lincoln Richardson**

193. Plaintiff Lincoln Richardson is actively involved in pro-Palestine organizing at Sarah Lawrence College. As a supporter of Palestinian and Muslim students at the College, he is a victim of associational and reverse discrimination by the Defendants. He was involved in the occupation of Westlands and organizing the encampment. He has been subjected to targeted disciplinary hearings by the College for political expression, through a process that did not include measures of support, such as chosen faculty accompaniment, that are customary at comparable institutions. He has faced harassment and baseless accusations of antisemitism from peers on multiple occasions due to canvassing for support on divestment. He has experienced College administrators threatening disciplinary action for no cause. He witnessed two Campus Security officers discussing at length their desire to physically assault students during the occupation.

194. Should the College release the identities of students involved in pro-Palestine organizing, these kinds of unjust, discriminatory, and threatening instances of bias are likely to increase. Further, they would risk transforming into state repression, as has been the case with the illegal detention of Columbia student Mahmoud Khalil, or worse, foster a climate of impunity for racist violence

48

against Palestinians, such as that against murdered six-year-old Palestinian-American Wadea Al Fayoume, for whom the occupation of Westlands was named.

**Nora Tucker-Kellogg**

195.  Nora Tucker-Kellogg is involved in pro-Palestine organizing at the College, including in the November 2024 occupation of Westlands and the subsequent encampment. As a supporter of Palestinian and Muslim students at the College, she is a victim of associational and reverse discrimination by the Defendants. In January 2024, Nora Tucker-Kellogg was charged by the College with student code of conduct violations for peacefully exercising her right to free speech by participating in the occupation and encampment. Nora Tucker-Kellogg has not yet been the target of doxing or harassment, but reasonably fears that she might become the target of such behavior, like many of her peers, if the College discloses her FERPA-protected records to the House Committee on Education and the Workforce. Nora Tucker-Kellogg worries that the disclosure of such information as requested by the Committee could not only endanger herself, but do irreparable damage to her friends and peers.

## COUNT I

**The Committee's demand that the College relinquish to it individual student records violates the First Amendment**

**Both Defendants**

196. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

197. Coercion of a third party can be the means by which the government violates the First Amendment rights of another.  The First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries.

198. The First Amendment guarantees the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. Indeed, privacy in group association is indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.

199. The government may regulate in the First Amendment area only with narrow specificity, and compelled disclosure regimes are no exception. Thus when it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution.

200. When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, because First Amendment freedoms need breathing space to survive.

201. The First Amendment proscribes the Government not only from directly infringing upon those rights but also from infringing upon them indirectly through the use of techniques like jawboning, a strategy which allows government officials to expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over.

202. As outlined above, by sending the two Letters, the Committee has repeatedly pressured the College to suppress and punish student, faculty, and staff's protected speech regarding Palestinian human rights that the Committee disfavors.

203. At the three Committee hearings held before the spring of 2024, the frankly absurd lines of questioning, in combination with the threats made against university presidents and trustees, led to two university presidents' resignations, the firing and/or suspension of numerous faculty members, and the pervasive and severe doxing and harassment of numerous administrators, faculty, staff, and students by members of Congress, their staffs, and third-party individuals and entities. The outcome of these hearings, and of the October 31 Committee Report, makes evident

50

that this Committee's threats, which it and the administration have carried out against other institutions, have real, life-altering consequences for both the College and members of its community, and particularly for these Plaintiffs.

204. Thus, even just the veiled threats of exposure, jawboning, funding cuts or stoppages, whether or not the Committee intends to or indeed can follow through, so intimidated the College that they apparently feel compelled to comply with whatever the Committee demands in order to assure their own survival as an academic institution.

205. The Letters request what would amount to hundreds of pages of disciplinary records, which infringe upon the Plaintiffs' and all students' privacy of association that is indispensable to their freedom of association.

206. The language of the Committee's Letters explicitly demonstrates its viewpoint discrimination toward any speech or expression that opposes Israel's actions against Palestinian people and/or that lift up the human rights of the Palestinian people, and reveals their political intent to target this political speech and association.

207. The Committee is using, and is pushing the College to use, a definition of antisemitism that labels as bigoted and discriminatory the common and typical criticisms people, including Plaintiffs, make about Israel—that it is a racist state, led by war criminals, and/or in some ways similar to Nazi Germany—even as they do not attach such negative labels and consequences when such criticism is leveled against the U.S. or other foreign governments. Plaintiffs challenge that definition facially and as-applied.

208. When viewing the totality of these circumstances, it can be reasonably understood that the Letters, and the Committee's continued focus on the College, and by proxy the Plaintiffs, are intended to convey a threat of adverse government action.

209. The Committee is not immune from these allegations under the Speech and Debate Clause, as its actions in seeking disclosure of FERPA-protected student information from Sarah Lawrence

do not substantially relate to any valid legislative purpose, let alone any compelling government interest.

210. The Letters, along with this Committee's other  actions, demonstrate the Committee's lack of concern with actual incidents of antisemitism and its intent to "expose for the sake of exposure" based solely on the viewpoints held by those individuals.  Moreover, there can be no legitimate legislative purpose when the Committee is engaging in prohibited conduct, which is to improperly suppress through a third actor protected speech because of the viewpoints expressed..

211.  Because the Letters are predicated on clear viewpoint discrimination, endeavor to deploy unlawful jawbone tactics to suppress through a third party protected speech based on that viewpoint, and can be reasonably seen as a clear intent to chill associational and speech rights, the Committees' Letters serve no legitimate legislative purpose and violate the First Amendment.

212. The Committee's project also chills the academic freedom of faculty members such as Plaintiff Suzanne Gardinier, by falsely accusing them of antisemitism, and thus placing Sarah Lawrence under pressure to terminate, suspend or sanction her.

213. The Committee's project also violates the Establishment Clause, in that it singles out not just for endorsement, but for enforcement, a single faith's claims and assertions about Palestine, and punishes those of other faiths who disagree or critique these views, or advance those of other faiths.

214. The College, by virtue of having complied with the Letters and furnished FERPA-protected documents to the Committee, should also be deemed a "state actor" for the purposes of the First Amendment analysis,  *cf. Republican Natl. Comm. v Pelosi,* 602 F Supp 3d 1, 22-23 (DDC 2022), *vacated on other grounds*  2022 U.S. App. LEXIS 26068 (DC Cir Sep. 16, 2022, No. 22-5123).

## COUNT II

### Discrimination and Retaliation
### under Title VI of the Civil Rights Act of 1964,
### 42 U.S.C. § 2000d

### The College only

215. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

216. The College receives federal financial assistance.

217. In fear of the Committee due to the Letters, publicity and other pressure, the College engaged in a purposefully discriminatory course of conduct that involved repeatedly deviating from its established mandates regarding expressive activity and student discipline in order to silence the Plaintiffs' legitimate protest activities and remove them from campus life. This includes subjecting Plaintiffs to draconian, opaque, and illegitimate disciplinary procedures that caused them to suffer a range of harms.

218. The College singled out the Plaintiffs and others for this disparate treatment because of their identity as Palestinians, Muslims,[23] and their supporters.

219. The College had actual notice of severe and pervasive discrimination against Palestinian, Muslim, and students supporting Palestine on campus, directly from Plaintiffs and others. The College possessed enough knowledge of the harassment that it reasonably should have implemented deterrence measures.

220. The College also created a racially hostile environment on campus, including by characterizing the Plaintiffs and their associates as antisemitic, promoters of terrorism, and disorderly, by restricting their ability to congregate and engage in protected speech, by directing or permitting Campus Security to target, surveil and harass them in violation of established norms and

___

23 While Title VI does not define religion as a protected class, *Badr v NY Inst. of Tech.,* 2025 US Dist LEXIS 256055, at *13-14 (EDNY Dec. 10, 2025, No. 24-CV-05333 (JMA) (JMW)), courts have treated antisemitism as racial discrimination for Title VI purposes, *T.E. v Pine Bush Cent. Sch. Dist.*, 58 F Supp 3d 332, 371 [SDNY 2014]--a result obviously supported by the Committee and the Trump administration, which constantly characterize antisemitism as a Title VI violation. Islamophobia should therefore also be construed as race discrimination-- and a failure to do so would itself constitute discriminatory disparate treatment.

protocols, by sharing their personal information with the Committee and others, and by failing to protect them from or adequately discipline the perpetrators of doxing and harassment against them.

221. The College also targeted white Plaintiffs and other students, staff and faculty, due to their solidarity with Palestinian students and people, creating the conditions of associational discrimination.

222. The College also has privileged one putatively protected class, Jewish people who assert that Zionism is a cornerstone of their religious beliefs, over all others, including other Jewish people, creating the conditions of reverse discrimination.

223. The College also retaliated against the plaintiffs for opposing its unlawful, discriminatory practices and policies.

224. Additionally, the College engaged in intentional harassment through its knowledge of and deliberate indifference to the harassment, including threats and defamation that the plaintiffs faced from students and faculty who were under the College's substantial control.

225. Moreover, the College created a hostile environment through its failure to take prompt and effective steps to end the harassment, eliminate the hostile environment, prevent its recurrence, and address its effects, thereby severely injuring the Plaintiffs and depriving them of access to their education.

226. By treating Plaintiffs differently and causing them harm because of their race, ethnicity, and affiliations, as well as by creating a racially hostile environment on the College's campus, and by retaliating against their opposition to this unlawful practice or policy, the College violated Title VI of the Civil Rights Act of 1968.

227. As a direct and proximate result of the College's actions and inactions in violation of Title VI, the Plaintiffs have sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and

54

career opportunities, reputational damages, economic injuries and other direct and consequential damages.

228. Accordingly, Plaintiffs are entitled to all relief available under Title VI, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief.

## Count III

## New York Human Rights Law, NY Exec. Law § 290 et seq.

## Sarah Lawrence only

229. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

230. By targeting the plaintiffs to suppress their protected speech and creating a hostile environment, the College failed to provide an education free of discrimination or harassment based on the the Islamic religion and Palestinian nationality of certain Plaintiffs as detailed above, and the support of others for Palestinian and Muslim students of the College.

231. The College's disclosure of the Plaintiffs' FERPA-protected information to the Committee created an atmosphere of fear among Plaintiffs and a fear of illegal governmental action (on a spectrum from doxing to arrest) against them personally.

232. The environment at the College, which has been rendered hostile for the Plaintiffs, is sufficiently severe, pervasive, persistent, and offensive such that it deprives them of equal access to the opportunities and benefits that the College provides to other students.

233. The College has retaliated against the Plaintiffs for opposing their unlawfully discriminatory practice. *See* NY Exec. Law 296(7).

234. This conduct violates the New York Human Rights Law.

235. As a direct and proximate result of the College's actions and inactions in violation of New York Human Rights Law, Plaintiffs sustained substantial injury, damage, and loss, including, but not

limited to: emotional distress, physical harm, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

236. Accordingly, Plaintiffs are entitled to all relief available under New York Human Rights Law, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief.

## COUNT IV

### Breach of Contract--Tedeschi Rights

### The College only

237. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

238. Under *Tedeschi v. Wagner College,* 49 N.Y.2d 652 (1980), a private university must strictly observe and grant the procedural and substantive rights it promises its students in its manuals and codes.

239. The College similarly has an implied obligation of good faith and fair dealing in its relations with the Plaintiffs.

240. The College promises its students due process, equal protection, and academic freedom in its Student Handbook as well as the confidentiality of all records, including disciplinary files.

241. Similarly, it promises its faculty, including Plaintiff Suzanne Gardiner,  academic freedom and privacy in its Faculty Handbook, and sets forth for all employees, under Policies and Procedures, its principles protecting Freedom of Expression and Mutual Respect.

242. The College also must not retaliate against members of its community for their First Amendment protected personal opinions stated in academic or nonacademic environments.

243. Instead of protecting the Plaintiffs, as their *Tedeschi* Rights mandated, the College enthusiastically and willfully punished them for their criticism of Israel and support for the

Palestinian people.

**244.** The College's violations of plaintiffs' *Tedeschi* Rights include, but are not limited to: refusing to publicly address the harm to student, staff, and faculty academic freedom caused by anti-Palestinian bullying; departing from decades-long campus customs around political protest to form ad hoc, unjust disciplinary procedures against pro-Palestine student protest; and by implicitly using and distorting the stated campus community commitment to "mutual respect" as a way to stifle criticism of the Israeli genocide in Gaza and support for the Palestinian people.

**245.** The College's violations of the plaintiffs' *Tedeschi* Rights have inflicted severe damage on their education and their personal well-being. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiffs sustained damages including, but not limited to: emotional distress, physical harm, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment:

A. Declaring that Defendants' actions, policies, and practices complained of herein violate Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution, the New York Human Rights Law, and their contracts (Tedeschi Rights) with the University;

B. Granting preliminary and permanent injunctive relief enjoining Defendants, their officers, agents, and employees from:

    i.  Disclosing, publishing, or distributing  to any outside party, or otherwise making use of to dox, shame or expose, any confidential or FERPA-protected information referring or relating to

57

Plaintiffs;

iii. Engaging in any further acts of discrimination, retaliation, or censorship against Plaintiffs for their protected speech and association;

C. Awarding Plaintiffs compensatory damages in an amount to be determined at trial;

E. Awarding Plaintiffs their reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1988;

F. Granting such other and further relief as the Court deems just and proper.

Dated: Amagansett, NY
March 19, 2026

/s/ Jonathan Wallace
Jonathan Wallace
PO #728
Amagansett NY 11930
917-359-6234
jonathan.wallace80@gmail.com
Counsel for Plaintiffs