UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------
Suzanne Gardinier, Maeve Aickin, Nazira Atalla,
Emily Carlisle, Sana Cheema,Vega Barrada Gullette,
Riziki Mbugua, Liam Sharif Montague,
Lincoln Richardson, Nora Tucker-Kellogg,
and  Nurah Abdulhaqq,

       Plaintiffs,       Number: 7:25-cv-06442

   -against-

SARAH LAWRENCE COLLEGE,
THE HOUSE COMMITTEE ON
EDUCATION AND THE WORKFORCE,
and TIM WALBERG,

       Defendants.
----------------------------------------------------------------------

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO SARAH LAWRENCE COLEGE'S MOTION TO DISMISS**

**PRELIMINARY STATEMENT[1]**

  This court has discretion to-- and it is respectfully suggested, must-- analyze this case against the background of its historical context, *Starr Intl. Co. v FRB*, 906 F Supp 2d 202, 205, n 1 (SDNY 2012 ("The Court also takes notice of the events constituting the financial crisis that occurred in fall 2008, for the purpose of providing historical context"); *Miah v Holder,* 431 F App'x 34, 35 (2d Cir 2011) ("[W]e may take judicial notice of indisputable historical events"); *Souleymane Niang v Mukasey,* 511 F3d 138, 149 (2d Cir 2007) ("[T]his Court is not ignorant of indisputable historical events"); *Bernstein v Vil. of Wesley Hills,* 95 F Supp 3d 547, 576 (SDNY 2015)  ("Discriminatory intent may be inferred from the totality of the circumstances, including 'historical background'").

---

1 I apologize for filing this brief without the required tables of contents and authorities. By way of explanation, not excuse, I retired from the paid practice of law in order to take cases like this on*e pro bono*. I work from home, have no secretary, paralegal or associate, and have never learned how to automate table generation, so I typically compile them manually. I wanted to get papers filed by the deadline and ran out of time, but will submit a corrected copy as soon as I can, tomorrow if possible.

FR Ev. 201(b), "Kinds of Facts That May Be Judicially Noticed", states: "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." History, including current events, falls in both categories.

As is set forth in the First Amended Complaint, paragraphs 1 to 7, the House Committee is engaged in an insensate national hunt to put down, mercilessly, anyone who looks and sounds like the Plaintiffs. All but three Republican members of the Committee[2] have personally expressed the most overt, and in some cases, incoherent and irrational Islamophobia (paragraphs 39 to 81).

"Mr. Trump and too many other Republicans are ... besmirching an entire faith even as they claim to protect religious freedom", The Editorial Board, "Trump's Hypocrisy on Religious Freedom", *The New York Times* March 19, 2026

https://www.nytimes.com/2026/03/19/opinion/anti-muslim-islamophobia-trump-republicans.html

As the venerable American Association of University Professors[3] (AAUP) said in a beautifully titled report in January 2025, "Against Anticipatory Obedience",

https://www.aaup.org/sites/default/files/Against_Anticipatory_Obedience.pdf : "The new administration's agenda for higher education has been thoroughly prepared by a series of statewide legal assaults on public colleges and universities in North Carolina, Florida, Texas, and elsewhere, as well as by the high-profile congressional witch hunt that within the past year brought down the presidents of three Ivy League institutions. How should we respond? The University of Chicago's 1967 Kalven Report, often cited as the source of calls for 'institutional neutrality,' declares, 'From time to

---

2 All three of the exceptions have voted for one or more resolutions supporting suppression of these plaintiffs, for example conflating anti-Zionism with antisemitism, or finding "from the river to the sea" antisemitic expression.

3  Founded in 1915, the organization, despite some weaker moments,. has protected its people through six great national free speech emergencies: 1. World War I and after, when Columbia, for example, fired professors who opposed the draft; 2. A milder censorship during World War II; 3. The McCarthy era, of course; 4. The 1960's and Vietnam war era speech; 5. 9/11 and the aftermath; 6. Today.

time instances will arise in which the society, or segments of it, threaten the very mission of the university and its values of free inquiry. In such a crisis, it becomes the obligation of the university as an institution to oppose such measures and actively to defend its interests and its values.' This is undoubtedly such a time...There is good reason to fear that many college and university leaders— trustees, chancellors, presidents, provosts, deans, and more than a few faculty members—will seek to accommodate, if not capitulate to, these unwarranted incursions into higher education...There is good reason to fear that many college and university leaders—trustees, chancellors, presidents, provosts, deans, and more than a few faculty members—will seek to accommodate, if not capitulate to, these unwarranted incursions into higher education....Now is not the time to be complacent. Now is the time to act."

The AAUP nobly served as plaintiff against the Trump administration in *AAUP v. Rubio* 1:25-cv-10685-WGY (D. Mass. 2025) (Document #73) . In its motion denying the motion to dismiss,   the Court held: "[D]uring his 2024 presidential campaign, President Trump characterized these protests as 'proHamas,' 'pro-terrorist,' 'antisemitic' and 'anti-American,' and promised to deport noncitizen students and faculty who participated, including a statement to donors in May 2024 that, 'any student that protests, I throw them out of the country'.....  Executive Order 13,899, issued during the first Trump administration, which adopted a definition of antisemitism[4] that includes constitutionally protected speech, such as claiming that Israel is 'a racist endeavor,' holding Israel to standards 'not expected or demanded of any other democratic nation,' or 'comparing Israeli policies to those of the Nazis'...[M]any noncitizen students and faculty no longer participate in public protests, some have stepped back from leadership roles or participation in advocacy groups related to Palestine, some abstain from public

---

4   These are the infamous International Holocaust Remembrance Association Alliance standards, which the House Committee has already publicly insisted SLC should adopt (Complaint paragraph #70). Students believe that the College may already have privately agreed to use the IHRA standards, which would explain the treatment of plaintiff Lincoln Richardson: "He has faced harassment and baseless accusations of antisemitism from peers on multiple occasions due to canvassing for support on divestment. He has experienced College administrators threatening disciplinary action for no cause." (paragraph #194)

writing or scholarship and have purged past writing and online posts, some skip class or classroom discussion, and some faculty have fled their home cities in the United States. This chill, flows directly from the policy challenged here".

Plaintiffs are mainly members of the College chapter of Student for Justice in Palestine (SJP) (paragraphs 165, 171, 180, 181, and footnote 16) which has been nationally doxed, reviled, threatened and harassed, in efforts led by the Trump administration and the House Committee (see paragraph 49). SJP chapters are often punished for pro-Palestinian expression by being suspended from, or denied, student organization standing by universities, *Matter of Awad v Fordham Univ.,* 189 AD3d 605, 605-606 (1st Dept 2020); *Columbia SJP et al. v. Columbia,* 152220/2024 (Supreme Court N.Y. County 2024) (NYSCEF #109).

On the other hand, federal courts have correctly viewed SJP chapters as beleaguered student organizations whose rights are being stepped on and who are entitled to injunctive relief*, Mizzou Students for Just. in Pal. v Choi*, 2025 US Dist LEXIS 223592, at *24 (WD Mo Sep. 19, 2025, No. 25-cv-04184-SRB) ("MSJP must be permitted to participate in the 2025 Homecoming Parade")[5]; . *Students for Just. in Palestine v Abbott*, 756 F Supp 3d 410, 427 (WD Tex 2024) ("Appropriate relief will focus on eliminating the connection between the university policies, GA-44's definition of antisemitism, and the IHRA's examples of antisemitism, because it is that connection that chills Plaintiffs' speech"); *Univ. of Maryland Students for Just. in Palestine v Bd. of Regents of the Univ. Sys. of Maryland,* 2024 US Dist LEXIS 178359, at *39 (D Md Oct. 1, 2024, No. 24-2683 PJM) ("SJP's Motion for Preliminary Injunction will be GRANTED").

I have appeared in approximately fifty cases relating to pro-Palestinian expression,[6] in three

---

5   This raises the paradox that the Plaintiffs would be permitted to march in the homecoming parade in Missouri carrying the same banners that the House Committee is pressuring the College to suspend or expel them for.

6   Gemini, the AI which responds to Google queries these days, says I should not be carrying more than fifteen cases. I am not solo on all of these, but work on teams of two to ten attorneys on about half. I take cases if I think the client will be unable to find an attorney, given the controversial nature of these cases and the paucity of lawyers with the needed skills.

state courts and eight federal courts,  "[T]here is no new thing under the sun", *Ecclesiastes* 1:9 KJV.

Recently I wrote and published on my web site an essay, Jonathan Wallace, "System Islamophobia[7] in

American Courts", *The Ethical Spectacle,* last updated May 2, 2026

https://www.spectacle.org/whitepapers/whitepaper.pdf (the "Essay"), in which I analyze eighteen

different tactics I have personally witnessed which have been used to deny Arab and Muslim litigants

access to justice. The College's motion papers advance at least five of these: "Zeno's Arrow,"  which

"breaks a compelling case down to its component parts in a sophistical way, finally concluding there is

no case at all"; "That's not discrimination!", which offers the conclusion that there is no culpability in a

private university  because the Arab and Muslim students are being oppressed "for their views, not their

membership in a protected class"; "Decontextualization": "In order to hold that the mistreatment of

Arab and Muslim people is not" actionable," it is highly convenient to ignore the historical forces at

work"[8] ; "Plausibility", in our cases the assertion that claims of Islamophobia fail *Iqbal/Twombly*

because (as we all know) there is no such thing; and the "Hand-Wave", in which judges "without

seeing, or caring, that they [are] disposing of an immense realm of rights, duties,interpretations,

discussion, of admonitions, respectful disagreements  and accords, all 'bending towards justice', [do so]

in a grammatical fifty word sentence".

The College's Memorandum is a rather neat and complete case study in "Zeno's Arrow", where

the arrow never reaches the target because it can't possibly be really moving: "Plaintiffs miss the mark

by focusing on the College's *past* document productions and the question of whether the College

redacted pursuant to FERPA....Plaintiffs speculate that SLC will disclose their unredacted disciplinary

records." p. 7 "Plaintiffs speculate that the Committee might, if received, disclose unredacted records to

---

7   Again, since I am not a telepath, I do not purport to detect actual hatred in anyone's mind or soul. The Essay centers on the various dispositions which are advocated by lawyers and sometimes accepted by judges in order to minimize the chances that Arab and Muslim litigants will survive a 12(b)(6) motion.

8  "Victims of empire don't die, they simply cease to exist. They burn away like fog". Omar El Akkad, *One Day, Everyone Will Always Have Been Against This* (New York: Alfred A. Knopf 2025) ebook

the public." p. 8 By the time all these sentences are said, there seems to be no motion, nothing to see here, nothing to complain about at all-- and pay no attention to those Arab and Muslim American plaintiffs behind the curtain, actual twenty-something people of color who have been bullied, threatened, and doxed, by the College, by public safety, and by the House Committee.[9]

"That's not discrimination!" is embodied in Point Two of the College's memorandum: "'VIEWPOINT DISCRIMINATION' IS NOT ACTIONABLE UNDER TITLE VI".

No defense counsel ever wants the Court to acknowledge the "Historical Context", which would undercut the sophistical argument that nothing is happening here, at most a minor stirring about, on which the Court is being requested to issue an *advisory* opinion. ""The injury in fact requirement prevents the federal courts from becoming a vehicle for the vindication of the value interests of concerned bystanders." (p. 7) Read that twice: It is mind-boggling to see students directly targeted for their ethnicity and views by the House Committee, (paragraph 156 of the Complaint), threatened by campus security, (paragraphs 120, 169, 173, 190, 193), harassed by Zionist peers while the College stands by (paragraphs 162, 178); dragged into baseless student conduct proceedings (paragraphs 186, 187, 193) being called "bystanders".

This raises a Rule 11 concern: under 11(b)(3) and (4), facts asserted must have "evidentiary support" and denials must be "warranted on the evidence". To be clear, Plaintiffs are NOT at this time making a rule 11 motion, nor seeking Rule 11 relief, but merely raise the issue whether defense counsel are frivolously disregarding the *Twombly* and *Iqbal* standards, and asking this Court to do the same.

There are numerous ways an attorney can zealously and ethically represent a university client in a case like this one, by filing a comprehensive answer with affirmative defenses; conducting discovery attentively and diligently, making a rule 56 motion if warranted; then trying the case with energy, wisdom, and a flair for cross-examination. But attorneys are not required to bring motions to dismiss

---

9 Advice to university defense counsel: "Just say the word 'speculative'. A lot."

which ask Courts to ignore *Iqbal/Twombly* and resolve disputed issues,  *Raydiant Oximetry, Inc. v ALC Med. Holdings LLC,* 808 F Supp 3d 987, 1003 (ND Cal 2025)  ("[T]hey made frivolous arguments for why the case should be dismissed for lack of jurisdiction"); *Naughton v Asher Ventures,* 2018 US Dist LEXIS 239734, at \*7 (ND Ill Apr. 5, 2018, No. 17 CV 4050) *aff'd,* 76 F.4th 539 (7th Cir. 2023)  ("Defendants did not amend their motion to remove their defunct argument"); *Universitas Educ., LLC v Nova Group, Inc.,* 2013 US Dist LEXIS 142481, at \*11 (SDNY Sep. 30, 2013) ("The fact that Mr. Robinson knew or should have known of all of these facts, and the legal frivolousness of his motion before he signed it, indicates that his re-filing of the motion to dismiss was in bad faith and with a motive to delay, harass, or needlessly increase the cost of litigation").

In the Essay, *supra,*  I state: "Dismissal on plausibility grounds is often based on the unspoken premise that Islamophobia, like teleportation, does not exist (while we all know antisemitism does)" (p. 16). Universities sued for antisemitism tend to defend on the grounds that "it exists, but we are dealing with it", for example, *Gartenberg v Cooper Union for the Advancement of Science & Art,* 765 F Supp 3d 245, 276 (SDNY 2025) ("Nor were Cooper Union's statements following the library incident sufficient to discharge its Title VI obligations"). Entities accused of racism towards African American people acknowledge that such things are shameful, but that random incidents in their offices are not "pervasive" enough to create a hostile environment, *Brooks v Frito-Lay, Inc.* 2022 US Dist LEXIS 132860 at \*33 (D Kan July 26, 2022, No. 21-2098-EFM) ("Plaintiff has failed to identify any case finding the reported finding of a noose by one employee necessarily generates a hostile environment for everyone employed at the plant").

It is unique to Islamophobia cases that defense counsel urges the Court to find there is none, That is the "Hand-wave".[10]

A few months ago, Judge Hasan Kingo in Supreme Court, New York County, on another

---

10  Counsel appears to be literally arguing here that  that Arab and Muslim students "ha[ve] no rights which the white man was bound to respect". *Scott v. Sandford,* 60 U.S. 393, 407 (1857).

controversial Palestine case, said: "[W]hat is the issue with [you] withdrawing this case at this juncture and mark it off the Court's calendar. And you can do as you wish in terms of trying to resolve it. I don't understand what the Court's involvement is." *Tellez v. NYC Dept. of Parks,* 100628/2025 (Supreme Court, N.Y. County 2025) (NYSCEF #39). In Judge Kingo's courtroom, "There used to be history, but there isn't any more". Guy Debord, *La Societe du Spectacle*

(Paris: Gallimard 1992) p. 142.

A judge whom I greatly admire, who knew what to do when history showed up, was the Hon. Gerhard Gesell, of Washington, who granted a request by the journalist Nat Hentoff for an injunction against the House Unamerican Activities Committee: "[T]he Report not only fails to indicate any legitimate legislative purpose, but on its face contradicts any assertion of such a purpose...The conclusion is inescapable that the Report neither serves nor was intended to serve any purpose but the one explicitly indicated in the Report: to inhibit further speech on college campuses by those listed individuals and others whose political persuasion is not in accord with that of members of the Committee," *Hentoff v. Ichord,* 318 F. Supp. 1175 (1970).

These are dangerous and frightening times for the Arab and Muslim plaintiffs and those standing by their side. The fortitude of a Judge Gesell would help us all get through them.

## Argument

### Point One

### THE MOTION TO DISMISS SHOULD BE DENIED

As a threshold issue, the College's motion may not meet F.R.C.P. Rule 11's requirements that "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; [and that]  the claims, defenses, and other legal contentions

8

are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law".

As the Plaintiffs anticipatorily asserted at Complaint paragraphs 82-83: "Defendants will ask this Court to apply a very demanding standard of proof to the Complaint, using as justification the 'plausibility' language of *Iqbal* and *Twombly*. This Court should not accept the invitation, *Hemme v Airbus,* 2010 US Dist LEXIS 31920, at *14 (ND Ill Apr. 1, 2010, No. 09 C 7239) ("Motorola misinterprets the plausibility standard of *Twombly* and *Iqbal* as an opportunity to make premature merits-based arguments regarding Plaintiffs' claims at the pleading stage. The Supreme Court has not imposed a probability requirement on plaintiffs[;] Plaintiffs have satisfied their burden of pleading by presenting sufficient facts to foster an expectation that discovery will uncover evidence supporting their allegations"); *KSW Mech. Servs. v Mech. Contrs. Assn. of NY,* 2012 US Dist LEXIS 63507, at *3-4 (SDNY May 4, 2012) ("[T]he Association both misinterprets *Twombly* and *Iqbal* and misreads the Complaint...Twombly and Iqbal did not disturb the well-settled rule that courts must accept as true the reasonable inferences that [can] be drawn from [a plaintiff's] allegations"); Mathews v Verizon Communs. Inc., 2020 US Dist LEXIS 158270, at *22-23 (DNJ Sep. 1, 2020, Civil Action No. 19-21442) ("[T]he Court agreed with the plaintiff that '[d]efendants have misinterpreted what is required at the pleading stage under *Twombly*,' and that '[w]hile [d]efendants are correct that [p]plaintiff's claims must be plausible on their face, there is no requirement that [p]laintiff must also plead a plausible motive for [d]efendants' actions... [P]llaintiff is only required to provide enough factual matter (taken as true) to suggest the required element[s] of the claims asserted"); *Griffin-El v Beard*, 2009 US Dist LEXIS 92975, at *6-7 (ED Pa Oct. 5, 2009, No. 06-2719) ("In this case, plaintiff, unlike the case in Iqbal, has plead sufficient factual allegations for the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged, and has therefore met the pleading requirement of

9

Federal Rule of Civil Procedure 8(a)"); *H2O Plus, LLC v Arch Personal Care Prods., L.P.,* 2011 US Dist LEXIS 54767, at *12-13 (DNJ May 17, 2011, No. 10-3089 (WJM-MF)) ("The Court agrees with Plaintiff that Defendants have misinterpreted what is required at the pleading stage under *Twombly*. While Defendants are correct that Plaintiff's claims must be plausible on their face, there is no requirement that Plaintiff must also plead a plausible motive for Defendants actions").

I[11] believe that motions to dismiss made by University counsel everywhere, mainly recycle the same arguments and all fail (or nearly do) to meet Rule 11 standards. However, the College's, more than most, would require this Court to construct entire scaffolds of rulings on the merits to reach the legal conclusions advanced. For example, here is just one of numerous case studies extracted from the Complaint (Memorandum p., 10-11): "Judge Subramanian's recent decision in *Khalil v. Trs. of Columbia Univ. in the City of N.Y.,[12]* is inapposite because the facts presented were fundamentally different, and extreme.. In *Columbia Univ.*, four of the eight plaintiffs had standing to assert First Amendment claims relating to Columbia's response to letters from the House Committee based on four key factors that do not exist here. First, Columbia was under immense pressure because the government announced it would 'conduct a comprehensive review of more than $5 billion in federal grant commitments to Columbia University to ensure the university is in compliance with federal regulations, including its civil rights responsibilities' and, days later, "cancelled or paused' approximately $400 million in federal grants to Columbia, citing its 'failure to protect Jewish students from antisemitic harassment.' Second, the Columbia plaintiffs' allegation that their records 'will be disclosed' was deemed plausible because Columbia agreed to produce 'existing . . . case files for each of the eleven events' and lifted some of the original redactions that had been placed on the records.   In contrast, SLC

---

11 Patrick Hagen, "Why lawyers should use the first person in briefs", *Linked In* https://www.linkedin.com/posts/hagenlaw_some-lawyers-say-you-should-never-use-the-activity-7397982209443536896-kZT8 Yay!

12 2026 U.S. Dist. LEXIS 58267 (S.D.N.Y. Mar. 19, 2026).

has not produced disciplinary files or student names,  and the Committee has no 'pending or future requests' for the College. Third, unlike SLC, Columbia had a "practice of disclosing students' disciplinary records to the Committee[.]'. Specifically, during the initial phase of the Committee's inquiry, Columbia produced student records that the Committee allegedly leaked to the press. The pleading alleged: 'When the University previously complied with the Committee's requests, student records were leaked to the press, 79 students' identities were not properly safeguarded . . . and members of Congress or their staffers posted students' private information on social media sites and identified students and faculty on the public record . . . all of which led to widespread and reputational harm, as well as increased incidents of doxing and harassment.'  Here, there is no allegation that SLC previously —or ever—produced unredacted student records to the Committee, much less that it had a 'practice' of doing so."

Each of these steps, even if inappropriately disguised as a "plausibility" finding, requires this Court to determine, without discovery, a hearing or the Plaintiffs' counsel having any opportunity to cross-examine, that an assertion made in the Silver affidavit is true, and that contradictory assertions made in the complaint are false.

Why would any litigant in federal court disregard *Twombly* and *Iqbal*? And why should any litigant doing so avoid any risk of Rule 11 sanctions? I could probably write an entire PhD dissertation on the answer, but in broad strokes: Government counsel are locked in to their client's position that the IHRA standards are constitutional, and that anti-Zionism is antisemitism. However, they never (in my experience) seem to do so by arguing that existing law is wrong, or for an extension; they merely ignore it. This is redolent of both arrogance and a dollar auction.[13]

I believe counsel for universities have multiple other possible motives: a. Making plaintiffs'

---

13 "[P]layers with complete information are trapped into making an ultimately irrational decision based completely on a sequence of rational choices made throughout the game". Sdandeep Pathak, "The Dollar Auction" https://www.phys.lsu.edu/~spathak/Talks/Dollar_Auction.pdf

counsel, especially solos, work lots of hours, which of course, would violate Rule 11's bar on motions made to "cause unnecessary delay, or needlessly increase the cost of litigation"; and, b. Most poignantly and infuriatingly, because some judges will easily disregard *Iqbal/Twombly* at university counsel's request. This, in my humble opinion, is exactly what happened in the *Fakhreddine* case in E.D. Pa., cited, of course, by my honorable adversary.  Need I say more than that Judge Goldberg decided on the merits, on a 12(b)(6) motion, that the House Committee's intervention with the University could not be coercive, because, the House Committeee said *please*:  "'To assist the Committee in understanding the antisemitism crisis at Penn and the university's response, *please produce* the following items no later than February 7, 2024.'" (His italics). "I do not find this language coercive". *Fakhreddine v Univ. of Pennsylvania,* 2025 US Dist LEXIS 16373, at *12 (ED Pa Jan. 30, 2025, Civil Action No. 24-cv-1034). Judge Goldberg also adroitly navigated his way to a finding that Dr. Fakhreddine, who had been defamed as an antisemite by two Congresspeople on national television (who demanded she be fired) and also in the information letter the House Committee sent, and who had been ostracized, denied promotion,  had events canceled, and been dropped from email lists by the University, lacked Article III standing to sue.[14]

A third reason that university counsel might expect this Court to disregard *Iqbal/Twombly* and resolve disputed fact issues is because Your Honor appeared to offer to do so.  The assertion that all records disclosed to the House Committee were redacted is denied by Plaintiffs (on information and belief, general counsel Ms. Silver, told Plaintiff Gardinier her name had also been redacted, but a document soon after released by the Committee revealed this promise had not been kept). Your Honor unfortunately seemed intrigued by the possibility of dismissing for lack of standing if the University merely provided an affidavit swearing the files were redacted, which they have now done. This would

---

14 The Third Circuit Court of Appeals modified Judge Goldberg's dismissal of the complaint with prejudice, to without prejudice. I am drafting a new complaint, which I will file in the next few weeks. In the end, the case stands only for the proposition that we did not plausibly plead standing, not that Dr. Fakhreddine did not have it, *Fakhreddine v Univ. of Pennsylvania,* 2026 LX 22085 (3d Cir Jan. 9, 2026, No. 25-1290).

be plain error. Paragraphs 84-92 of the FAC state: "Both Defendants have asserted that all documents pertaining to Plaintiff students were redacted in compliance with FERPA before being disclosed by the College to the Committee. Plaintiffs assert plausibly that they cannot rely on this claim of redaction, especially because their request to inspect the documents pertaining to them which were turned over to the Committee [was denied]. Plaintiffs have a right to view these documents insofar as they constitute each Plaintiff's individual confidential files under FERPA ( 34 CFR § 99.30). FERPA required the College to obtain consent from the student (if major) or parent (of a minor) before disclosing anything to the House ( 34 CFR § 99.30), as there was no applicable exception (the disclosure was voluntary, not subject to a "judicial order or lawfully issued subpoena"), (99.31). This was never done. Even if the College redacted files, Plaintiffs believe FERPA was still violated, to the extent that even without names, the files contain "personally identifiable information". For example, a student conduct record that "[Name withheld] is a junior living off campus with a double major in architecture and anthropology, and a member of the debating club" might contain enough information for public identification of the student. Each of the Letters contains a statement directing the recipient not to redact anything, and the Committee has previously savagely criticized MIT and Harvard for supplying redacted files (see above). Mere statements in letters and pleadings, or even under oath in an affidavit, that files were redacted is hearsay and would not be probative of anything even if this were an evidentiary hearing, which it is not. This Court would misapprehend *Twombly* and *Iqbal* if it made a finding that Plaintiffs' Complaint was not "plausible" or that Plaintiffs lacked standing due to defendant's claims about  redaction and FERPA compliance, *Segedie v Hain Celestial Group, Inc.,* 2015 US Dist LEXIS 60739, at *27 (SDNY May 7, 2015, No. 14-cv-5029 (NSR)) ("To accept Defendant's argument, the Court would need to take Defendant's word over allegations in the Complaint, which the Court must accept as true on a motion to dismiss"); *Patel v NY Life Ins. Co.,* 2012 US Dist LEXIS 72717, at *16 (SDNY May 21, 2012) ("While the Court may take judicial notice of this Georgia statute,

the Court cannot, on a motion to dismiss, simply take Defendant's word that it complied with the statute").

In fact, a request to dismiss the Complaint because of the alleged redactions is a disguised mootness argument (paragraph 92)  To grant a motion to dismiss on a mootness defense, the defendant must satisfy the Court that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation", a threshold which the Defendants cannot imaginably pass here, *Martinez v Pure Green NYC Wholesale Corp.,* 2025 US Dist LEXIS 59432, at *15 (EDNY Mar. 30, 2025, No. 23-cv-4247 (NRM) (MMH)); *United States v Concentrated Phosphate Export Ass'n,* 393 US 199, 203 (1968)("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant . . . free to return to his old ways").

In both the instant case and *Fakhreddine,* defense counsel used the disreputable tactic of refusing to let us see what had been disclosed,[15] then claiming that our complaints were "speculative" because, you know, we could not specifically  allege what had been turned over to Congress. Judge Goldberg leaned in: "Plaintiffs complain they should not have to allege what only Penn knows—namely, what documents Penn intends to send to the House Committee. Plaintiffs rely on authority holding that the special rules for pleading fraud claims may be relaxed 'where the factual information is peculiarly within the defendant's knowledge or control.' *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir. 1997). However, this is not a fraud case", *Fakhreddine v Univ. of Pennsylvania*, 2024 US Dist LEXIS 110406, at *8-9 (ED Pa June 24, 2024, Civil Action No. 24-cv-1034). Judge Goldberg was wrong: The "defendant's knowledge" doctrine is not limited to fraud (and

---

15  On March 10, I wrote to university counsel requesting that "we arrange a time for me to inspect all FERPA-protected files, communications and documents maintained by Sarah Lawrence in connection with any of the Plaintiffs herein, that relate to student conduct proceedings for pro-Palestinian expression, request from or disclosures to the House Committee on Education and the Workforce, or communications with the Committee about these matters." There was n response.  Plaintiffs had also so requested, and been declined (paragraph #85).

14

why should it be?) but has also been applied (quote relevantly here) to jurisdictional inquiries, *Birdie Girl Golf, LLC v Many Hats Enters.,* LLC, 2025 US Dist LEXIS 159935, at *28 (SDNY Aug. 18, 2025, No. 24-cv-9425 (LJL)) (Hearing appropriate when "the facts necessary to establish personal jurisdiction . . . lie exclusively within the defendant's knowledge").

It is 3:34 a,m. on an insomniac Sunday (but who wouldn't rather brief than sleep?). There are a couple of remaining issues I will deal with quickly, hoping for the Court's tolerance.

**Viewpoint discrimination and Title VI are not siloed; they overlap.** University counsel routinely argue that if its viewpoint discrimination, it couldn't possibly have anything to do with ethnicity. As we already said at paragraphs 125-130 of the FAC: "Viewpoint discrimination infringing the First Amendment may sometimes be closely allied with protected-class discrimination which violates Title VI.  Where for example members of a protected class are associated with a particular viewpoint of which their university disapproves, they may receive more severe sanctions or retaliation than non-members.  Similarly, it may be an act of racism or discrimination automatically to assign certain opinions or viewpoints to members of a protected class.  Plaintiffs are on the receiving end of both types of discrimination.  As Palestinian, Arab and Muslim students and their supporters, they are more severely punished than others similarly situated, for equivalent alleged violations of student code. ….They are also viewed in a biased way as being dangerous, violent and prone to antisemitism and supporters of terrorism, *Counterman v Colorado*, 600 US 66, 88-89 (2023) ("[U]nfortunately yet predictably, racial and cultural stereotypes can also influence whether speech is perceived as dangerous"); see also AAUP, "On Title VI, Discrimination, and Academic Freedom", September 2025 https://www.aaup.org/reports-publications/aaup-policies-reports/topicalreports/title-vi-discrimination-and-academic ("Title VI investigations [are targeting] speech and expressive activity protected by the First Amendment and academic freedom").

**The College gets *Khalil v. Columbia* wrong.** The case is clearly indistinguishable, despite all

15

the College's wriggling. And it tolls like an ocean bell: the College stays in, even if this Court lets the House Committee out: "Coercion to violate a third party's constitutional rights doesn't equal 'mere compliance'; it's state action," *Khalil v Trustees of Columbia Univ. in the City of NY,* 2026 US Dist LEXIS 58267, at *37 (SDNY Mar. 19, 2026, No. 25-cv-2079 (AS)).[16]

**"Self disclosure" does not affect standing.** This argument also verges on the frivolous. Put through the English to English Translator, it emerges: "If you sue under your own name, you can't sue". Pseudonymity in litigation is a matter of choice, and of the Court's discretion, and it seems not to be sustainable in cases in the antisemitism/ anti-Zionism space anyway: "Plaintiff's renewed motion to appear anonymously is denied. Plaintiff shall file an amended complaint with her true name within by April 18, 2025. If an amended complaint is not  filed by that date, or if that deadline is not extended, the Court will dismiss the Complaint without prejudice", *Doe v Fashion Inst. of Tech.,* 2025 US Dist LEXIS 64432, at *15-16 (SDNY Apr. 3, 2025). Plaintiffs' choice not to proceed pseudonymously would just possibly be relevant on the merits, as to an affirmative defense that they had failed to mitigate damages. There is no way it should be construed as an Article III issue (the College doesn't even cite any cases in support).

"The dismissal of a claim challenging a law that abridges protected speech will rarely, if ever, be appropriate at the pleading stage. Instead, factual development will likely be indispensable to the assessment of whether [such state action] is constitutionally permissible....Careful balancing of the need for the [action] against [its] constriction of first amendment rights is called for. Full development of the facts is essential for the court to strike this balance", *Cornelio v. Connecticut,* 32 F.4th 160, 172 (2d Cir. 2022); *Nicholas v Mason,* 2023 US Dist LEXIS 236719, at *17 (DNH Dec. 28, 2023, No. 23-

---

16  The College never cites *Republican Natl. Comm. v Pelosi,* 2022 US Dist LEXIS 91503 (DDC May 20, 2022, Civil Action No. 22-659 (TJK)], *vacated on other grounds,* 2022 U.S. App. LEXIS 26068 (DC Cir Sep. 16, 2022, No. 22-5123), which analyzes at length how the recipient of a Congressional subpoena may be sued in the absence of Congress itself. "Defendants' failure to cite, let alone address" controlling authority violates Rule 11. *Pacheco v Chickpea at 14th St. Inc.,* 2019 US Dist LEXIS 210725, at *5 (SDNY Dec. 6, 2019, No. 18-CV-251 (JMF) (GWG)).

cv-196-LM-A]) ("[T]he norm is to wait until the summary judgment stage of the litigation to address the ultimate question of whether the [restriction] should stand").

## Point Two

### PLAINTIFFS HAVE, AND HAVE ADEQUATELY PLED, STANDING

The College challenges standing under FRCP 12(b)(1), on the theory that if standing does not exist, the Court lacks subject matter jurisdiction. "To satisfy the requirements of Article III standing, a party must show that (1) the party has suffered an actual or imminent injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and conduct complained of; and (3) it is likely that a favorable decision in the case will redress the injury", *Roman v Greenwich Vil. Dental Arts P.C.,* 2022 US Dist LEXIS 165400, at *3-4 (SDNY Sep. 13, 2022, No. 21-cv-5939 (JGK))

It is well-settled that this Court has discretion to order limited discovery pertaining to subject matter in advance of deciding a motion to dismiss, *Filus v Lot Polish Airlines*, 907 F2d 1328, 1332 (2d Cir 1990) ("[G]enerally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue"); *Alliance for Envtl. Renewal, Inc. v Pyramid Crossgates Co.,* 436 F3d 82, 88 (2d Cir 2006) (Grant of "limited discovery on the jurisdictional issue"); *Brocsonic Co. v M/V Mathilde Maersk*, 120 F Supp 2d 372, 375 (SDNY 2000), aff'd 270 F.3d 106 (2nd Cir. 2001); *1964 Realty LLC v Consulate of the State of Qatar-New York,* 2015 US Dist LEXIS 118547, at *23 (SDNY Sep. 4, 2015) ("Therefore, limited jurisdictional discovery as to these factual issues, along with additional briefing as to the applicable law, is necessary before the Court can make any determination as to actual authority")*; Robinson v Blank,* 2013 US Dist LEXIS 72068, at *17-20 (SDNY Feb. 22, 2013) ("[W]here a plaintiff's Article III standing has been placed in issue on a Rule 12(b)(1) motion, the court may choose to decide the motion based on limited discovery"); *Burlington Ins. Co. v MC&O Masonry, Inc.*, 2018

US Dist LEXIS 111998, at *7 (EDNY July 5, 2018, No. 1:17-cv-02892-FB-SMG) ("The parties shall conduct limited discovery to determine the identity and citizenship of the members of FSLM and First Avenue").

Once discovery has been conducted, "[t]he Court may resolve the factual issues concerning jurisdiction either on a summary judgment motion, if appropriate, or, if not, after an evidentiary hearing", *Alliance for Envtl. Renewal, Inc. v Pyramid Crossgates Co.*, 436 F3d 82, 83-84 (2d Cir 2006).

### CONCLUSION

"There is an old legend that on one occasion God prayed, and his prayer was 'Be it my will that my justice be ruled by my mercy'." Benjamin N. Cardozo, *The Nature of the Judicial Process* (New Haven: Yale University Press 1949) p. 66

DATED: Amagansett, NY
May 4, 2026

/s/ Jonathan Wallace
Jonathan Wallace
PO #728
Amagansett NY 11930
917-359-6234
jonathan.wallace80@gmail.com
Counsel for Plaintiffs

CERTIFICATE OF SERVICE AND COMPLIANCE

I certify that on April 20, 2026, I caused the foregoing document to be filed via this Court's CM/ECF system, which I understand caused service on all registered parties, and one courtesy hard copy of this document, the Notice of Motion, and the Declaration of Sana Cheema, to be mailed to the below address pursuant to the Court's Individual Rules of Practice 1.E and

18

2.B.ii:

Chambers of The Honorable Cathy Seibel
U.S. District Judge for the Southern District of New York
The Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse
300 Quarropas Street
Room 633
White Plains, NY 10601-4150


I further certify that the foregoing document contains 6435 words, which is compliant with

Local Civil Rule 7.1(c).

/s/ Jonathan Wallace