UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------

Suzanne Gardinier, Maeve Aickin, Nazira Atalla,
Emily Carlisle, Sana Cheema,Vega Barrada Gullette,
Riziki Mbugua, Liam Sharif Montague,
Lincoln Richardson, Nora Tucker-Kellogg,
and  Nurah Abdulhaqq,

                Plaintiffs,                Number: 7:25-cv-06442

      -against-

SARAH LAWRENCE COLLEGE,
THE HOUSE COMMITTEE ON
EDUCATION AND THE WORKFORCE,
and TIM WALBERG,

                Defendants.
-----------------------------------------------------------------------

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO SARAH LAWRENCE COLEGE'S MOTION TO DISMISS

### PRELIMINARY STATEMENT [1]

This court has discretion to-- and it is respectfully suggested, must-- analyze this case against the background of its historical context, *Starr Intl. Co. v FRB*, 906 F Supp 2d 202, 205, n 1 (SDNY 2012 ("The Court also takes notice of the events constituting the financial crisis that occurred in fall 2008, for the purpose of providing historical context"); *Miah v Holder,* 431 F App'x 34, 35 (2d Cir 2011) ("[W]e may take judicial notice of indisputable historical events"); *Souleymane Niang v Mukasey,* 511 F3d 138, 149 (2d Cir 2007) ("[T]his Court is not ignorant of indisputable historical events"); *Bernstein v Vil. of Wesley Hills,* 95 F Supp 3d 547, 576 (SDNY 2015)  ("Discriminatory intent may be inferred from the totality of the circumstances, including 'historical background'").

---

1  I apologize for filing this brief without the required tables of contents and authorities. By way of explanation, not excuse, I retired from the paid practice of law in order to take cases like this on*e pro bono*. I work from home, have no secretary, paralegal or associate, and have never learned how to automate table generation, so I typically compile them manually. I wanted to get papers filed by the deadline and ran out of time, but will submit a corrected copy as soon as I can, tomorrow if possible.

FR Ev. 201(b), "Kinds of Facts That May Be Judicially Noticed", states: "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." History, including current events, falls in both categories.

As is set forth in the First Amended Complaint (FAC)[2], paragraphs 1 to 7, the House Committee is engaged in an insensate national hunt to put down, mercilessly, anyone who looks and sounds like the Plaintiffs. All but three Republican members of the Committee[3] have personally expressed the most overt, and in some cases, incoherent and irrational Islamophobia (paragraphs 39 to 81).

"Mr. Trump and too many other Republicans are ... besmirching an entire faith even as they claim to protect religious freedom", The Editorial Board, "Trump's Hypocrisy on Religious Freedom", *The New York Times* March 19, 2026

https://www.nytimes.com/2026/03/19/opinion/anti-muslim-islamophobia-trump-republicans.html

As the venerable American Association of University Professors[4] (AAUP) said in a beautifully titled report in January 2025, "Against Anticipatory Obedience",

https://www.aaup.org/sites/default/files/Against_Anticipatory_Obedience.pdf : "The new administration's agenda for higher education has been thoroughly prepared by a series of statewide legal assaults on public colleges and universities in North Carolina, Florida, Texas, and elsewhere, as well as by the high-profile congressional witch hunt that within the past year brought down the

---

2  I  I respectfully request that this Court review the Complaint for its legal advocacy as well as for its factual assertions. In the "fog of war", I may not have repeated every legal precedent cited in the brief (but adopt them by reference now).

3  All three of the exceptions have voted for one or more resolutions supporting suppression of these plaintiffs, for example conflating anti-Zionism with antisemitism, or finding "from the river to the sea" antisemitic expression.

4  Founded in 1915, the organization, despite some weaker moments,. has protected its people through six great national free speech emergencies: 1. World War I and after, when Columbia, for example, fired professors who opposed the draft; 2. A milder censorship during World War II, the "good war"; 3. The McCarthy era, of course; 4. The 1960's and Vietnam war era speech; 5. 9/11 and the aftermath; 6. Today.

presidents of three Ivy League institutions. How should we respond? The University of Chicago's 1967 Kalven Report, often cited as the source of calls for 'institutional neutrality,' declares, 'From time to time instances will arise in which the society, or segments of it, threaten the very mission of the university and its values of free inquiry. In such a crisis, it becomes the obligation of the university as an institution to oppose such measures and actively to defend its interests and its values.' This is undoubtedly such a time...There is good reason to fear that many college and university leaders—trustees, chancellors, presidents, provosts, deans, and more than a few faculty members—will seek to accommodate, if not capitulate to, these unwarranted incursions into higher education...There is good reason to fear that many college and university leaders—trustees, chancellors, presidents, provosts, deans, and more than a few faculty members—will seek to accommodate, if not capitulate to, these unwarranted incursions into higher education....Now is not the time to be complacent. Now is the time to act."

The AAUP nobly served as plaintiff against the Trump administration in *AAUP v. Rubio* 1:25-cv-10685-WGY (D. Mass. 2025) (Document #73) . In its motion denying the motion to dismiss,   the Court held: "[D]uring his 2024 presidential campaign, President Trump characterized these protests as 'proHamas,' 'pro-terrorist,' 'antisemitic' and 'anti-American,' and promised to deport noncitizen students and faculty who participated, including a statement to donors in May 2024 that, 'any student that protests, I throw them out of the country'.....  Executive Order 13,899, issued during the first Trump administration, which adopted a definition of antisemitism[5] that includes constitutionally protected speech, such as claiming that Israel is 'a racist endeavor,' holding Israel to standards 'not expected or demanded of any other democratic nation,' or 'comparing Israeli policies to those of the Nazis'...[M]any

---

5    These are the infamous International Holocaust Remembrance Association Alliance standards, which the House Committee has already publicly insisted SLC should adopt (Complaint paragraph #70). Students believe that the College may already have privately agreed to use the IHRA standards, which would explain the treatment of plaintiff Lincoln Richardson: "He has faced harassment and baseless accusations of antisemitism from peers on multiple occasions due to canvassing for support on divestment. He has experienced College administrators threatening disciplinary action for no cause." (paragraph #194)

noncitizen students and faculty no longer participate in public protests, some have stepped back from leadership roles or participation in advocacy groups related to Palestine, some abstain from public writing or scholarship and have purged past writing and online posts, some skip class or classroom discussion, and some faculty have fled their home cities in the United States. This chill, flows directly from the policy challenged here".

Plaintiffs are mainly members of the College chapter of Student for Justice in Palestine (SJP) (paragraphs 165, 171, 180, 181, and footnote 16) which has been nationally doxed, reviled, threatened and harassed, in efforts led by the Trump administration and the House Committee (see paragraph 49). SJP chapters are often punished for pro-Palestinian expression by being suspended from, or denied, student organization standing by universities, *Matter of Awad v Fordham Univ.,* 189 AD3d 605, 605-606 (1st Dept 2020); *Columbia SJP et al. v. Columbia,* 152220/2024 (Supreme Court N.Y. County 2024) (NYSCEF #109).

On the other hand, federal courts have correctly viewed SJP chapters as beleaguered student organizations whose rights are being stepped on and who are entitled to injunctive relief*, Mizzou Students for Just. in Pal. v Choi*, 2025 US Dist LEXIS 223592, at *24 (WD Mo Sep. 19, 2025, No. 25-cv-04184-SRB) ("MSJP must be permitted to participate in the 2025 Homecoming Parade")[6]; . *Students for Just. in Palestine v Abbott*, 756 F Supp 3d 410, 427 (WD Tex 2024) ("Appropriate relief will focus on eliminating the connection between the university policies, GA-44's definition of antisemitism, and the IHRA's examples of antisemitism, because it is that connection that chills Plaintiffs' speech"); *Univ. of Maryland Students for Just. in Palestine v Bd. of Regents of the Univ. Sys. of Maryland,* 2024 US Dist LEXIS 178359, at *39 (D Md Oct. 1, 2024, No. 24-2683 PJM)  ("SJP's Motion for Preliminary Injunction will be GRANTED").

Federal courts have now recognized in numerous cases that anti-Zionism is not antisemitism,

---

6  This raises the paradox that the Plaintiffs would be permitted to march in the homecoming parade in Missouri carrying the same banners that the House Committee is pressuring the College to suspend or expel them for.

sometimes in those exact words, *StandWithUs Ctr. for Legal Just. v Massachusetts Inst. Of Tech.,* 2025 U.S. App. LEXIS 27390, at *18 (1st Cir Oct. 21, 2025, No. 24-1800) ( "Most of the conduct about which plaintiffs complain is speech protected by the First Amendment, and we do not construe Title VI as requiring a university to quash protected speech"); *Sussman et al v. Massachusetts Institute of Technology et al ,* 1:25-cv-11826-RGS (D Mass 2025) Docket No. 75, 1/5/2026 ("But the court sees no basis on which to distinguish the First Circuit's conclusion that anti-Israeli sentiment is not, without more, antisemitic messaging"); *Eyal Yakoby v Trustees of the Univ. of Pennsylvania,* 2025 US Dist LEXIS 103709, at *18-19 (ED Pa June 2, 2025, No. 23-4789)  ("At worst, Plaintiffs accuse Penn of tolerating and permitting the expression of viewpoints which differ from their own"); *Landau v. Corp. of Haverford Coll.*, No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at *4-5 (E.D. Pa. Jan. 6, 2025) ("Plaintiffs seek[] to blur the line between Zionism as a political philosophy and Zionism as a component of Jewish identity, and in the process implicitly sweep any and all criticism of Israel into the basket of antisemitism. As a threshold matter,....I reject Plaintiffs' embedded proposition that any anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views")*; Am. Assn. of Univ. Professors v Rubio*, 802 F Supp 3d 120, n 17 (D Mass 2025) ( "Criticisms of the State of Israel are not anti-Semitism, they're political speech, protected speech"); *Canel v Art Inst. of Chicago,* 2025 US Dist LEXIS 30309, at *24-25 (ND Ill Feb. 20, 2025, No. 23 CV 17064) ("[T]he banners and flyers reflect political points of view critical of the Israeli government.... From these allegations...the Court cannot also conclude that the banners and flyers represent discriminatory harassment of plaintiff on the ground of her Jewish or Israeli identities"); *Gerwaski v Nevada ex rel. Bd. of Regents of the NV Sys. of Higher Educ.,* 2025 US Dist LEXIS 84645, at *21-22 (D Nev May 5, 2025, No. 2:24-cv-00985-APG-MDC) ("As pleaded, AMP and SJP-UNLV's conduct alleged in the FAC is protected by the First Amendment"); *Newman v. Point Park Univ.,* No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722, at *78-

79 (W.D. Pa. Mar. 31, 2022) ("Despite the sensitive and important the issues these conflicting viewpoints and actions raise, as an overarching matter, such debates... have been recognized to fall within First Amendment protections when efforts have been advanced to limit or impair such advocacy...Against that backdrop, Plaintiff has not shown that Defendant has subjected her to an objectively hostile work environment by its not suppressing, or otherwise protecting Plaintiff from, the personal views and academic interests of some of Defendant's professors and students related to these geopolitical topics").

The House Committee's foundational principle, which it has said out loud over and over, not only in X posts but in its hearings, official statements, and votes in resolutions, is to the contrary: Anti-Zionism *is* antisemitism, see FAC paras # 46, 76-77, 94. I[7] respectfully urge the Court to confirm with House Counsel that this is the official position, but the Memorandum is consistent, citing First Amendment-protected statements of oppsoition to Israel as if they were antisemitic instances, for example at page

I have appeared in approximately fifty cases relating to pro-Palestinian expression, in three state courts and eight federal courts,  "[T]here is no new thing under the sun", *Ecclesiastes* 1:9 KJV. Recently I wrote and published on my web site an essay, Jonathan Wallace, "Systemic Islamophobia[8] in American Courts", *The Ethical Spectacle,* last updated May 2, 2026 https://www.spectacle.org/whitepapers/whitepaper.pdf  (the "Essay"), in which I analyze eighteen different tactics I have personally witnessed which have been used to deny Arab and Muslim litigants access to justice. The House Committee's  motion papers advance at least four of these: "Zeno's Arrow,"  which "breaks a compelling case down to its component parts in a sophistical way, finally

---

7   Patrick Hagen, "Why lawyers should use the first person in briefs", *Linked In* https://www.linkedin.com/posts/hagenlaw_some-lawyers-say-you-should-never-use-the-activity-7397982209443536896-kZT8

8   Again, since I am not a telepath, I do not purport to detect actual hatred in anyone's mind or soul. The essay centers on the various dispositions which are advocated by lawyers and sometimes accepted by judges in order to minimize the chances that Arab and Muslim litigants will survive a 12(b)(6) motion.

concluding there is no case at all"; " Decontextualization": "In order to hold that the mistreatment of Arab and Muslim people is not" actionable, "it is highly convenient to ignore the historical forces at work"[9] ; "Plausibility", in our cases the assertion that claims of Islamophobia fail *Iqbal/Twombly* because (as we all know) there is no such thing; and the "Hand-Wave", in which judges "without seeing, or caring, that they [are] disposing of an immense realm of rights, duties,interpretations, discussion, of admonitions, respectful disagreements  and accords, all 'bending towards justice', [do so] in a grammatical fifty word sentence".

The House Committee Memorandum works two variations on "Zeno's Arrow", where the arrow never reaches the target because it can't possibly be really moving. One, dealt with below, is the Speech and Debate Clause argument; the other is the more conventional one, very similar to the College's, which ends by assuring us that no attention is to be paid to a group of young Arab and Muslim Americans who are really suffering and frightened. "Plaintiffs have not alleged any cognizable injury... [F]or the student Plaintiffs, it is non-party actors who would be doing the alleged harassing and doxing at some undefined point in the future". These kids, whom the House Committee can't stop defaming even in it's motion papers (see below) can assert only " abstract disagreements"--with the frenetic forces trying not only to end their education and careers, but to evict their families, and everyone of their ethnicity and religion, from the country entirely.

By the time all these sentences are said, there seems to be no motion, nothing to see here, nothing to complain about at all-- and pay no attention to those Arab and Muslim American plaintiffs behind the curtain, actual twenty-something people of color who have been bullied, threatened, and doxed, by the College, by campus security, and by the House Committee.

No defense counsel ever wants the Court to acknowledge the "Historical Context", which would undercut the sophistical argument that nothing is happening here, at most a minor stirring about,

---

9 "Victims of empire don't die, they simply cease to exist. They burn away like fog". Omar El Akkad, *One Day, Everyone Will Always Have Been Against This* (New York: Alfred A. Knopf 2025) ebook

on which the Court is being requested to issue an *advisory* opinion. It is mind-boggling to see students directly targeted for their ethnicity and views by the House Committee (paragraph 156 of the Complaint), who are then told by the Committee to just take the hit, as there as no possible basis, substantive or procedural, for them to seek redress.

Rule 11 does not permit attorneys to bring motions to dismiss which ask Courts to ignore *Iqbal/Twombly* and resolve disputed issues, *Raydiant Oximetry, Inc. v ALC Med. Holdings LLC,* 808 F Supp 3d 987, 1003 (ND Cal 2025) ("[T]hey made frivolous arguments for why the case should be dismissed for lack of jurisdiction"); *Naughton v Asher Ventures,* 2018 US Dist LEXIS 239734, at *7 (ND Ill Apr. 5, 2018, No. 17 CV 4050) *aff'd,* 76 F.4th 539 (7th Cir. 2023) ("Defendants did not amend their motion to remove their defunct argument"); *Universitas Educ., LLC v Nova Group, Inc.,* 2013 US Dist LEXIS 142481, at *11 (SDNY Sep. 30, 2013) ("The fact that Mr. Robinson knew or should have known of all of these facts, and the legal frivolousness of his motion before he signed it, indicates that his re-filing of the motion to dismiss was in bad faith and with a motive to delay, harass, or needlessly increase the cost of litigation").

I state in the Essay: "Dismissal on plausibility grounds is often based on the unspoken premise that Islamophobia, like teleportation, does not exist (while we all know antisemitism does)" (p. 16). Since the House Committee does not simply rationalize Islamophobia, or look away from it (like the College), but *embodies* it, naturally the House Committee would claim there is no such thing.

But should their lawyers?

Rule 11(b)(3) says that "factual contentions" in a pleading must " have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery".[10] The assertion that the twenty something Arab and Muslim college student

---

[10] To be clear, Plaintiffs are NOT at this time making a rule 11 motion, nor seeking Rule 11 relief, but merely raise the issue whether defense counsel are frivolously disregarding the *Twombly/ Iqbal* standard, and asking this Court to do the same.

Plaintiffs receive funding or direction from terrorist organizations is a lie.  The House Committee and their lawyers have had years to find one shred of evidence; there is none. "Plaintiffs fail to provide any facts that support the conclusions that Defendants' support for Palestinians transformed them into the 'U.S. [] arms of Hamas' or that any money was given or diverted to Hamas", *Shnaider v Am. Muslims for Palestine,* 2026 US Dist LEXIS 38792, at *18 [MD Fla Feb. 24, 2026, No. 8:24-cv-01067-MSS-SPF])  False accusations of support of terrorism are defamatory, *Khalil v Fox Corp.,* 630 F Supp 3d 568, 582-583 (SDNY 2022) ("Dobbs' tweets and statements used language that was precise and readily understood, and statements in the tweets such as 'we have evidence' and 'Khalil is a liaison with Hezbollah' are capable of being proven true or false").

In other words, Plaintiffs said, "We have a well-founded fear the House Committee will defame us", and the latter's lawyers indignantly responded, "The Committee would never defame you Hamas supporters".

In amending the complaint at Your Honor's suggestion, it occurred to me to add paragraphs 39-67, giving examples of the relevant views about Arab and Muslim people of each Republican majority member of the House Committee. Here area few selected paragraphs,  to give a  full idea of the whole endeavor:  "The Committee's Chairman, Tim Walberg, said at a March 2024 town hall meeting in Dundee, Michigan, in reference to Gaza, 'We shouldn't be spending a dime on humanitarian aid. It should be like Nagasaki and Hiroshima. Get it over quick', https://www.nytimes.com/2024/03/31/us/politics/tim-walberg-gaza-nagasaki-hiroshima.html"

The former chairperson and current member, Virginia Foxx, "told the *New York Times* about the people of her district: "The people here believe that the Jews are God's chosen people, and I grew up in the Baptist Church believing that....There are verses in the Bible that ministers will quote, that if you bless the Jewish people you will be blessed. If you curse the Jewish people you will be cursed." https://www.nytimes.com/2024/04/16/us/virginia-foxx-harvardantisemitism.html "

"Member Rick Allen of Georgia quoted the same verse of the Bible of which Ms. Foxx was apparently thinking, to then-Columbia President Minouche Shafik, who is Egyptian, Muslim, and a person of color, at the Committee's April 17, 2024 hearing: '[A]re you familiar with Genesis 12:3?... It was a covenant that God made with Abraham and that covenant was real clear. If you bless Israel, I will bless you. If you curse Israel, I will curse you... Do you want Columbia University to be cursed by [the] God of the Bible?' https://www.rev.com/transcripts/university-antisemitism-hearing "

" Committee member Joe Wilson said: 'These stones and trees will say oh, Muslim, there is a Jew behind me, come and kill him.' That's their ideology. Free Palestine from the river to the sea is a code for death to Israel, death to America. We know that anti-Zionism is antisemitism. https://congress.gov/119/chrg/CHRG-119hhrg61619/CHRG-119hhrg61619.pdf "

Attention must be paid to such statements. Thought experiment: We are at trial, and I move in this evidence, by having a fact or expert witness testify to these statements, or by using them on cross of a Congressional witness. House counsel makes a motion to exclude them under F.R. Ev. 403, which states: "[T]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

This is not a close call. The FAC described what it calls the House Committee's "project": "Advancing a new McCarthyism, defendant House Committee on Education and the Workforce (the 'Committee') has assumed the role of jawboning and bullying the nation's universities, seeking the suppression of disfavored speech and the elimination of diversity, using as cover the excuse that it is investigating and deterring antisemitism on campus. The Committee is carrying out this project with unusually open expressions of bigotry, spite, and the Christian fundamentalism of certain members"(FAC paragraphs 1-2); "The Committee..., by its majority members' own statements and

actions, publicly acts on, endorses and enables Islamophobia, Christian fundamentalist goals for government action, and brutal disregard for the civil rights and liberties of the Palestinian and Muslim students whom it claims to be investigating". (paragraph #39). These statements are material evidence of assertions made in the FAC whose probativeness therefore clearly outweighs their prejudice, *United States v Fratus,* 2023 U.S. App. LEXIS 7554, at *5  (3d Cir Mar. 30, 2023, No. 22-1185), *cert. den.* 144 S. Ct. 304 (2023) (recording of prior threatening call to African American congressperson was admissible).

House counsel's one reference to this in the Memorandum is a classic instance of what I refer to in the Essay as the "Hand-wave": "Plaintiffs list remarks made by Committee Members....and assert 'this evidence would be admissible at trial,'", Footnote 11. Nothing to see here, people! The footnote asserts that "many of these statements were made during congressional hearings,  and some while 'speaking on the House floor'". In fact, thirteen of the twenty-one quoted statements were made in X posts, press releases, town halls, and media interviews which do not warrant Speech and Debate clause protection under *Gravel* and *Hentoff,* see below.

House Counsel in the same Footnote also offers a rather iconic nonsequitur[11]: "These allegations violate the core of the Speech or Debate Clause." In this eleven word sentence, the House Committee is, no exaggeration, arguing that House Committee Congressman Fine's *X* post, "We need more Islamophobia, not less. Fear of Islam is rational",[12] not only cannot lead to liability for Mr. Fine, *but may not be introduced as evidence of mens rea.* No case law is cited for this quite radical proposition.

The claims in the FAC that, for example,  an *X* post "We need more Islamophobia, not less", does not have Speech and Debate Clause protection is based squarely on the Supreme Court's holding

---

11  A category I omitted from the Essay, but which I will add now.
12  Posted on March 12, 2026, when this case and several others naming the House Committee were already pending. Unsolicited advice to House counsel: Sometimes, zealous representation of a client may include the advice, "stop talking now".

11

in *Gravel v United States,* 408 US 606, 622 (1972) that "Senator Gravel's alleged arrangement with Beacon Press to publish the Pentagon Papers was not protected speech or debate within the meaning of Art. I, § 6, cl. 1, of the Constitution". The proposition here, which would be applicable to social media, is that there is a class of speech which Congressfolk sometimes utter, off the House floor and not expressed in official reports or letters, that is outside Speech and Debate clause protection. The case law exemplified by *Watkins v. United States,* 354 US 178 (1957) leaves the door open for a finding that, under proper circumstances, Congress may act for an improper purpose and lose Speech and Debate clause protection; *Gravel* suggests circumstances in which that might be so; *Hentoff v. Ichord,* 318 F. Supp. 1175 (1970) granted an injunction against the House Committee on Unamerican Activities, holding that a report intended only to prevent people like the plaintiff, journalist Nat Hentoff, from ever being invited to speak at universities again, lacked Speech and Debate protection, at least to the extent it was being published, like the Pentagon Papers in *Gravel.* House counsel's statement that "The Clause's absolute immunity extends to all civil actions" (p. 7) fails under these cases.

Although House counsel never uses the phrase "presumption of regularity", this is obviously what they are referring to when they say at page 13, "[C]ourts must assume that the action of the legislative body was with a legitimate object, if it is capable of being so construed, and [the court] ha[s] no right to assume that the contrary was intended". However, as a District Judge held in Oregon recently, given intemperate government behavior similar to that asserted in the FAC: "The presumption of regularity that has been previously extended to [the federal government] that it could be taken at its word with little doubt about its intentions and stated purposes no longer holds. When [the government], in this case, conveys assurances that any private and sensitive data will remain private and used only for a declared and limited purpose, it must be thoroughly scrutinized and squared with its open and public statements to the contrary", *United States v Oregon,* 2026 US Dist LEXIS 25259, at *34 (D Or Feb. 5, 2026, No. 6:25-cv-01666-MTK).

I am not aware of any case law standing for the proposition that the Speech and Debate clause goes so far as to preclude the use of any Congressional speech, including that uttered on the floor of the house, from being introduced merely as evidence. This is, of course, done every day, in cases where judges are tasked with determining legislative intent, for example, *Frankel v SEC,* 460 F2d 813, 816 (2d Cir 1972), *cert. den.* 409 U.S. 889 (1972).

Since I may have misunderstood what counsel intended here, or (given the lack of a case cite), they may not have been seriously advancing this argument, I will not devote more space to it, but would be happy to file a supplemental brief on this or any other issue if Your Honor wishes, *Milwaukee Elec. Tool Corp. v Individuals,* 2026 US Dist LEXIS 76505, at \*5 (SDNY Apr. 3, 2026, No. 1:26-cv-2720-GHW).

 A few months ago, Judge Hasan Kingo of the Supreme Court, New York County,  asked, on another controversial Palestine case,  "[W]hat is the issue with [you] withdrawing this case at this juncture and mark[ing] it off the Court's calendar. And you can do as you wish in terms of trying to resolve it. I don't understand what the Court's involvement is." *Tellez v. NYC Dept. of Parks,* 100628/2025 (Supreme Court, N.Y. County 2025) (NYSCEF #39). In Judge Kingo's courtroom, "There used to be history, but there isn't any more". Guy Debord, *La Societe du Spectacle* (Paris: Gallimard 1992) p. 142.

A judge whom I greatly admire, who knew what to do when history showed up, was the Hon. Gerhard Gesell, of Washington, who granted a request by the journalist Nat Hentoff for an injunction against the House Unamerican Activities Committee: "[T]he Report not only fails to indicate any legitimate legislative purpose, but on its face contradicts any assertion of such a purpose...The conclusion is inescapable that the Report neither serves nor was intended to serve any purpose but the one explicitly indicated in the Report: to inhibit further speech on college campuses by those listed individuals and others whose political persuasion is not in accord with that of members of the

Committee," *Hentoff v. Ichord, supra.*

I respectfully hope, however, that Your Honor will follow Judge Gesell's pathway, not Judge Kingo's.

## Argument

### Point One

### THE MOTION TO DISMISS DOES NOT MEET RULE 11 STANDARDS

The House Committee's motion does not meet F.R.C.P. Rule 11(b)'s requirements that each attorney, by signing a pleading, certifies that "(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information."

The motion's misuse of *Twombly/Iqbal* is not a "nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law".  As the Plaintiffs anticipatorily asserted at Complaint paragraphs 82-83: "Defendants will ask this Court to apply a very demanding standard of *proof* to the Complaint, using as justification the 'plausibility' language of *Iqbal* and *Twombly*. This Court should not accept the invitation, *Hemme v Airbus,* 2010 US Dist LEXIS 31920, at *14 (ND Ill Apr. 1, 2010, No. 09 C 7239) ('Motorola misinterprets the plausibility standard of *Twombly* and *Iqbal* as an opportunity to make premature merits-based arguments regarding Plaintiffs' claims at the pleading stage. The Supreme Court has not imposed a probability requirement on plaintiffs[;] Plaintiffs have satisfied their burden of pleading by presenting sufficient facts to foster an expectation

14

that discovery will uncover evidence supporting their  allegations'); *KSW Mech. Servs. v Mech. Contrs. Assn. of NY,* 2012 US Dist LEXIS 63507, at \*3-4 (SDNY May 4, 2012) ('[T]he Association both misinterprets *Twombly* and *Iqbal* and misreads the Complaint...*Twombly* and *Iqbal* did not disturb the well-settled rule that courts must accept as true the reasonable inferences that [can] be drawn from [a plaintiff's] allegations'); *Mathews v Verizon Communs. Inc.,* 2020 US Dist LEXIS 158270, at \*22-23 (DNJ Sep. 1, 2020, Civil Action No. 19-21442) ('[T]he Court agreed with the plaintiff that '[d]efendants have misinterpreted what is required at the pleading stage under *Twombly,*' and that '[w]hile [d]efendants are correct that [p]laintiff's claims must be plausible on their face, there is no requirement that [p]laintiff must also plead a plausible motive for [d]efendants' actions... [P]laintiff is only required to provide enough factual matter (taken as true) to suggest the required element[s] of the claims asserted'); *Griffin-El v Beard*, 2009 US Dist LEXIS 92975, at \*6-7 (ED Pa Oct. 5, 2009, No. 06-2719) ('In this case, plaintiff, unlike the case in *Iqbal,* has plead sufficient factual allegations for the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged, and has therefore met the pleading requirement of Federal Rule of Civil Procedure 8(a)'); *H2O Plus, LLC v Arch Personal Care Prods., L.P.,* 2011 US Dist LEXIS 54767, at \*12-13 (DNJ May 17, 2011, No. 10-3089 (WJM-MF)) ('The Court agrees with Plaintiff that Defendants have misinterpreted what is required at the pleading stage under *Twombly*. While Defendants are correct that Plaintiff's claims must be plausible on their face, there is no requirement that Plaintiff must also plead a plausible motive for Defendants actions')."

While the College motion asks this Court to resolve disputed fact issues based on assertions in the Silver affidavit, the House Committee motion asks this Court to do the same based on hearsay assertions from random commentators on the Internet. A prime example is the assertion at the bottom of page 2 that  "The students themselves acknowledged that they did this to 'answer[] [Hamas's] call'". This very critical-- and defamatory-- statement is sourced at Footnote 2: "Steve McGuire

15

(@sfmcguire79), X (Dec. 8, 2024, 12:04 PM), https://perma.cc/7PVJ-55Q5."

Steve McGuire is not a member of SJP. He is not a student at Sarah Lawrence. He is not a faculty member there[13]. He is a random Internet commenter whose opinion that SJP members "acknowledged" anything, is pure hearsay. He has no first hand knowledge of the events. He could never be called as a witness at a hearing or trial.

These statements, even if disguised as "plausibility" assertions, ask this Court to determine, without discovery, a hearing or the Plaintiffs' counsel having any opportunity to cross-examine, that an assertion based on random Internet hearsay is true, and that contradictory assertions made in the complaint are false.

The House Committee's prejudgment that Plaintiffs are antisemites, and its willingness to defame them in its letters and reports, based on random Internet hearsay, supports Plaintiffs' thesis that it lacks a legitimate legislative purpose. Why would counsel then use them in a signed pleading? Quoting statements like Steve McGuire's in a pleading filed with the Court violates rule 11(b)(3)'s requirement of " evidentiary support".

For that matter, why would any litigant in federal court misinterpret *Twombly* and *Iqbal*? Government counsel appear to be locked in to their client's position that the IHRA standards are constitutional, and that anti-Zionism is antisemitism. However, they never (in my experience) seem to do so by arguing that existing law is wrong, or for an extension; they merely ignore it.

**Point Two**

**CONGRESS IS NOT A NECESSARY PARTY TO AN ACTION AGAINST THE COLLEGE**

Judge Subramanian in the recent *Khalil* decision found, that Columbia, by "leaning in" to coercion, could be deemed a state actor, at least for the purposes of denying a 12(b)(6) motion. "Coercion to violate a third party's constitutional rights doesn't equal 'mere compliance'; it's state

---

13  See his bio at https://www.goacta.org/staff/steven-mcguire/

action," *Khalil v Trustees of Columbia Univ. in the City of NY,* 2026 US Dist LEXIS 58267, at *37 (SDNY Mar. 19, 2026, No. 25-cv-2079 (AS)).

*Kahlil* stands for the proposition that students can sue a university for its compliance with a House subpoena or information letter, without Congress being a party. So does *Republican Natl. Comm. v Pelosi,* 2022 US Dist LEXIS 91503 (DDC May 20, 2022, Civil Action No. 22-659 (TJK)], *vacated on other grounds,* 2022 U.S. App. LEXIS 26068 (DC Cir Sep. 16, 2022, No. 22-5123), which analyzes at length how the recipient of a Congressional subpoena may be sued in the absence of Congress itself.

House counsel never cited *RNC.* "Defendants' failure to cite, let alone address" controlling authority violates Rule 11. *Pacheco v Chickpea at 14th St. Inc.*, 2019 US Dist LEXIS 210725, at *5 (SDNY Dec. 6, 2019, No. 18-CV-251 (JMF) (GWG)).

The *Fakhreddine* case in E.D. Pa., (cited by my honorable adversary) is epitomized by Judge Goldberg's  Need I say more than that Judge Goldberg  decided on the merits, on a 12(b)(6) motion, that the House Committee's intervention with the University could not be coercive, because the House Committeee said *please*:  "'To assist the Committee in understanding the antisemitism crisis at Penn and the university's response, *please produce* the following items no later than February 7, 2024.'" (His italics). "I do not find this language coercive". *Fakhreddine v Univ. of Pennsylvania,* 2025 US Dist LEXIS 16373, at *12 (ED Pa Jan. 30, 2025, Civil Action No. 24-cv-1034). Judge Goldberg also adroitly navigated his way to a finding that Dr. Fakhreddine, who had been defamed as an antisemite by two Congresspeople on national television (who demanded she be fired) and also in the information letter the House Committee sent, and who had been ostracized, denied promotion,  had events canceled, and been dropped from email lists by the University, lacked Article III standing to sue.[14]

---

14 The Third Circuit Court of Appeals modified Judge Goldberg's dismissal of the complaint with prejudice, to without prejudice. I am drafting a new complaint, which I will file in the next few weeks. In the end, the case stands only for the proposition that we did not plausibly plead standing, not that Dr. Fakhreddine did not have it, *Fakhreddine v Univ. of Pennsylvania,* 2026 LX 22085 (3d Cir Jan. 9, 2026, No. 25-1290).

Also contradicting Judge Goldberg's holding that saying "please" obviates coercion, are a line of cases finding that DOE's "Dear Colleague" letter to universities were inherently coercive, *Doe v Univ. of the Sciences,* 961 F3d 203, 214 (3d Cir 2020).

The worst impact of this case, is that Judge Goldberg's false statement that I conceded that the University had not been coerced has gone viral; Judge Subramanian quoted, but distinguished it in *Khalil,* and here it is again being cited by House counsel. I never said that; read my original complaint and the amended one. I asserted that the University was being savagely bullied by the House Committee, and that it leaned in to thew coercion, like *Columbia,* via its "voluntary" compliance. This is an instance of what I call in the Essay "Games with Words". It is also a sad instance of how an ill-considered or sophistical expression by a judge, which often takes only a moment to phrase, can harm people like the Plaintiffs for years afterwards.

Why, by the way, does the House Committee care so much that the Plaintiffs' action against the University also be dismissed? Are there coercive "smoking gun" communications between the House Committee and the College which the House Committee is concerned would still be discoverable?

## Point Two

### PLAINTIFFS HAVE, AND HAVE ADEQUATELY PLED, STANDING

The House  challenges standing under FRCP 12(b)(1), on the theory that if standing does not exist, the Court lacks subject matter jurisdiction. "To satisfy the requirements of Article III standing, a party must show that (1) the party has suffered an actual or imminent injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and conduct complained of; and (3) it is likely that a favorable decision in the case will redress the injury"*, Roman v Greenwich Vil. Dental Arts P.C.,* 2022 US Dist LEXIS 165400, at *3-4 (SDNY Sep. 13, 2022, No. 21-cv-5939 (JGK))

18

It is well-settled that this Court has discretion to order limited discovery pertaining to subject matter in advance of deciding a motion to dismiss, *Filus v Lot Polish Airlines*, 907 F2d 1328, 1332 (2d Cir 1990) ("[G]enerally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue"); *Alliance for Envtl. Renewal, Inc. v Pyramid Crossgates Co.,* 436 F3d 82, 88 (2d Cir 2006) (Grant of "limited discovery on the jurisdictional issue"); *Brocsonic Co. v M/V Mathilde Maersk*, 120 F Supp 2d 372, 375 (SDNY 2000), aff'd 270 F.3d 106 (2nd Cir. 2001); *1964 Realty LLC v Consulate of the State of Qatar-New York,* 2015 US Dist LEXIS 118547, at *23 (SDNY Sep. 4, 2015) ("Therefore, limited jurisdictional discovery as to these factual issues, along with additional briefing as to the applicable law, is necessary before the Court can make any determination as to actual authority")*;*

*Robinson v Blank,* 2013 US Dist LEXIS 72068, at *17-20 (SDNY Feb. 22, 2013) ("[W]here a plaintiff's Article III standing has been placed in issue on a Rule 12(b)(1) motion, the court may choose to decide the motion based on limited discovery"); *Burlington Ins. Co. v MC&O Masonry, Inc.,* 2018 US Dist LEXIS 111998, at *7 (EDNY July 5, 2018, No. 1:17-cv-02892-FB-SMG) ("The parties shall conduct limited discovery to determine the identity and citizenship of the members of FSLM and First Avenue").

Once discovery has been conducted, "[t]he Court may resolve the factual issues concerning jurisdiction either on a summary judgment motion, if appropriate, or, if not, after an evidentiary hearing", *Alliance for Envtl. Renewal, Inc. v Pyramid Crossgates Co.*, 436 F3d 82, 83-84 (2d Cir 2006).

"The dismissal of a claim challenging a law that abridges protected speech will rarely, if ever, be appropriate at the pleading stage. Instead, factual development will likely be indispensable to the assessment of whether [such state action] is constitutionally permissible....Careful balancing of the need for the [action] against [its] constriction of first amendment rights is called for. Full development

of the facts is essential for the court to strike this balance", *Cornelio v. Connecticut,* 32 F.4th 160, 172

(2d Cir. 2022); *Nicholas v Mason,* 2023 US Dist LEXIS 236719, at *17 (DNH Dec. 28, 2023, No. 23-

cv-196-LM-A]) ("[T]he norm is to wait until the summary judgment stage of the litigation to address

the ultimate question of whether the [restriction] should stand").

**CONCLUSION**

The motion to dismiss should be denied.

DATED: Amagansett, NY
May 4, 2026

/s/ Jonathan Wallace
Jonathan Wallace
PO #728
Amagansett NY 11930
917-359-6234
jonathan.wallace80@gmail.com
Counsel for Plaintiffs

CERTIFICATE OF SERVICE AND COMPLIANCE

I certify that on May 4, 2026, I caused the foregoing document to be filed via this

Court's CM/ECF system, which I understand caused service on all registered parties, and one

courtesy hard copy of this document, the Notice of Motion, and the Declaration of Sana Cheema,

to be mailed to the below address pursuant to the Court's Individual Rules of Practice 1.E and

2.B.ii:

Chambers of The Honorable Cathy Seibel
U.S. District Judge for the Southern District of New York
The Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse
300 Quarropas Street
Room 633
White Plains, NY 10601-4150

I further certify that the foregoing document contains 6435 words, which is compliant with

Local Civil Rule 7.1(c).

/s/ Jonathan Wallace